# In the United States Court of Federal Claims

No. 10-480 C
(Filed Under Seal: September 17, 2010)
(Reissued: November 19, 2010)[*]

```
*********************************************
BILFINGER BERGER AG SEDE              *
SECONDARIA ITALIANA,                  *
                                      *    Post-Award Bid Protest; 28 U.S.C.
            Plaintiff,                *    § 1491(b); Motion to Dismiss;
                                      *    RCFC 12(b)(1); RCFC 12(b)(6);
v.                                    *    Unreasonable Delay; Laches;
                                      *    Standing; A & D Fire Protection,
THE UNITED STATES,                    *    Inc.; Dismas Charities, Inc.;
                                      *    Implied-in-Fact Contract; Resource
            Defendant,                *    Conservation Group, LLC;
                                      *    Preliminary Injunction; Likelihood
and                                   *    of Success on the Merits; Irreparable
                                      *    Harm; Balance of Harms; Public
COOPERATIVA MURATORI RIUNITI,         *    Interest
                                      *
            Defendant-Intervenor.     *
*********************************************
```

Seamus Curley, Washington, DC, for plaintiff. Fernand A. Lavallee and C. Bradford Jorgensen, of counsel.

L. Misha Preheim, United States Department of Justice, Washington, DC, for defendant. Katherine Denzel, United States Army Corps of Engineers, Europe District, of counsel.

Joseph Hornyak, McLean, VA, for defendant-intervenor. T. Wayne Gray and Megan Mocho Jeschke, of counsel.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court in this post-award bid protest are Plaintiff's Motion for a Preliminary Injunction and Defendant's Motion to Dismiss. Plaintiff Bilfinger Berger AG Sede Secondaria

---

[*] The parties submitted their proposed redactions as an exhibit accompanying their November 17, 2010 joint motion to dismiss without prejudice. All redactions are indicated by a bracketed ellipsis ("[. . .]").

Italiana ("BBSSI") requests that the court issue a preliminary injunction (1) preventing the United States Army Corps of Engineers ("Corps") from issuing any task orders to the awardee and defendant-intervenor, Cooperativa Muratori Riuniti Impresa Generale di Construzioni ("CMR"), under Job Order Contract ("JOC") number W912GB-10-D-0007, and (2) requiring the Corps to suspend performance of the JOC, including all task orders issued to CMR, until this action is resolved.[1]  Defendant moves to dismiss the complaint pursuant to RCFC 12(b)(1) and 12(b)(6).  For the reasons set forth below, defendant's motion to dismiss is denied in part and plaintiff's motion for a preliminary injunction is granted.

Due to the length of this opinion, the court provides the following table of contents:

I. FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   A.  The Solicitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      1.  Evaluation Factors for Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      2.  The Societa Organismi D'Attestazione ("SOA") Certification System. . . . . . 7

         a.  Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         b.  Procedure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      3.  Solicitation Requirements Related to the SOA Certificate. . . . . . . . . . . . . . 10

   B.  Submission of Proposals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   C.  The Corps' Competitive Range Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      1.  Adjectival Ratings Assigned by the TEB. . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

         a.  Experience Factor Ratings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

         b.  Past Performance Factor Ratings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         c.  Management Approach Factor Ratings. . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.  Evaluation of Price by the TEB. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      3.  The TEB's Ratings of Offerors' Proposals. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   D.  Discussions With BBSSI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      1.  Experience Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         a.  The Debarred Contractor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         b.  BBSSI's Explanation Concerning the Experience Factor. . . . . . . . . . 20

      2.  Management Approach Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      3.  Pricing Factor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      4.  BBSSI's Italian Submissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         a.  BBSSI's Legal Position Concerning Its Use of BBH's SOA Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            i.  Discussions Prior to the December 4, 2009 Competitive Range Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

---

[1]  Both the Tucker Act, 28 U.S.C. § 1491(b)(2) (2006), and Rule 65 of the Rules of the United States Court of Federal Claims ("RCFC") grant the United States Court of Federal Claims ("Court of Federal Claims") the authority to issue temporary restraining orders.  In accordance with RCFC 65(b), the court, on August 20, 2010, issued a temporary restraining order, which was extended on September 3, 2010.

        ii.  Discussions Following the December 4, 2009 Competitive
            Range Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      b.  BBSSI's Representations That It Was Separate From BBH. . . . . . . . 24
  E.  Procurement of a Legal Opinion Concerning SOA Certificates Under Italian Law. . 25
    1.  The Corps' Solicitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    2.  The Italian Legal Opinion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      a.  The Background Section. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      b.  The SOA Qualification System Section. . . . . . . . . . . . . . . . . . . . . . 27
      c.  <u>Avvalimento</u> Under the Italian Code Section. . . . . . . . . . . . . . . . . . 27
      d.  The Conclusions Section.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
  F.  The Corps' Source Selection Decision Document ("SSDD"). . . . . . . . . . . . . . . . 32
    1.  Technical Results. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
      a.  Experience Factor in BBSSI's Proposal. . . . . . . . . . . . . . . . . . . . . 33
      b.  Past Performance Factor in BBSSI's Proposal. . . . . . . . . . . . . . . . . 34
      c.  Management Approach Factor in BBSSI's Proposal. . . . . . . . . . . . 35
    2.  Price Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    3.  Tradeoff Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    4.  Responsibility Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    5.  Source Selection Decision.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
  G.  Post-Award Communications Between the Corps and BBSSI. . . . . . . . . . . . . . . 40
    1.  Notification of Unsuccessful Offeror to BBSSI. . . . . . . . . . . . . . . . . . . . . 40
    2.  BBSSI's Request for a Debriefing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    3.  The Corps' Written Debriefing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
  H.  Post-JOC Solicitation Discussions Between the Corps and BBSSI.. . . . . . . . . . . 46
    1.  Reconsideration of the JOC Award and Participation in the Italy MATOC
        Procurement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    2.  Issues Related to the Predecessor JOC. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
  A.  Proceedings Before the GAO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
  B.  Proceedings Before the Court of Federal Claims. . . . . . . . . . . . . . . . . . . . . . . . . . 50

III.  LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
  A.  Bid Protests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
  B.  Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
  C.  Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    1.  RCFC 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    2.  RCFC 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
  D.  Preliminary Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
  A.  Defendant's Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    1.  Whether BBSSI Engaged in Unreasonable Delay. . . . . . . . . . . . . . . . . . . 58

         a.  Standards for a Laches Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
         b.  The Parties' Arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
         c.  BBSSI's Delay Was Not Unreasonable. . . . . . . . . . . . . . . . . . . . . . . . 61
    2.  Whether BBSSI Possesses Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
         a.  Defendant Has Not Demonstrated That any SOA Certificate
             Deficiencies Could Not Be Cured. . . . . . . . . . . . . . . . . . . . . . . . . 62
         b.  The Solicitation Did Not Require an Offeror to Submit an SOA
             Certificate in Its Own Name. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
         c.  Absent the Alleged Procurement Error, BBSSI Would Have Had a
             Substantial Chance of Receiving the JOC Award. . . . . . . . . . . . 72
         d.  The Corps' Decision to Make a Single Award. . . . . . . . . . . . . . . . . . 73
    3.  Whether BBSSI's Implied-in-Fact Contract Claim Is Barred by Federal Circuit
        Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
  B.  BBSSI's Motion for a Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    1.  Whether BBSSI Is Likely to Succeed on the Merits. . . . . . . . . . . . . . . . . . . . 79
    2.  Whether BBSSI Will Suffer Immediate and Irreparable Harm. . . . . . . . . . . . 85
    3.  Whether the Harm BBSSI Will Suffer Outweighs the Harm to Defendant and
        to CMR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
    4.  Whether Injunctive Relief Is in the Public Interest. . . . . . . . . . . . . . . . . . . . . 89

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

# I.  FACTUAL BACKGROUND[2]

## A.  The Solicitation

On May 12, 2009, the Corps issued a solicitation requesting proposals for a firm-fixed-price,[3] indefinite delivery/indefinite quantity ("IDIQ") JOC for real property repair, maintenance,

---

[2]  The facts are derived from the following: the complaint ("Compl."); the appendix accompanying BBSSI's motion for a preliminary injunction ("Pl.'s App."); the declaration of Juergen Hagner, Chief Executive Officer and President of Bilfinger Berger Government Services GmbH ("BBGS"), a wholly owned subsidiary of Bilfinger Berger AG ("BBAG"), accompanying BBSSI's motion for a preliminary injunction ("Hagner Decl."); exhibits accompanying defendant's motion to dismiss ("Def.'s Ex."); exhibits accompanying BBSSI's memorandum of points and authorities in support of its August 12, 2010 motion for leave ("Pl.'s Mem. Ex."); BBSSI's supplemental brief ("Pl.'s Supp'l Br.") and exhibit appended thereto ("Pl.'s Supp'l Br. Ex."); and CMR's supplemental memorandum ("Def.-Intervenor's Supp'l Mem.") and appendices ("Def.-Intervenor's Supp'l Mem. App.").

[3]  A firm-fixed-price contract is one that "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  48 C.F.R. § 16.202-1 (2008).  It is "suitable for acquiring commercial items . . . or for acquiring

minor construction, and/or asbestos abatement at various United States Department of Defense facilities located in Italy.[4]  Compl. ¶ 17; Pl.'s App. 3, 14, 37.  Tracy L. Wickham served as the contracting officer for the JOC procurement.  Compl. ¶ 14; Pl.'s App. 117.  Performance of the work encompassed by the JOC spanned one base year with two option years.  Pl.'s App. 88.  The maximum value of the JOC was $30,000,000 with an estimated annual amount of $10,000,000 that could not exceed $15,000,000 during any period.  Id.

Task orders under the JOC addressed general building renovation, road and pavement repair, and general environmental work, and specifically included: incidental, new minor construction; excavation; plumbing; demolition; electrical, structural, and mechanical work; concrete work; environmental remedial work; and force protection.  Id. at 14.  Offerors were advised that an award would be made to "one Offeror who is deemed responsible in accordance with the Federal Acquisition Regulation [("FAR")], conforms to the solicitation requirements, and whose proposal, judged by an overall assessment of the evaluation criteria and other considerations specified in this solicitation, represents the Best Value (Cost Technical Trade-Offs) to the Government."  Id. at 23-24.  The Corps reserved the right to award the JOC to "other than the lowest offer received," id. at 28, and "to make multiple awards if, after considering the additional administrative costs, it [was] in the Government's best interest to do so," id. at 36.

### 1.  Evaluation Factors for Award

The Corps was to evaluate proposals based upon four factors: (1) experience; (2) past performance; (3) management approach; and (4) price.[5]  Id. at 23.  The JOC solicitation advised offerors that the experience factor was deemed "slightly more important" than the past performance factor, which, in turn, was deemed "slightly more important" than the management approach factor.  Id. at 24.  A combination of these three factors was "approximately equal to Cost or Price."  Id.

---

other supplies or services on the basis of reasonably definite functional or detailed specifications . . . when the contracting officer can establish fair and reasonable prices at the outset . . . ."  Id. § 16.202-2.

[4]  The JOC contemplated work "throughout Italy[,] primarily in Vicenza[,] with additional work anticipated in Livorno and Aviano . . . [, and] other areas in Italy . . . ."  Pl.'s App. 89.

[5]  Price is also referred to as "Coefficients" throughout the JOC solicitation.  See, e.g., Pl.'s App. 27 (indicating that an evaluation of the price factor "will be performed on the proposed Coefficients for the base period and all option periods" and explaining that, with respect to the total contract bottom line sum, "any inconsistency, whether real or apparent, between proposed performance and proposed coefficients (price) must be clearly explained in the Price Proposal").

First, with respect to the experience factor, the Corps was to evaluate proposals based upon relevant projects that, among other things, were "designed and constructed in accordance with criteria similar to those required herein, constructed in Italy; recently completed; and that demonstrate multiple trades and experience managing multiple projects simultaneously . . . ."[6] Id.  Second, with respect to the past performance factor, the Corps was to evaluate each proposal based upon, among other things, the offeror's "own past performance . . . and on the past performance of any Joint Venture partners whose projects the Offeror may have submitted."[7]  Id. at 25.  Third, with respect to the management approach factor, the Corps was to evaluate proposals based upon, among other things, "reasonableness, risk, and logic" and "illustrat[ion of] a basic understanding of managing the contract . . . ."[8]  Id. at 26.  Finally, with respect to the price factor, the Corps was to evaluate proposals based upon several criteria, namely: (1) completeness;[9] (2) reasonableness;[10] (3) normal-hours and other-than-normal-hours coefficients, and non-prepriced overhead and profit factors;[11] (4) bottom line sum for base period and option

---

[6]  The Corps evaluated projects performed by offerors that demonstrated experience in the following categories: (1) building renovations, including floors, doors, walls, windows, external façades, and roofs; (2) repair/replacement of major building systems, such as electrical, mechanical, and heating and air conditioning; (3) civil work that included concrete/asphalt roads and pavements, earthwork, and drainage structures; environmental work; (4) and force protection.  Pl.'s App. 24.  The Corps also characterized "relevant projects" as those that, in addition to the above requirements, demonstrated offerors' experience managing multiple projects simultaneously.  Id.

[7]  The Corps evaluated the following criteria as part of the past performance factor: (1) quality of product; (2) timeliness of performance; (3) cost control; (4) business practices; (5) customer satisfaction; (6) key personnel; (7) utilization and management of subcontractors/team members; (8) cooperative manner; and (9) safety.  Pl.'s App. 25-26.

[8]  The Corps sought from offerors an organizational chart that indicated "[c]learly delineated lines of authority" and was "organized in a precise and logical manner including the relationship between the headquarters' office and the site office, including all involved with the management of the contract including subcontractors and joint venture partners."  Pl.'s App. 26.  It also expected offerors to furnish comprehensive descriptions of duties, roles, responsibilities, and authorities for key personnel, "including roles of authorities for joint venture partners . . . ."  Id.

[9]  See infra Part I.C.2.

[10]  See infra Part I.C.2.

[11]  In addition to reviewing proposals for completeness and reasonableness, the Corps "reserve[d] the right to question and/or reject coefficients and factors that are not reasonable in comparison to current market values and other competitive proposals."  Pl.'s App. 27.

periods; (5) total contract bottom line sum; (6) price factor;[12] and (7) a determination of the bottom line sum.  Id. at 27-28.

## 2.  The Societa Organismi D'Attestazione ("SOA") Certification System[13]

### a.  Background

As part of their price proposals, offerors were required to submit various documents, including an SOA certificate.  Id. at 15.  The requirement for offerors to produce an SOA certificate stems from the execution of an October 20, 1954 Bilateral Infrastructure Agreement ("BIA") between the United States and Italy.  Pl.'s Mem. Ex. 2 at 3; Def.-Intervenor's Supp'l Mem. 2.  The BIA "regulates the cradle-to-grave life cycle of U.S. funded military infrastructure projects in Italy."  Pl.'s Mem. Ex. 2 at 3.  Specifically, it provides that

> all infrastructure built, upgraded or repaired by U.S. funds will eventually be
> consigned to the Italian Government and, therefore, must conform to Italian norms
> and laws.  Thus, any construction, upgrade or repair of a facility must be
> considered as "executed on behalf of the Italian Government" and[,] as such, must
> comply with all Italian regulations and technical norms and standards.

Id.; accord Def.-Intervenor's Supp'l Mem. 2.

Established by Law number 109/1994, the Italian procurement authority for public works, Autorità per la Vigilanza sui Contratti Pubblici di Lavori, Servizi e Forniture ("AVCP"),[14] is tasked with supervising Italian public contracts and ensuring transparency and competition

---

[12]  The price factor comprised the sum of two products per line item.  Pl.'s App. 27.  The first product was the normal-hour coefficient ("NHC") multiplied by the anticipated amount of work to be performed during normal working hours (or 95%).  Id.  The second product was the proposed other-hour coefficient ("OHC") multiplied by the anticipated amount of work to be performed during other hours (or 5%).  The sum of the first and second products yielded the overall price evaluated by the Corps.  Id.  Mathematically, this calculation is expressed as

$$\text{First Product (NHC} \times 0.95) + \text{Second Product (OHC} \times 0.05) = \text{Price Factor}$$

Id. at 28.

[13]  The information contained in this section is derived, in part, from an Italian legal opinion obtained by the Corps.  See infra Parts I.E.1-2.

[14]  The AVCP is the "Authority for the Supervision of Public Contracts for Works, Services, and Supplies."  See AVCP, at http://www.avcp.it/portal/public/classic/ MenuServizio/english (last visited Sept. 16, 2010).

within the public procurement market.  Def.-Intervenor's Supp'l Mem. 3.  Pursuant to Presidential Decree ("D.P.R.") number 34/2000, all contractors seeking a contract award for Italian public works must demonstrate that they possess the requisite technical and organizational capabilities, have "good" economic and financial standing, and comply with specified quality standards.[15]  Id.  Pursuant to D.P.R. number 34/2000, the AVCP was designated the governing authority over the SOA qualification system, and it was charged with supervising and authorizing the SOA, a collection of private certification companies ("SOA company" or, collectively, "SOA companies").  Id.  The SOA companies are tasked with certifying that contractors comply "with the European Quality Certification standards, their technical and organizational capabilities, [and] their economic and financial standing . . . ."[16]  Pl.'s App. 264.  Additionally, they are responsible for (1) accepting applications from contractors seeking to obtain SOA certificates, (2) evaluating applications for renewals of SOA certificates, (3) issuing the appropriate level of SOA certification, and (4) evaluating renewals of SOA certificates.  Def.-Intervenor's Supp'l Mem. 3.

Pursuant to Article 15 of D.P.R. number 34/2000, "in case of merger or other operations which imply a transfer of the business or of a business branch, the assignee can rely on the requirements of the assignor companies at the aim of the release of a new SOA certificate."  Pl.'s Supp'l Br. Ex. 2-3.  According to BBSSI,

> [f]rom a literal interpretation of the cited provision it seems possible to affirm that in case of transfer of a business branch–or other company transformation–it is not possible to transfer the existing SOA certificate to the new company but it is instead necessary to revoke the SOA of the assignor and to require a new attestation referred to the new company (the assignee).  The abovementioned provision clarifies that the assignee can file an application for the new SOA [certificate] relying on the requirements of the assignor.

---

[15]  As part of the Italian Code of Public Procurements ("Italian Code"), which is also referred to as either the Codice degli Appalti or the Codice de Lise, Article 40 of Legislative Decree number 163/2006 requires that contractors intending to participate in bids for the award of public works contracts by the Italian Public Administration be eligible to do so under a qualification system.  Pl.'s App. 264.  Specifically, in order for a contractor to receive a public works contract award for an amount greater than € 150,000, it must "act in compliance with the principles of quality, professionalism and fairness, and also prove to have the technical and organizational capabilities and economic and financial standing."  Id.  In the absence of the promulgation of a regulation, the SOA certification system is governed by D.P.R. number 34/2000.  Id.

[16]  There are numerous SOA Companies throughout Italy, including but not limited to Protos S.p.A., Attesla S.p.A., Delo.Sovim S.p.A., Euro SOA S.p.A., La Soatech S.p.A., Oprah SOA S.p.A., SOANC S.p.A., and SOA Quadrifoglio S.p.A.  Def.-Intervenor's Supp'l Mem. 3 & n.4.

> Therefore, by means of the transfer of business or of business branch the assignee acquires not only an organized complex of goods and services for the business activity but also the possibility of making use of the economic-financial and technical-organizational requirements of the assignor, necessary to obtain the SOA attestation.  In particular, the new company could rely on the turnover, the labour cost, the amortizations, leasing, rentals and certificates of completed works . . . of the assignor company.

Id. at 3.

The AVCP issued several resolutions concerning the qualification of assignees. Specifically,

> by means of resolution [number] 5/2003[,] the [AVCP] specified that the operation implying the transfer of a business or of a business branch does not imply, in its turn, the "transfer" of the qualification of the assignor but only the possibility (and not the necessity) for the assignee to rely, for its qualification, on the requirements (and therefore not on the certification itself, considered as the result of the evaluation of the requirements) of the assignor company/companies.

Id.  The assignee "applies for a new SOA [certificate]–and it does not require the transfer of the existing SOA [certificate]."  Id.

### b.  Procedure

The process for obtaining an SOA certificate is regulated by Article 15 of D.P.R. number 34/2000.  Def.-Intervenor's Supp'l Mem. 2-3.  First, the contractor seeking an SOA certificate must enter into an agreement with an SOA company in which it requests the issuance of an SOA certificate for a specific category and value of public works.  Pl.'s Supp'l Br. Ex. at 1.  General categories include construction, maintenance, restoration, or upgrading of thirteen types of projects (i.e., civil and industrial buildings, transportation routes, damns, pipelines, electrical plants, etc.).  Def.-Intervenor's Supp'l Mem. App. A at 1.  There are also thirty-three specialized categories, which include but are not limited to, excavation, sanitary facility work, carpentry, waste and disposal, surveying, demolition, parks and recreation, heating and air conditioning systems, railways, and acoustic work.  Id. at 2.  Each category is assigned a classification, which represents the value threshold within that category for which the contractor qualifies.[17]  Def.-Intervenor's Supp'l Mem. 4.

---

[17]  For example, work that is valued up to € 258,228 falls within classification I, work that is valued up to € 15,493,707 falls within classification VII, and work that generally exceeds € 20,658,276 falls within classification VIII.  Def.-Intervenor's Supp'l Mem. App. B at 1.  As noted in Part I.A.3, infra, the JOC solicitation required that contractors possess an SOA certificate within classification IV, which encompasses work valued up to € 2,582,284.

Second, once the contractor has entered into an agreement with an SOA company, it must furnish all documents necessary to demonstrate that it satisfies the requirements set forth in D.P.R. number 34/2000 for the issuance of an SOA certificate.[18]  Pl.'s Supp'l Br. Ex. at 2, 4. Once all of these submissions have been received, the SOA company conducts a due diligence investigation in order to verify the contractor's eligibility.  Id. at 2.  This verification process "can take up to 90 days" and may be interrupted or suspended at any time.[19]  Id.  However, the duration of any interruption or suspension of the process may not exceed ninety days.  Id.  The SOA company must, within 180 days after the contractor's submission of its application, either grant or deny the SOA certificate.  Id.  Thereafter, the SOA company has thirty days to convey its determination to the AVCP.  Id.

If a contractor is deemed compliant, then it is issued an SOA certificate.  Pl.'s App. 264; see also id. at 259 (indicating that the SOA certificate is an attestation of qualification for the execution of public works).  The SOA certificate comprises one page and includes, among other things, the name of the certified company, tax identification information, and the names and titles of the company's production managers.  Id. at 259.  It also "establishes and certifies for which category of works (general or specialised) and for which amount the company is qualified. Therefore, as a general rule, the company is able to participate [in] bids for contracts falling within the categories for which its SOA certification has been issued."  Id. at 264.  The SOA certificate is valid for five years.  Id.  At the conclusion of a three-year period, the contractor must participate in a verification process with the SOA company that issued the SOA certificate in order to confirm that the contractor still satisfies the requirements necessary to possess the SOA certificate.  See id.; Def.-Intervenor's Supp'l Mem. 6.

### 3.  Solicitation Requirements Related to the SOA Certificate

The JOC solicitation apprised offerors that they must comply with the requirements of D.P.R. number 34/2000 and subsequent amendments.  Pl.'s App. 42.  Additionally, it advised offerors that the

---

[18]  For example, the contractor must provide, among other things: (1) a citizenship certificate; (2) a procedure certificate demonstrating that no criminal proceedings are pending against any of the contractor's legal representatives and technical directors; (3) a police record demonstrating that no final judgment or irrevocable criminal degree of condemnation has been entered against any of the contractor's legal representatives and technical directors; (4) bank references; (5) financial information; and (6) other certifications ensuring that the contractor has not committed serious infringements during the execution of public works contracts and complies with safety regulations.  Pl.'s Supp'l Br. Ex. at 5-7.

[19]  For example, the SOA Company could interrupt or suspend the verification process if additional information or documentation is needed from the contractor.  Pl.'s Supp'l Br. Ex. at 2.

[f]ailure to furnish the documents required by this solicitation with your proposal may be cause for elimination of your proposal from competition. Firms must furnish additional back-up documentation requested by the contracting officer within the time period specified by the [c]ontracting [o]fficer. Failure to provide supporting documentation will subject the Contractor to possible termination for default of the contract. . . .

If this project is valued at over [€] 150,000[,] offerors must provide their S.O.A. [certificate] reflecting eligibility to bid on the work solicited, by work qualification and classification. The prevailing work categories and classification[s] are described in the pre-solicitation notice and in this solicitation. These work categories and classifications will also be described in individual task order requests for proposal and the S.O.A. [certificate] demonstrating eligibility will be required to be submitted with the task order proposal.

Id. at 42-43.

On June 2, 2009, the Corps issued Amendment 0001, which extended by one week the deadline for submission of proposals and incorporated various changes to the JOC solicitation. Id. at 100. Amended Section 00100, titled "Instructions, Conditions, and Notices to Bidders," enumerated four prequalification requirements. Id. at 100, 104. In order for an offeror to be determined qualified to submit an offer, the offeror was required to submit the following:

a.    A description of the teaming arrangement which demonstrates how the potential Offeror and their proposed team will meet the qualification requirements. List all the firms (including subcontractors) that will contribute toward satisfying the stated S.O.A. [certificate] requirements. State how each firm contributes towards the satisfaction of the requirements.

b.    A copy of **ALL** of the following Societa Organismi D'Attestazione (S.O.A.) Certifications, which have been established for this solicitation:

Prevailing Category of Work: CONTRACTOR QUALIFICATIONS

Offerors shall be qualified in accordance with [D.P.R. number] 34 of 25 Jan 2000, REGULATIONS FOR THE QUALIFICATIONS [OF] CONSTRUCTION FIRMS IN ITALY, IAW Legislative Decree 12 April 06 u. 163, the "De Lise Code" and subsequent amendments as follows:

**Class IV € 2.582.284.**

OG 1 Edifici Civili e Industriali

Civil and Industrial Buildings

c.  Contractors must comply with the following:
    Art. 38 of the De Lise Code as follows:

    •   Self certify they meet the requirements of Art. 38;
    •   Submit the "Documento Unico di Regolarità Contributiva"
        pursuant to Art. 2 of Legislative Decree [number] 210/2002
        concerted into law n. 266/2002, which embodies the relevant
        statements from INPS and INAIL;
    •   Submit a copy of the "Casellario Guidiziario" Certificate for each
        member of the company.

d.  If the potential Offeror is a joint venture, the joint venture members shall
    demonstrate how the joint venture team meets the S.O.A. certification
    requirements as stated in Paragraph 2, JOINT VENTURES.

Id. at 104-05.  No other solicitation provisions referenced additional requirements related to the
SOA certificate.  Compl. ¶ 22.

## B.  Submission of Proposals

On June 19, 2009, seven contractors submitted proposals in response to the JOC
solicitation: Basttistella SRL ("Basttistella"); BBSSI; CMR; Gemmo/Maltaura SpA ("Gemmo");
Lotos Costruzioni ("Lotos"); Pavan Costruzioni ("Pavan"); and SKE Support Services GmbH
("SKE").[20]  Pl.'s App. 150, 273.  BBSSI is the Italian branch of BBAG, a publicly traded German
corporation.[21]  Compl. ¶¶ 3, 21.  BBSSI, which engages in a wide range of government
contracting with the United States in Europe, id. ¶ 3, "has broad construction and related-work
experience, including work performed for the . . . Corps and other Federal agencies," id. ¶ 12.

---

[20]  All seven proposals "were found acceptable and forwarded to the Source Selection
Evaluation Board [("SSEB")] . . . for review."  Pl.'s App. 273.

[21]  According to Mr. Hagner, numerous BBAG divisions, branches, or subsidiaries have
competed for and performed procurement contracts in Europe for the United States government,
including BBSSI.  Hagner Decl. ¶ 3.  In 2009, BBGS was established, in part, "to compete for,
take on, and perform all such U.S. Government contracts in Europe prospectively."  Id.  The
creation of BBGS and its assumption of government contracts awarded to the Bilfinger group
"arose out of suspension and debarment proceedings" involving two BBAG subsidiaries:
Bilfinger Berger Hochbau GmbH ("BBH") and HSG Zander GmbH.  Id. ¶ 4.

BBSSI was the incumbent contractor under the predecessor JOC issued by the Corps.[22]  Id.

## C.  The Corps' Competitive Range Determination

On June 25, 2009, and October 27, 2009, the Technical Evaluation Board ("TEB") convened to determine which offerors were in the competitive range for discussion and negotiation purposes.[23]  Pl.'s App. 146, 274.  Proposals, as indicated in Part I.A.1, supra, were evaluated based upon four factors, and an award would "be made to that Offeror whose proposal contains the combination of those criteria offering the best overall value to the Government."  Pl.'s App. 146.  The Corps, which reserved the right to accept other than the lowest price offers and to reject any or all offers, id., issued its competitive range determination on December 4, 2009, id. at 154.

### 1.  Adjectival Ratings Assigned by the TEB

After reviewing each proposal, the TEB assigned a consensus adjectival rating for three of the four factors listed in the solicitation: experience, past performance, and management approach.  Id. at 147.

#### a.  Experience Factor Ratings

The TEB assigned one of six adjectival ratings for the experience factor: "Excellent"; "Good"; "Satisfactory"; "Marginal"; and "Unsatisfactory."[24]  Id.  An "Excellent" rating meant that the offeror's experience demonstrated "an exceptional understanding of the government's requirements.  The proposal offers numerous significant strengths which are not offset by weaknesses, if any.  The Government is extremely confident that the Offeror can successfully perform the anticipated services with little to very low risk with a high probability of success."  Id.  A "Good" rating meant that the offeror's experience demonstrated "a clear understanding and the proposal contains no deficiencies or significant weaknesses.  The proposal offers some strengths/significant strengths which are not offset by weaknesses.  The Government is confident that the Offeror can successfully perform the anticipated services with an overall low risk with a

---

[22]  On January 26, 2009, the Corps exercised the first option period on the predecessor JOC awarded to BBSSI.  Compl. ¶ 65.  The Corps did not exercise the second option period, and the JOC expired on March 10, 2010.  Id.; see infra Part I.H.2.

[23]  Although the Corps "intend[ed] to select, without discussions, the responsible Offeror that conform[ed] to the solicitation and [was] determined to be the best value to the Government," it "reserve[d] the right to conduct discussions as determined necessary by the Contracting Officer."  Pl.'s App. 146.

[24]  Because no proposal was assigned an "Unsatisfactory" rating, see infra Part I.C.3, its description is omitted.

good probability of success." Id. A "Satisfactory" rating meant that the offeror's experience demonstrated "a sufficient understanding and the proposal contains some weaknesses and no deficiencies. The Government is fairly confident that the Offeror can adequately perform the anticipated services with an overall low to moderate risk with an acceptable probability of success." Id. A "Marginal" rating meant that the offeror's experience did

> not demonstrate that the contractor fully understands all the objectives/
> requirements, and/or the proposal may contain deficiencies, and/or significant
> weaknesses. The Government is not confident that the Offeror can successfully
> perform all the anticipated services as required and possesses a moderate to high
> degree of risk and marginal probability of success.

Id.

### b. Past Performance Factor Ratings

The TEB assigned one of seven adjectival ratings for the past performance factor: "Excellent"; "Good"; "Adequate"; "Marginal"; "Poor"; and "Unknown."[25] Id. at 148. An "Excellent" rating meant that the offeror's past performance indicated "a highly successful performance record identified for evaluation and for all projects evaluated. The Government is extremely confident that the Offeror can successfully perform the anticipated services based on [its] performance record and overall risk of failure to perform is very low." Id. A "Good" rating meant that the offeror's past performance indicated "a successful performance record identified for the evaluation and for all or almost all of the projects evaluated. The Government is confident that the Offeror can successfully perform the anticipated services based on [its] performance record and overall risk of failure to perform is low." Id.

### c. Management Approach Factor Ratings

The TEB assigned one of five adjectival ratings for the management approach factor: "Excellent"; "Good"; "Satisfactory"; "Marginal"; and "Unsatisfactory."[26] Id. at 149. An "Excellent" rating meant that the offeror's management approach demonstrated "an excellent understanding of the government's requirements. The proposal offers numerous significant strengths which are not offset by weaknesses, if any. The Government is extremely confident that the Offeror can successfully perform the anticipated services with little very low risk with a high probability of success." Id. A "Good" rating meant that the offeror's management approach demonstrated "a good understanding and the proposal contains no deficiencies or significant

---

[25] Because no proposal was assigned an "Adequate," "Marginal," "Poor," or "Unknown" rating, see infra Part I.C.3, these rating descriptions are omitted.

[26] Because no proposal was assigned an "Unsatisfactory" rating, see infra Part I.C.3, this rating description is omitted.

weaknesses.  The proposal offers some strengths/significant strengths which are not offset by weaknesses.  The Government is confident that the Offeror can successfully perform the anticipated services with an overall low risk with a good probability of success."  Id.  A "Satisfactory" rating meant that the offeror's management approach demonstrated "a sufficient understanding of the government's requirements and the proposal contains some weaknesses and no deficiencies.  The Government is fairly confident that the Offeror can adequately perform the anticipated services with an overall low to moderate risk with an acceptable probability of success."  Id.  A "Marginal" rating meant that the offeror's management approach indicated

> a limited understanding of the anticipated effort under this requirement.  The proposal contains deficiencies and/or significant weaknesses and the strengths <u>do not</u> outweigh the weaknesses.  The Government is not confident that the Offeror can successfully perform all the anticipated services as required and possesses a moderate to high degree of risk and marginal probability of success.

Id.

## 2.  Evaluation of Price by the TEB

The TEB did not assign adjectival ratings for the price factor.  Id.  Instead, it evaluated proposals based upon two criteria: (1) "completeness"; and (2) "reasonableness."  Id.  In order for the proposed price to be deemed "complete," the offeror was required to "provide all data that is requested and necessary to evaluate the Coefficients.  The Government will assess the extent to which the proposed coefficients comply with the content and format requirements set forth in this solicitation."  Id.  With respect to "reasonableness,"

> [t]he Offeror's proposal is evaluated through price analysis techniques as described in FAR Subpart 15.305(a)(1).[27]  For Price (coefficient) to be reasonable, it must represent a Price (coefficient) that provides best value to the Government when consideration is given to prices in the market[] (market conditions may be evidenced by other competitive proposals), [and] technical and functional

---

[27]  Subpart 15.305(a)(1) of the FAR, which governs cost or price evaluations, provides:

Normally, competition establishes price reasonableness.  Therefore, when contracting on a firm-fixed-price or fixed-price with economic price adjustment basis, comparison of the proposed prices will usually satisfy the requirement to perform a price analysis, and a cost analysis need not be performed.  In limited situations, a cost analysis . . . may be appropriate to establish reasonableness of the otherwise successful offeror's price. . . .  The contracting officer shall document the cost or price evaluation.

48 C.F.R. § 15.305(a)(1).

capabilities of the Offeror.  The Offeror's proposed coefficients will be evaluated
to determine if any are unreasonably high or low in relation to the anticipated
work under the contract, as well as with current industry standards.

Id. at 149-50 (footnote added).

### 3.  The TEB's Ratings of Offerors' Proposals

Mr. Wickham, in his capacity as both the contracting officer and the Source Selection
Authority ("SSA"), compared the ratings assigned to the offerors' proposals by the TEB with
respect to both price and technical ratings.  Id. at 150.  With respect to price, proposals were
evaluated against the Independent Government Estimate ("IGE"), which was [. . .].  Id.  The
following chart reflects the offerors' ratings, with the offerors listed in order based upon price:

**Chart 1**

| Offeror | TOTAL Base Bid and Options | Experience | Past Performance | Management Approach |
|---|---|---|---|---|
| BBSSI | [. . .] | [. . .] | [. . .] | [. . .] |
| Pavan | [. . .] | [. . .] | [. . .] | [. . .] |
| CMR | [. . .] | [. . .] | [. . .] | [. . .] |
| SKE | [. . .] | [. . .] | [. . .] | [. . .] |
| Lotos | [. . .] | [. . .] | [. . .] | [. . .] |
| Basttistella | [. . .] | [. . .] | [. . .] | [. . .] |
| Gemmo | [. . .] | [. . .] | [. . .] | [. . .] |

Id.  The following chart reflects the offerors' ratings with the offerors listed in order based upon
their technical ratings:

**Chart 2**

| Offeror | TOTAL Base Bid and Options | Experience | Past Performance | Management Approach |
|---|---|---|---|---|
| CMR | [. . .] | [. . .] | [. . .] | [. . .] |
| SKE | [. . .] | [. . .] | [. . .] | [. . .] |

16

| Pavan | [. . .] | [. . .] | [. . .] | [. . .] |
|---|---|---|---|---|
| Lotos | [. . .] | [. . .] | [. . .] | [. . .] |
| Gemmo | [. . .] | [. . .] | [. . .] | [. . .] |
| Basttistella | [. . .] | [. . .] | [. . .] | [. . .] |
| BBSSI | [. . .] | [. . .] | [. . .] | [. . .] |

Id. at 151.

After comparing these ratings, Mr. Wickham determined that four of the proposals–those submitted by BBSSI, CMR, Pavan, and SKE–were within the competitive range.[28]  Id.; see also id. at 154 (stating that these four offerors "have a reasonable chance of being selected for award and are therefore recommended for inclusion in the Competitive Range"); cf. id. at 152-54 (explaining the elimination of the three remaining offerors).  He also concluded that it was not in the Corps' best interest to select an awardee absent discussion:

> In order to determine which proposal is the best value, we must enter into discussions.  This requirement is for the selection of one (1) Contractor to receive an award for the Italy JOC.  Based on the combination of technical factors and price (coefficient), none of the proposals as submitted can be selected for award. Meaningful written discussions will be held with the remaining four (4) firms.

Id. at 151.

## D.  Discussions With BBSSI

On December 4, 2009, Mr. Wickham informed BBSSI that it was "determined to be in the competitive range for purposes of conducting discussions and negotiations."  Id. at 116.  He also apprised BBSSI that the Corps "identified a number of areas where we feel we need additional technical information in order to understand your proposal as compared with the solicitation requirements."  Id.  These areas included BBSSI's (1) experience, (2) management approach, (3) pricing, and (4) submissions required pursuant to Italian law.  Id. at 118-19.

---

[28]  By contrast, Mr. Wickham determined that the remaining three proposals were "not in the competitive range, [were] determined not to be within the group of the most highly rated offerors[,] and [could not] be made acceptable during discussions."  Pl.'s App. 152.

### 1. Experience Factor

The Corps asked BBSSI to address the following: that its proposal [. . .].[29]  Id. at 118.  Although BBSSI identified ten projects for evaluation under the experience factor, id. at 155, 276, the Corps advised BBSSI that "[e]xperience from the debarred contractor has not been considered[.  T]herefore the contractor lacked evidence of experience in all of the categories required for construction disciplines," id. at 118; see also id. at 276 (indicating that "all but two (2) projects were performed by the debarred contractor . . . and could not be considered"[30]).

### a.  The Debarred Contractor

BBH is a wholly owned subsidiary of BBAG.  Compl. ¶ 23 n.1; supra note 21.  Beginning in March 2009, BBH, together with another BBAG subsidiary, was involved in debarment proceedings with the United States.  Compl. ¶ 23 n.1; see also Pl.'s App. 155 (indicating that BBH was issued a notice of proposed debarment on March 26, 2009); supra note 21.  During discussions with the Corps, BBSSI explained its relationship, or lack thereof, with BBH:

> BBSSI is and always has been the Italian branch of [BBAG], not a separate legal entity.  BBAG is the German-based parent corporation of the Bilfinger family. . . . [BBH] . . . is a separate legal entity from BBAG (i.e., a subsidiary). . . .
>
> . . . .
>
> . . . [On] 13 March 2008, the BBAG Hochbau division in Germany, including the Kaiserslautern branch, demerged from BBAG.  That division and its branches became a new stand-alone entity known as [BBH], and the United States Government entered into a Novation Agreement, through which multiple U.S. Government contracts were transferred from BBAG to BBH . . . .[31]

---

[29]  See supra note 6.

[30]  [. . .]

[. . .].

Pl.'s App. 276.

[31]  Mr. Hagner explained the circumstances that resulted in the creation of BBH:

[P]rior to 18 March 2008, BBAG had a construction division located in Germany, which included a Kaiserslautern Branch.  The branch was called Bilfinger Berger AG Hochbau, Kaiserslautern Branch.  The Kaiserslautern Branch was a branch office of, not a separate legal entity from, BBAG.  Historically, a significant

Pl.'s App. 156 (footnote added).

On March 26, 2009, BBH was placed on the Excluded Parties List System ("EPLS") and was precluded from participating in United States government contracting work until March 15, 2012.  Hagner Decl. ¶ 8.  According to BBSSI, neither BBAG nor BBSSI was the subject of any debarment proceedings, and BBAG and BBSSI were "never precluded from participating on U.S. procurements as a result of or as part of such proceedings."[32]  Pl.'s Supp'l Br. 4; accord id. at 4-

------

amount of BBAG's U.S. Government procurement contracting was performed through this branch and division.

On 18 March 2008, Bilfinger Berger AG Hochbau, including Kaiserslautern Branch, was demerged from BBAG (i.e., the construction division, including the Kaiserslautern branch, ceased to be the same legal entity as BBAG) and became a wholly-owned subsidiary of BBAG.  The newly-formed subsidiary's name was (and is) [BBH].  As a result of the demerger, BBH filed for and received . . . separate business licenses for Germany.

On or about 20 June 2008, BBAG novated several U.S. Government procurement contracts to BBH, the newly-formed BBAG subsidiary.  One contract that was not novated from BBAG to BBH was the predecessor Italian [JOC], which remained with BBAG/BBSSI.  Task orders on the predecessor JOC are still performed by BBSSI.

Hagner Decl. ¶¶ 5-7.

[32]  On April 14, 2009, Mr. Hagner sent an electronic-mail communication to Katherine D. Denzel, counsel for the Corps, in which he objected to the apparent inclusion of both BBAG and BBSSI on the EPLS:

[W]e understand the [Corps'] current position is, as a result of proposed debarment actions posted to the [EPLS] web site by the United States Air Force debarring official[,] . . . to declare [BBAG], as a whole, ineligible to participate in any procurement actions under the auspices of the [Corps] . . . .

We believe your position and subsequent actions taken as a result of this position are unnecessarily punitive, inconsistent with the information posted on the EPLS web site and inconsistent with the positions of other U.S. Department of Defense Organizations. . . .  We kindly request your reconsideration of this position and reinstatement of Bilfinger Berger entities not affected by the proposed debarment.  Specifically, and foremost, we would like your reconsideration for [BBSSI] . . . .

19

5.  Thereafter, BBAG established BBGS, see supra note 21, which performed an asset transaction with BBH in early 2010, Hagner Decl. ¶ 9.  As a result of this transaction, "contracting staff were transferred to BBGS.  BBH has and will remain a stand-alone subsidiary of BBAG, with its own management, personnel, equipment, and locations."  Id.  Throughout the remainder of 2009, BBH was "working in good faith towards an administrative agreement with the U.S. Government to resolve all outstanding issues (none of which relate to BBSSI)."  Pl.'s App. 155.  BBH was ultimately removed from the EPLS in February 2010.  Hagner Decl. ¶ 8.

### b.  BBSSI's Explanation Concerning the Experience Factor

With respect to the ten projects it identified in its initial proposal for evaluation under the experience factor, BBSSI requested that all ten projects "be considered as valid experience examples for BBSSI."  Pl.'s App. 155.  BBSSI noted that the [. . .].  Id.  According to BBSSI, these [. . .].  Id. at 156; supra note 6.  Furthermore, BBSSI indicated that it [. . .].  Pl.'s App. 156; supra note 6.  These projects, BBSSI asserted, were [. . .].  Pl.'s App. 156.

BBSSI also requested that the [. . .] "[. . .]."  Id.  These projects were, according to BBSSI, [. . .].  Id.  In the event that the Corps declined to consider these projects, BBSSI submitted an additional seven project references for contracts that specifically named BBSSI.  Id. at 156-57.

### 2.  Management Approach Factor

The Corps indicated that BBSSI's organizational chart did not clearly identify the lines of authority or work for all three locations.  Id. at 118.  In response, BBSSI [. . .] "[. . .]."  Id. at 157.  BBSSI noted that [. . .] "[. . .]."  Id.; see supra note 21.

BBSSI also indicated that BBAG has "vast experience with the type of work which will be performed under this IDIQ contract, having performed–through BBSSI–works under the 2008

---

Our position is that the only Bilfinger Berger entities affected by the proposed debarment actions . . . are [BBH] . . . and the Joint Venture WBT . . . .

We kindly request the reinstatement of eligibility for [BBSSI,] which is currently executing over $50 Mill. in contracts for the [Corps] . . . .

Def.'s Ex. 2 at 16-17.  Mr. Hagner also noted that BBSSI was (1) not named in the EPLS or the memorandum in support of the proposed debarments, and (2) wholly independent–both financially and managerially–from BBH.  Id. at 17.

JOC Italy contract" and other efforts.[33]  Pl.'s App. 157.  According to BBSSI, [. . .] "[. . .]."  Id. [. . .] "[. . .]."  Id. at 158.

### 3.  Pricing Factor

The Corps apprised BBSSI that [. . .].[34]  Id. at 118.  As such, the Corps indicated that [. . .] "[. . .]."  Id.  The Corps requested that [. . .].  Id.  Furthermore, the Corps requested that [. . .] "[. . .]."  Id.  Although BBSSI responded to the Corps, the copy of its response that the court received was redacted.  See id. at 158-59.

### 4.  BBSSI's Italian Submissions

The Corps raised two issues concerning BBSSI's Italian submissions.  First, BBSSI's self-certification related to Article 38 of Legislative Decree number 163/2006 was missing from its proposal.[35]  Id. at 119.  Second, the Corps advised BBSSI that the SOA certificate it provided was in the name of BBH, a debarred contractor.  Id.; supra Part I.D.1.a.  As such, the Corps declined to accept BBSSI's submission of BBH's SOA certificate.  Pl.'s App. 119.  The Corps requested that BBSSI furnish an SOA certificate in its own name.  Id.

#### a.  BBSSI's Legal Position Concerning Its Use of BBH's SOA Certificate

#### i.  Discussions Prior to the December 4, 2009 Competitive Range Determination

The record indicates that BBSSI engaged in several discussions via electronic-mail and in person regarding the SOA certificate issue throughout August and September 2009.  On August 28, 2009, Roberto Tomaiuolo, the procurator for BBSSI, sent an electronic-mail communication to Ms. Denzel and attached the following documentation: (1) an SOA certificate from BBSSI;[36]

---

[33]  BBSSI apprised the Corps [. . .]

[. . .].

Pl.'s App. 158.

[34]  At the same time, certain line items were [. . .].  Pl.'s App. 118.

[35]  BBSSI provided the self-certification to the Corps, as requested.  Pl.'s App. 159.

[36]  The SOA certificate from BBSSI, which was in the name of BBAG, had expired on January 15, 2009.  Pl.'s App. 259.

(2) a "[n]ew SOA" certificate, which was issued in the name of BBH; and (3) a self-declaration.[37]
Id. at 250, 260.  One month later, on September 28, 2009, Mr. Tomaiuolo again sent an
electronic-mail communication to Ms. Denzel in which he explained that BBSSI could utilize
BBH's SOA certificate based upon the principle of avvalimento infra-gruppo.  Id. at 252; supra
note 37.  Mr. Tomaiuolo also attached a legal opinion obtained by BBSSI's Italian counsel that
explained avvalimento infra-gruppo.  Pl.'s App. 258.

        In this legal opinion, BBSSI's Italian counsel indicated that, pursuant to Article 49 of
Legislative Decree number 163/2006, companies competing for the award of public works
contracts by an Italian Public Administration must "prove that they meet the economic, financial,
technical and organization requirements or SOA certification which are necessary in order to
participate in competitive procedures for granting of public contracts" and may do so "by means
of other subjects' requirements or SOA certification."  Id.  According to BBSSI's legal counsel,
where a company participating in the procurement relies upon the SOA certificate of an auxiliary
company to prove it satisfies the economic, financial, technical, and organizational requirements,
the competing company must, as part of its bid proposal, file with the contracting agency a copy
of the contractual agreement executed between it and the auxiliary company in whose name the
SOA certificate was issued.  Id.  If the company participating in the procurement and the
auxiliary company in possession of the SOA certificate "are part of the same group," then
avvalimento infra-gruppo applies.  Id.  Under the concept of avvalimento infra-gruppo, the
company participating in the procurement does not need to file with the contracting agency a
contractual agreement between it and the auxiliary company in possession of the SOA certificate.
See id.  Thus, the company participating in the procurement must submit to the contracting
agency "a self declaration attesting the legal and economic tie between them instead of the above
mentioned contract . . . ."  Id.; see also id. at 256 (containing Mr. Tomaiuolo's explanation to Ms.
Denzel that "it is absolutely legal and standard procedure to use 'Avvalimento infragruppo[,] i.e.
Inter-group transfer' of certifications used in contracts (i.e. SOA) . . . .  To make this procedure
complete, we always have to attach the 'self declaration' that you see on our bids"); supra note
37.

        In a second electronic-mail communication to Ms. Denzel dated September 28, 2009, Mr.
Tomaiuolo reiterated that BBSSI, in order to rely upon avvalimento infra-gruppo, "need[ed] to
attach the SOA [certificate] of the company 'used' and the self certification stating the link.  This
concludes the procedure."  Pl.'s App. 252; see supra note 37.  Mr. Tomaiuolo also sent a third
electronic-mail communication on September 28, 2009, which was quoted by the Corps as part
of its request for quotations ("RFQ") seeking a legal opinion concerning SOA certificates under

--------

        [37]  In his self-declaration, Mr. Tomaiuolo (1) indicated that the principle of avvalimento
infra-gruppo referred to an intergroup transfer between companies of the same group, (2)
identified the legal and economic bond between BBSSI and BBH as "holding," and (3)
recognized that Article 49 of Legislative Decree number 163/2006 applied to BBH as an
auxiliary company.  Pl.'s App. 261.  The contents of Mr. Tomaiuolo's declaration are discussed
below.

Italian law.[38]  See infra Part I.E.1.  In this communication, Mr. Tomaiuolo indicated that BBSSI's use of BBH's SOA certificate would

> create no problems, since this fact has no consequences whatsoever other than the name change itself.  In the case, in fact, of a Group, with reference to inter-group certifications needed per public solicitations (i.e. SOA, which is the most important), as per Italian (and more extensively European) regulations, the "label" is PURELY NOMINAL, i.e. [BBSSI] not only can but has legally full independent authority[] to use and be qualified with a group member SOA certification, using a standard procedure (a self-declaration) introduced by the latest version of "Codice de Lise."  The rationale for this (which is relatively a new concept, inherited by [European Union] directives in the latest version of "Codice De Lise" and rulings of the European Court of Justice . . . )[] is to avoid the necessity for a group of issuing multiple certifications for the same issue, [a] situation that for a group like ours, which is composed of many dozens of different independent companies, would result in an unbearable and unjustified escalation of costs.

> Also the certification itself[] REMAINED exactly [like] the previous one [in] the name of [BBAG], with only a name change (i.e.[,] ALL requirements presented to obtain it in the past remained untouched, and basically the application was for a "change" and not for a different or new certification, and all values and work categories are unchanged).

> We absolutely confirm our previous discussions and the complete legal separation between [BBSSI] and [BBH] that, as we all know, is debarred, and also confirm that this situation did not and will not change.

---

[38]  Mr. Tomaiuolo's communication was sent in response to an August 26, 2009 electronic-mail communication from Ms. Denzel, who wrote:

> On your recent submissions for projects under the Italy [Multiple Award Task Order Contract ("MATOC")] and for the stand-alone solicitation for runways and parking at Aviano, your company has submitted offers and documentation in the name of [BBSSI] with addresses in Vicenza and Bolzano, however[,] your SOA [certificate] has been submitted under the name of [BBH] with an address [of] Frankfurt, Germany.  This company is debarred and the [Corps] does not hold a contract for either the Italy JOC or Italy MATOC with [BBH].  As you have always insisted that your company in Italy is completely separate and because of the reasons above, we would appreciate clarification on these SOA submissions from [BBH].

Def.'s Ex. 2 at 15.

Def.'s Ex. 2 at 12-13; accord Pl.'s App. 239-40.

### ii. Discussions Following the December 4, 2009 Competitive Range Determination

In its December 10, 2009 response to the Corps' discussion questions, BBSSI reiterated its position regarding the legality of utilizing BBH's SOA certificate:

> [A]ccording to Legislative Decree [number] 163/2006 (the so-called Public Contract Code in Italy), BBAG, proposing through its Italian branch, BBSSI, is entitled to rely upon the SOA certificate of BBAG's subsidiary entity, BBH, without that entity's (BBH's) involvement, performance, or support on the contract in any manner.

> Pursuant to Art. 47, par. 2, of the Public Contract Code in Italy, a foreign company established in a European Member State can indicate and file the documentation which is necessary, in compliance with the legislation of the State in which it is established, in order to prove all the requirements prescribed to obtain the qualification to engage in public contract work. In other words, [an] SOA [certificate] in the name of BBAG is not required under Italian law, because it is a foreign entity that is in compliance with its own country['s] laws.

Pl.'s App. 159; see also id. at 160 (explaining that the Italian Code authorized a bidder to fulfill the SOA certificate requirement by utilizing an SOA certificate of another group company through avvalimento infra-gruppo and asserting that the Bilfinger corporate family could rely upon BBH's SOA [certificate] "because of the corporate family relationship and based upon the . . . European and Italian legislative principles, which are referred to as the 'avvalimento.' They permit such reliance").

According to BBSSI, its submission of BBH's SOA certificate demonstrated its compliance with the law and its eligibility to perform Italian public works contracts. Id. at 160. Furthermore, BBSSI noted that the Corps previously raised an issue concerning use by BBSSI of BBH's SOA certificate under the previous JOC. Id.; see supra note 38. According to BBSSI, it discussed this matter, as well as avvalimento infra-gruppo, with the Corps in September 2009, and the Corps "accepted this proposition by continuing to issue task orders to BBSSI under the JOC predecessor . . . . For the same reasons, BBSSI is qualified to propose on–and to be awarded the contract under–this solicitation." Pl.'s App. 160.

### b. BBSSI's Representations That It Was Separate From BBH

In addition to asserting the legal grounds upon which it could rely upon BBH's SOA certificate, BBSSI also represented to the Corps that BBH had no connection to BBSSI or the JOC procurement at issue in this case. On August 28, 2009, Mr. Tomaiuolo advised Ms. Denzel that, pursuant to the Italian Code, "'the contract is in any case executed by the company that

participates [in] the Bid, which will receive[] the BOD certification . . .'[,] i.e. ONLY [BBSSI] (the entity submitting and signing the bid)[] can execute the job and will be the only one obligated to the Government (and vice-versa)." Id. at 250.  Mr. Tomaiuolo reiterated this position on September 28, 2009, explaining to Ms. Denzel that provisions set forth in the document used for demonstrating avvalimento infra-gruppo, see id. at 254-55, provided that "'the company used CANNOT become the awardee towards the Awarding Agency, as NO RELATIONSHIP WILL BE MADE BY THE AWARDING AGENCY WITH IT,'" id. at 252. In effect, Mr. Tomaiuolo advised the Corps that the "'used' company," i.e., BBH, "has and will have no links whatsoever with the awarding agency."  Id.

In its December 10, 2009 response to the Corps' discussion questions, BBSSI reiterated that BBH would not be involved in any aspect of performance under the JOC if awarded to BBSSI:

> BBAG[,] through BBSSI[,] undertakes to execute the contract under the solicitation[] without having to make use of the SOA certificate transmitted, as there is no need for it to do so under Italian law.  Further, BBSSI is absolutely capable of fulfilling–and intends to fulfill–its contractual duties by means of its own requirements and resources, without any involvement of BBH.  In other words, the SOA [certificate] is valid for BBSSI's use without any staffing, contract work, supervision, financial support, or any other involvement by or from BBH.

Id. at 160 (emphasis added).  BBSSI offered to provide any additional information or documentation on the issue of BBH's SOA certificate.  Id.

### E. Procurement of a Legal Opinion Concerning SOA Certificates Under Italian Law

#### 1. The Corps' Solicitation

On September 16, 2009, twelve days before Mr. Tomaiuolo communicated with Ms. Denzel and approximately one and one-half months before the Corps issued its discussion questions to BBSSI, see supra Part I.D.4.a.i, the Corps initiated an RFQ seeking a legal opinion concerning SOA certificates under Italian law, see Pl.'s App. 237-49.  In the "Background" section related to the "Schedule of Services," the Corps noted that it issued several contracts to BBSSI and that BBH had been debarred from contracting with the United States government until 2012. Id. at 239.  In addition to quoting from one of Mr. Tomaiuolo's electronic-mail communications, Compl. ¶ 27, the Corps summarized BBSSI's position:

> [BBSSI] has consistently maintained that [it is] completely separate from [BBH] such that they are still eligible to contract.  In the last month, [BBSSI] has provided [an] SOA [certificate] under the name of [BBH] and ha[s] stated that [its] previous one issued in [its] name is no longer valid.  [It is] legally required to

use the [BBH] SOA [certificate] and can no longer obtain [an] SOA [certificate] in [its] own name; however[,] [it] still maintain[s] they [it is] not affiliated with [BBH].

Pl.'s App. 239.

The Corps framed its request as follows: "Provide a preliminary legal opinion addressing the overall interpretation and application of the various laws regarding [SOA certificates] and how they address subsidiary and affiliated companies and verifying the above explanation as valid from [BBSSI]." Id. at 240. It also sought verification that BBSSI's explanations and interpretations of Italian law were valid. Id. Furthermore, the Corps posed the following questions:

1. Do the Italian laws, such as [D.P.R. number] 34/00 and the "Codice de [Lise,"] require a single company with several different subsidiaries to hold the SOA [certificate]? May other subsidiary and affiliated companies utilize the parent company's SOA [certificate]? Is it legally required that affiliated companies utilize the parent company's SOA [certificate] and cannot be certified and obtain SOA [certificates] in their own name?

2. What type of relationship must a company have with another one if they are legally able to use their SOA [certificate] for their technical certification? Are they considered the same company, subsidiaries, or something else? Can they be considered legally separated from a company if they are utilizing another company's SOA [certificate] for their SOA certifications?

Id. The contract was awarded to Dr. Giorgio Cosmelli of the law firm Verusio e Cosmelli.

## 2. The Italian Legal Opinion

On January 8, 2010, Dr. Cosmelli issued an "Opinion on the SOA Qualification System and Some Relevant Connected Issues." Id. at 263-71. Dr. Cosmelli divided his opinion into four parts: a background section; discussion of the SOA qualification system; discussion of the "instrument of 'avvalimento' under the [Italian] Code"; and a conclusions section. Due to the importance of Dr. Cosmelli's opinion, the court details the substance of each section below.

### a. The Background Section

In the background section, Dr. Cosmelli summarized the purpose of his legal opinion was:

to verify the reliability, from an Italian Law perspective, of a statement rendered by the Italian branch of [BBAG], a German company with registered office in

26

> Mannheim, Germany . . . in the bid for the award of a contract by the [Corps] in
> Italy.
>
> To participate in such a bid[, BBSSI] intends to avail itself of a[n] SOA
> certification issued to an affiliate company (i.e.: a company belonging to the same
> group of companies), [BBH], being its own SOA certificate [is] no longer valid.
> Despite the fact that [BBH] has been debarred from contracting with the US
> Government until 2012, according to [BBSSI] the latter is still eligible to contract
> with the [Corps] as it is a totally different legal entity from [BBH].

Id. at 263 (footnotes omitted).  Dr. Cosmelli also reproduced the specific inquiries enumerated by
the Corps in its RFQ.  See supra Part I.E.1.

### b.  The SOA Qualification System Section

As previously indicated, Dr. Cosmelli explained the SOA qualification system and
enumerated applicable provisions of the Italian Code related thereto.  Pl.'s App. 264-65; supra
Part I.A.2.  He noted that, while the SOA certification "covers the existence of the technical
capabilities and of the economic and financial standing" of a company participating in a public
works contract solicitation, it "does not cover the existence of such further general requirements"
under the Italian Code.[39]  Pl.'s App. 265.

### c.  Avvalimento Under the Italian Code Section

Dr. Cosmelli indicated that

> [p]recedents of the European Court of Justice and subsequently the EU
> Legislation admitted the possibility that an economic operator may have the
> technical capabilities and the economic and financial standing necessary to
> participate [in] a bid for the award of a public works contract[] by relying on the
> resources (e.g.[,] employees, machinery, know-how, organization, economic and
> financial standing, etc.) of other entities, provided that, in such case, the bidder
> can prove to the contracting authority that it will have in its disposal the resources
> of such other entities to carry out the works, under the contract, to be awarded.

---

[39]  Article 38 of the Italian Code lists a variety of circumstances in which bidding
companies are ineligible for receiving a public works contract award and therefore do not satisfy
"general requirements."  Pl.'s App. 265.  These include, among other things: (1) bankruptcy; (2)
condemnation for mafia, fraud, money laundering, or other enumerated crimes; (3) violations of
safety, social security, or tax rules; (4) commission of "gross negligence or bad faith in the
performance of other contracts with the same contracting authority"; (5) submission of false
declarations; and (6) revocation or suspension of an SOA certification "for having submitted
false documents or representations."  Id.  None of these circumstances applies in this case.

Id. at 266.  Initially, this process was permitted to be used "only among companies belonging to the same group . . . ."  Id.  However, provisions enacted into the Italian Code "admitted the possibility [of] us[ing] third parties' technical capabilities and economic and financial standing regardless of the existence of infra-group links between the two entities . . . ."  Id.  One caveat to the use of third parties, Dr. Cosmelli noted, was that "the company who intends to avail itself of the third party's resources shall prove to be able to have access to them in carrying out the works under the contract."  Id.

This practice, known as avvalimento, was codified in Article 49 of the Italian Code.[40]  Id. It "allow[s] the economic operators not having themselves the minimum requirements to participate [in] a bid for the award of a public works contract[] to avail themselves vis à vis the contracting authority of the technical capabilities and the economic and financial standing of third parties."[41]  Id.  According to Dr. Cosmelli, the Italian Code authorizes avvalimento to be "admitted not only among companies belonging to the same group but also among not related companies"; however, it is only permitted "with respect to the technical and organizational capabilities and to the economic and financial standing (the existence of which is certified by the SOA certification) . . . ."  Id.  Therefore, avvalimento does not extend to the "general requirements."  Id.; supra note 39.

According to Dr. Cosmelli, Italian judicial precedent provides that the contracting authority "has the power to decide if the proposed scheme of avvalimento fully grants that the contractor has [at] its disposal the third party's resources necessary to successfully perform the work."  Pl.'s App. 266.  Italian law also sets forth regulations to protect the contracting authority from situations in which avvalimento is used "to circumvent principles and rules established by the public works legislation . . . ."  Id.  Article 49 of the Italian Code provides that a company participating in a public works contract procurement that "intends to avail itself of [a] third party's resources shall produce, besides its own SOA certification, if any, and the SOA certification of the company providing the necessary resources (defined 'ancillary company')," the following specific documentation:

> a declaration certifying that it intends to avail itself of [a] third party's resources in order to meet the necessary requirements, with the specific indication of such resources that the bidder possesses directly and of such resources possessed by the ancillary company;

> a declaration made by both the bidder and the ancillary company stating the existence of the general requirements set forth by Art. 38 of the [Italian] Code;

---

[40]  Dr. Cosmelli noted, however, that Italian courts "had already permitted the use of such system on the basis of the mentioned EU precedents and legislation . . . ."  Pl.'s App. 266.

[41]  Additionally, Article 49 of the Italian Code "allows the ancillary company to act as a sub-contractor."  Pl.'s App. 267.

> a declaration made by the ancillary company undertaking the obligation, towards the bidder and the contracting authority, to put at disposal of the former the resources for which it is lacking; [and]

> a copy of the agreement whereby the ancillary company undertook to put at the disposal of the bidder the needed resources.  In [the] case of companies belonging to the same group, instead of such agreement, the bidder may submit a self-declaration certifying the legal and economic link with the ancillary company.

Id. at 267.  Furthermore, Article 49 of the Italian Code provides that "both the bidder and the ancillary company are jointly and severally liable towards the contracting authority for the performance of the contract to be awarded . . . and that the bidders' obligations arising from anti-mafia legislation are to be complied also by the ancillary company."  Id.

Article 49 of the Italian Code pertains to "ordinary avvalimento."  Id.  Article 50 of the Italian Code authorizes "permanent avvalimento."  Id.  Once an implementing regulation is enacted, Article 50 of the Italian Code will permit a company participating in a public works contract procurement "to use, for five years time, the SOA [certification] of a company belonging to the same group and having control over the bidding company or being under the common control of another company."  Id.  In such a circumstance,

> the ancillary company shall issue a declaration whereby it undertakes the obligation, also towards the contracting authorities, to put its own resources at the disposal of its affiliate for the entire period of validity of the SOA certification. Also in this case the bidder-affiliate and the ancillary company are jointly and severally liable towards the contracting authority for the performance of the contract.

Id.

### d.  The Conclusions Section

Dr. Cosmelli next turned to the explanation furnished by BBSSI to the Corps in support of BBSSI's submission of BBH's SOA certificate, noting that he "understand[s] that [BBSSI's] position is" as follows:

> [BBSSI] can legally use the SOA certification of its affiliate [BBH] even if the latter has been debarred from contracting with the US Government, since the SOA certification "remained exactly the previous one on the name of [BBAG], with only a name change" and "all requirements presented to obtain it in the past remained untouched ( . . . ) and all values and work categories are unchanged";

29

to use the SOA certification of [BBH], [BBSSI] only needs to make a self-declaration pursuant to the Presidential Decree [number] 445/2000;

"the rationale for this is to avoid the necessity for a group of issuing multiple certifications for the same issue."

Id. at 268.  Dr. Cosmelli responded that this "explanation is at least incomplete."  Id.  He elaborated:

It is true . . . that a bidder may use the resources of another company belonging to the same group to be awarded a public works contract.  However, since the "avvalimento" implies that the work will be carried [out] by the company awarded by using the resources (e.g.[,] employees, machinery, know-how, organization, economic and financial standing, etc.) of the ancillary company, it is necessary, pursuant to Art. 49 of the [Italian] Code, that the bidder: (i) specifically declares which such resources are; (ii) submits to the contracting authority an undertaking from the ancillary company whereby the latter agrees to put at the disposal of the bidder the required resources; (iii) submits to the contracting authority a declaration of the ancillary company whereby the latter declares to have itself the general requirements set forth by Art. 38 of the Code . . . and (iv) submits to the contracting authority a self-declaration whereby the bidder confirms the infra-group links with the ancillary company.

Id.

Applying these requirements to his understanding of the circumstances, as presented by the Corps, Dr. Cosmelli concluded:

From the documents submitted to us[,] it does not appear that all the above documentation/representations required by Art. 49 of the [Italian] Code have been submitted []or that [BBSSI] has explained the reason why it assumes that they are not necessary.  It seems that [BBSSI] with its explanation tries to imply that using the SOA certification of [BBH] is a mere formality while, as we have seen above, this is not the case.  On the contrary, the use by [BBSSI] of [BBH]'s SOA [certificate] implies that, in order to carry out the works, the former will need to use [BBH]'s resources (e.g.[,] employees, machinery, know-how, organization, economic and financial standing, etc.).  Therefore, the latter shall confirm to have put at disposal of [BBSSI] the necessary resources to perform the works under the contract to be awarded and to have the necessary general requirements under Art. 38 of the [Italian] Code . . . .

Id. at 269.  Additionally, Dr. Cosmelli responded to the Corps' specific questions.  For example, he stated that the Italian laws do not require a single company with several different subsidiaries

to hold the SOA certificate.  Id.  He also confirmed that subsidiary and affiliated companies may utilize the parent company's SOA certificate, adding that such an arrangement "implies that, in carrying out the awarded works, the subsidiary and affiliated companies will use the resources (e.g.[,] employees, machinery, know-how, organization, economic and financial standing, etc.) of the parent company."  Id.  Additionally, Dr. Cosmelli stated that affiliated companies are not required to utilize the parent company's SOA certificate, noting that "[s]ubsidiary and affiliated companies may elect to obtain their own SOA certification."  Id.

In response to the Corps' question concerning "[w]hat type of relationship a company must have with another one if they are legally able to use their SOA for their technical certification," Dr. Cosmelli elaborated:

> In case the SOA certification of another company is used to participate [in] a bid for the award of a single public works contract pursuant to Art. 49 of the [Italian] Code, the bidder and the ancillary company must have an agreement whereby the latter puts at the disposal of the former its own resources (e.g.[,] employees, machinery, know-how, organization, economic and financial standing, etc.) for the performance of the works to be awarded or belong to the same group.
>
> Besides this, it is immaterial what type of relationship exists between the bidder and the ancillary company.  The relationship could be established by a mandate agreement, by the lease to the bidder of the business (or of a branch of the business) of the ancillary company or may arise from infra-group commitments.
>
> In case a company intends to avail [itself] of the permanent avvalimento of a[n] SOA certification of a company belonging to the same group pursuant to Art. 50 of the [Italian] Code,[42] the latter must have control over the former or must be under common control of a third company . . . .

Id. at 269-70 (footnote added).  In response to the Corps' question as to whether "they are considered the same company, subsidiaries, or something else," Dr. Cosmelli stated: "No, they are not.  The bidder and the ancillary company cannot be considered the same company.  Nevertheless, in order to increase the protection of the contracting authority, Art. 49 of the [Italian] Code expressly provides for the joint and several liability of the ancillary company towards the contracting authority."  Id. at 270.  Furthermore, in response to the Corps' question concerning whether BBSSI "[c]an . . . be considered legally separated from a company if they are utilizing another company's SOA [certificate] for their SOA certifications," Dr. Cosmelli explained: "From a merely legal perspective[,] the two companies are separated.  However, since the bidder uses the ancillary company's resources and the relevant SOA certification to be awarded a contract and to perform the relevant works, the two companies are acting in pool."  Id.

---

[42] See supra Part I.E.2.c.

Lastly, Dr. Cosmelli offered the following observations:

> In view of the above, and keeping in mind that we are not qualified to [advise]
> under US Procurement Laws and that we are not aware of the procedure and
> criteria established for its application in awarding of [the Corps'] contracts in
> Italy, we wonder to what extent a company that has been debarred from
> contracting with the US Government could be allowed, by using the instrument of
> the avvalimento, to grant to another company its technical capabilities and/or its
> economic and financial standing to carry out works under a [Corps] contract.

> Under Italian law this would not be allowed if the ancillary company has
> been debarred due to the fact that it does not meet the general requirements set
> forth by Art. 38 of the [Italian] Code.

> We ignore the reasons why [BBH] has been debarred from contracting
> with the US Government until 2012.  However[,] if the decision to debar it was
> based on one of the circumstances listed as general requirements under Art. 38 of
> the [Italian] Code, we would have no doubt in stating that such company would
> not be qualified to give the required support to the bidder to allow the latter to be
> awarded a contract for public works . . . .

Id.

### F.  The Corps' Source Selection Decision Document ("SSDD")

On January 28, 2010, Mr. Wickham, in his capacity as the contracting officer and SSA,
reviewed and approved the SSDD.[43]  See id. at 272-304.  Mr. Wickham reiterated that the JOC
solicitation "utilized the best value concept" and that an award would be made "to the
responsible offeror whose proposal, conforming to the Request for Proposal, will be most
advantageous to the Government, resulting in the Best Value, price and other non-price factors
considered."  Id. at 274.  He also indicated that the Corps received a final proposal revision
("FPR") from each offeror found to be within the competitive range on or before December 10,
2009.  Id.  Thereafter, the SSEB evaluated each offeror's FPR.[44]  Id. at 275.

---

[43] Kathleen A. Kern, in her capacity as the contract specialist, prepared the SSDD.  Pl.'s
App. 296.  Ms. Denzel also reviewed the SSDD for legal sufficiency.  Id.

[44] The SSDD refers to the SSEB and the TEB interchangeably.  See, e.g., Pl.'s App. 274
(stating that the SSEB initially convened on June 22, 2009, and that "the TEB reconvened" on
October 27, 2009, after the contracting officer determined that a potential conflict of interest
existed with respect to one SSEB member); cf. id. at 275 (stating that the SSEB "re-convened"
on October 27, 2009).

### 1.  Technical Results

Mr. Wickham indicated that the technical results consisted of "a summarization of the proposals as submitted in the initial and revised versions by the Contractors," the evaluation of the TEB," and his independent consideration of the proposals submitted.  Id.  The following chart, which was reproduced in the SSDD, represents the final consensus ratings as determined by the TEB and as agreed to by the SSA:

### Chart 3

| Offeror | Experience | Past Performance | Management Plan |
|---------|-----------|------------------|-----------------|
| BBSSI | [. . .] | [. . .] | [. . .] |
| CMR | [. . .] | [. . .] | [. . .] |
| SKE | [. . .] | [. . .] | [. . .] |
| Pavan | [. . .] | [. . .] | [. . .] |

Id.; cf. Chart 2, supra Part I.C.3 (containing the TEB's "[. . .]" rating for BBSSI's experience).

### a.  Experience Factor in BBSSI's Proposal

Mr. Wickham indicated that BBSSI initially identified ten projects in partial satisfaction of the construction experience factor, but noted that all, save for two projects, were performed by BBH, a debarred contractor, and were not considered.  Pl.'s App. 276.  In response to discussion questions submitted by the Corps, BBSSI identified seven replacement projects.  Id.; see also id. at 166-236 (containing copies of BBSSI's submissions).  In terms of relevancy, Mr. Wickham indicated that these projects

> were completed in Italy; contained the multiple categories of building renovations, including floors, doors, walls, windows, external façades, roofs; repair/ replacement of major building systems such as electrical, mechanical, and HVAC and civil work[] that includes[] concrete/asphalt roads and pavements, earthwork, and drainage structures[;] environmental work; and force protection–having between two . . . and four . . . of each category applicable; the selection of projects demonstrated the ability to manage multiple projects simultaneously . . . .

Id. at 276.  The TEB identified the following significant strengths in BBSSI's revised submissions: (1) "very detailed explanation[s] of the scopes of work performed that demonstrated the experience in the categories"; and (2) "multiple experience locations within Italy of Livorno, Aviano and Vicenza."  Id.  It also determined that BBSSI's revised submissions

33

"contained no weaknesses as the firm addressed those found in the initial review and provided to the firm during discussions."  Id.

Following discussions with BBSSI, the TEB raised BBSSI's experience rating from "[. . .]" to "[. . .]."  Id.  Mr. Wickham reviewed and concurred with this assessment, particularly since BBSSI's experience "demonstrate[d] an exceptional understanding of the government's requirements" by offering "numerous significant strengths in its proposal, which ha[d] no weaknesses.  The SSA is extremely confident that the Offeror [could] successfully perform the anticipated services with little to very low risk and with a high probability of success."  Id.

### b.  Past Performance Factor in BBSSI's Proposal

Mr. Wickham noted that the TEB, after considering the two projects identified as part of BBSSI's initial proposal, "rated [BBSSI] as [. . .] based on evidence of successful performance but nothing that explained any highly successful performance."  Id. at 277.  With respect to the additional projects BBSSI identified during discussions with the Corps,

> relevance of the past performance [was] demonstrated in the high level of
> relevancy of the construction experience projects; all projects were begun within
> the last three (3) years; the trends in the Offeror's performance in . . . all the areas
> . . . [was] positive; the firm encountered minor problems that were addressed
> quickly with appropriate and effective corrective actions taken to ensure progress
> with project completion that minimized any schedule and cost impacts, and the
> overall quality was outstanding in most projects; evaluations, letters of
> appreciation, and commendations from customers; and the satisfactory to
> outstanding customer comments affirmatively impacted the TEB evaluation of
> [the] Offeror's past performance.

Id.  Although two TEB members rated BBSSI "[. . .]" based upon the overall satisfactory nature of the comments, a third member rated BBSSI "[. . .]" based upon its "ability to excel on the projects . . . ."  Id.  After reviewing BBSSI's proposal and the findings in the TEB report, Mr. Wickham conducted an independent analysis and made the following determination:

> [P]ast performance submission and final evaluations rate an [. . .], supported by
> the highly successful performance record identified for all projects evaluated; the
> SSA is extremely confident that the Offeror can successfully perform the
> anticipated services on [its] performance record and overall risk of failure of
> [BBSSI] to perform is very low.

Id.

### c. Management Approach Factor in BBSSI's Proposal

The organizational chart that BBSSI provided as part of its initial proposal "[. . .]." Id. It did, [. . .] "[. . .]," and it also [. . .]. Id. at 278.  During discussions, BBSSI furnished a new, revised organizational chart that

> clearly identifie[d] the lines of authority at all locations in Italy[;] [. . .] this addition is seen as another significant strength.

Id.  Based upon BBSSI's revised submission, "[t]he original rating of [. . .] assigned by the TEB has been upgraded to [. . .] . . . ." Id.  Mr. Wickham explained:

> [R]eview of the proposals and TEB reports found the increase warranted as the management plan demonstrates an excellent understanding of the government's requirements; the proposal offers numerous significant strengths not offset by any weaknesses.  The SSA is extremely confident that the Offeror can successfully perform the anticipated services with little to very low risk and a high probability of success.

Id.

### 2. Price Analysis

Mr. Wickham indicated that, pursuant to FAR 15.404-1(a), an analysis of the offerors' proposals was performed in order to ensure that the final agreed-to prices were both fair and reasonable.  Id. at 286.  The following chart, which was reproduced in the SSDD, represents the offerors' overall price evaluation for the contract total bottom line sum, as compared with the IGE of [. . .], with the offerors listed in order based on their technical ratings:

**Chart 4**

| Offeror | Bottom Line Sum | Percent Difference From IGE | Point Difference From IGE |
|---------|-----------------|-----------------------------|---------------------------|
| BBSSI | [. . .] | [. . .] | [. . .] |
| CMR | [. . .] | [. . .] | [. . .] |
| SKE | [. . .] | [. . .] | [. . .] |
| Pavan | [. . .] | [. . .] | [. . .] |

Id. at 287.  BBSSI, "the highest technically rated offeror . . . , submitted the lowest total

35

coefficient for the base bid and all options of [. . .], which [was] [. . .] or [. . .] points below the IGE of [. . .]." Id.

Mr. Wickham acknowledged that, "[. . .][, it is] the incumbent contractor and [. . .]." Id. Nevertheless, BBSSI's pricing information

[. . .].

Id.; see also id. at 288 (explaining that BBSSI's bidding was, [. . .], which indicated "[. . .]"). Although Mr. Wickham noted that BBSSI's pricing provided "[. . .]," BBSSI's technical proposal indicated that it "[. . .]." Id. at 288.  Accordingly, Mr. Wickham determined that BBSSI "[. . .]." Id.

### 3.  Tradeoff Analysis

Mr. Wickham reiterated that the solicitation contemplated that one award would be made. Id. at 289.  BBSSI "provided the lowest price that was [. . .] lower than the IGE, and significantly lower than other offerors . . . ." Id.  Moreover, BBSSI had technical ratings that were "superior in the [. . .] to the next lowest priced offeror and equal to the ratings of any other offeror . . . ." Id.; cf. id. at 287 (noting that BBSSI was the "highest technically rated offeror").  Accordingly, BBSSI "appear[ed] to be the best value awardee."  Id. at 289.

### 4.  Responsibility Determination

Before an award could be made, an affirmative responsibility determination was required. Id.  To be found responsible, the contractor must first have adequate financial resources to perform the contract or the ability to obtain these resources.  Id.  Mr. Wickham indicated that BBSSI showed "a minimum risk of business failure, with 0% of other German businesses having a lower failure risk."  Id.  BBSSI's payment trends were "in line with the industry average," and Mr. Wickham determined that BBSSI had the financial resources to perform the JOC.  Id.

Second, the contractor must be able to comply with the required or proposed delivery schedule.  Id.  Mr. Wickham indicated that BBSSI had "been providing construction services to the Corps . . . , through past and on-going contracts, in a timely and satisfactory manner."  Id.  He cited no degradation of performance by BBSSI on other government projects and acknowledged BBSSI's representations in its proposal that it would "be able to comply with the required delivery schedule for the current project."  Id.

Third, the contractor must have a satisfactory performance record.  Id.  The TEB "evaluation identified that awarding contracts to [BBSSI] represent[ed] best value to the government."  Id.  Moreover, BBSSI's past performance was rated as "excellent," and Mr. Wickham noted that there "have not been any indications that there [would] be any change in the future to the quality of service."  Id.  Additionally, Mr. Wickham acknowledged that all of

BBSSI's references would not hesitate to utilize BBSSI again.  Id.

Fourth, the contractor must have a satisfactory record of integrity and business ethics.  Id.
BBSSI's records of performance were "adequate to determine a satisfactory record of
integrity . . . ."  Id.  Mr. Wickham also indicated that no information refuted BBSSI's reputation
for "high standards of integrity and ethics."  Id.

Fifth, the contractor "must have the necessary organization, experience, accounting and
operation controls, and technical skills or the ability to obtain them[,] including such elements as
production control procedures, property control systems and quality assurance measures
applicable to services to be performed by the prospective contractor and subcontractors."  Id. at
290.  BBSSI, Mr. Wickham indicated, demonstrated the required abilities, skill, experience, and
operational control to be able to perform the JOC.  Id.  Despite this finding, he noted: "[P]er their
SOA [certificate] and avvalimento, [BBSSI is] required to utilize the capabilities of [BBH],
[which] is currently debarred from U.S. Government contracts."  Id.

Notwithstanding the determination that BBSSI must utilize the capabilities of BBH, Mr.
Wickham indicated that there was "no doubt" that BBSSI possessed the ability to perform.  Id.
He cited the TEB's determination that BBSSI's management plans "articulate[d] complete
understanding of all requirements and present[ed] sound approaches for effectively controlling,
supervising, administering, managing, and performing the required work effort . . . ."  Id.
Additionally, BBSSI's management staff had "outstanding technical and operational education
and experience," and BBSSI's proposal reflected "outstanding detail and a very thorough
understanding of the technical requirements."  Id.  Furthermore, BBSSI's technical and
management approaches satisfied all of the government's minimum objectives and requirements.
Id.

"Based on an integrated assessment of all proposals in accordance with the specified
evaluation factors," Mr. Wickham concluded that an "award to [BBSSI] offer[ed] the best value
to the Government.  The proposal provide[d] strengths and demonstrate[d] an understanding of
the proposal requirements."  Id.

Sixth, the contractor must have the necessary production, construction and technical
equipment, and facilities or an ability to obtain them.  Id.  With regard to this factor, Mr.
Wickham stated:

It is apparent by the initial technical evaluation of the Contractors' proposals that
the firms are fully qualified to provide and maintain the needed services, but
again, this may mean, due to [BBSSI's] use of [BBH]'s SOA, that [BBSSI is] also
required to utilize the assets and equipment of a debarred firm in order to perform
the technical requirements of the contract [and] that [it has] relied on [BBH]'s
assets and structure in order to use their SOA certification.

Id.  Nevertheless, BBSSI's competency and past performance information were not questioned.
See id. ("The contractors' competencies have been demonstrated and verified by the review of
the past performance information provided by the firms' customers . . . .").

Seventh, the contractor must be otherwise qualified and eligible to receive an award
under the applicable laws and regulations.  Id.  Mr. Wickham noted that BBSSI had "performed
successfully and satisfactorily on previously issued [Corps] contracts and there [were] no
indications of financial, technical[,] or personnel difficulty."  Id.  Moreover, he acknowledged
that BBSSI possessed a responsible financial rating.  Id.  Nevertheless, Mr. Wickham questioned
the relationship between BBSSI and BBH on two grounds.  First, BBSSI

> provided several indications that it is affiliated with [BBH] and may, in fact, be a
> mechanism for [BBH] to submit proposals and to continue to contract with the
> U.S. Government.  Therefore, in order to make an affirmative responsibility
> determination for [BBSSI] for this award and others, it was necessary to look at
> the whole record . . . , based on various evidence and documents that have been
> received from this contractor which indicate this relationship.  For example, 8 out
> of the 10 projects submitted as Experience and Past Performance in their original
> proposal were performed by [BBH].  Although we conducted discussions for
> other reasons, and they provided alternate submissions with a revised proposal, it
> was not until the U.S. Government notified them of the inherent problem and the
> attempt to receive technical credit for efforts performed by a debarred firm that
> this was even changed, months after the debarment happened.

Id.  Second, BBSSI was utilizing BBH's SOA certificate while BBH was debarred.  Id.
Specifically,

> [a]round the time of discussions, early September 2009, it was noticed that
> [BBSSI] was submitting their required SOA [certificate] for this contract in the
> name of [BBH] with the address in Kaiserslautern.  When questioned, [BBSSI]
> represented to us that the name of the SOA [certificate] holder was a mere
> formality and that they had no legal ability under Italian law to obtain [an] SOA
> [certificate] in their name. . . . [T]his explanation appeared concerning not only
> because the SOA [certificate] holder was debarred, but also because the firm with
> whom a potential contract would be established ([BBSSI]) was not qualified to
> legally perform the construction work in Italy without this SOA [certificate].  At
> that point, we notified [BBSSI] that we were seeking expert advice and then hired
> an Italian legal expert and received his opinion on the 8th of January, 2010,
> rejecting the [BBSSI] representations as to Italian law and advising us that use of
> the [BBH] SOA [certificate] would indicate a relationship between the firms . . . .

Id.

38

Mr. Wickham then offered his own interpretation of Dr. Cosmelli's opinion:

[BBSSI] has submitted [an] SOA certificate in the name of [BBH] with an address in Kaiserslautern, Germany as well as a document entitled "self declaration" which attests that they have executed an "avvalimento infragruppo[,]" which is required by Italian law as a legal document that allows one company to use another company's SOA [certificate].  However, per Italian law, the avvalimento is, in fact, an agreement or contract between the two entities and has prescribed provisions and consequences to prevent abuse by contractors and to protect contracting parties so that they are, in fact, contracting with qualified companies.  This Law is D.P.R. [number] 163/2006, articles 49 and 50.  Some of the provisions state that the ancillary company (in this case, [BBH]) must provide to the bidding company (in this case, [BBSSI]) full disposal of its assets and resource[s]–technical, financial, employees, machinery, know-how, organization, economic and financial standing, etc. and the bidding company shall avail itself of these assets.  Moreover, the law provides that both the bidder and the ancillary company are jointly and severally liable towards the contracting party for the performance of the contract to be awarded and that the bidders' obligations arising from anti-mafia legislation are also to be complied with by the ancillary company.  The law further states that the bidding company must either be controlled by the ancillary company or they must be jointly controlled by a third company.  Lastly, the law provides that the ancillary company work as a subcontractor to the bidding company.

The SOA certificate is legally required to perform construction work in Italy.  The use of a debarred contractor's SOA [certificate], together with the avvalimento declaration accompanying it that certifies that [BBSSI] has the legal right to use [BBH]'s SOA [certificate], [means that] under Italian [law], the firm must make use of [BBH]'s technical and financial resources, is either controlled by [BBH] or the two (2) firms are jointly controlled by a third party, and [is] jointly and severably liable [with BBH] for their work when using the SOA [certificate]–evidencing that the firms are "affiliated" in accordance with the definition at FAR Part 9.403 and that a debarred firm, [BBH], is attempted to indirectly propose on this solicitation through its "affiliate," [BBSSI].  Therefore, per [FAR] Part 9.405, [BBSSI] is inel[i]gible to receive an award as a debarred "contractor" . . . .

Id. at 291.  Because BBSSI failed "to meet the standard . . . of a responsible contractor," Mr. Wickham concluded that it was "not eligible to receive award of this contract."  Id.

Consideration of BBSSI's proposal, as reflected within the SSDD, concluded with Mr. Wickham's determination that BBSSI was not a responsible contractor within the meaning of FAR Subparts 9.1 and 9.4.  Id.  As a result, BBSSI, despite being found to have submitted a

proposal that offered the best value before Mr. Wickham issued his responsibility determination, was "considered ineligible for providing the required construction services." Id.  Because BBSSI was not eligible for the JOC award, a best value determination based on the remaining offerors was necessary.  Id. at 292.  To that end, the remainder of the SSDD considered the other three offerors' proposals, id. at 292-96, and Mr. Wickham ultimately concluded that CMR's proposal presented the best value to the government, id. at 293.  He then determined that CMR was a responsible contractor and was eligible for providing the required construction services.  Id. at 295.

### 5.  Source Selection Decision

Mr. Wickham–based upon the findings of the TEB, his independent analysis of the proposals, and a comparison "giving appropriate consideration to the evaluation criteria set forth in the solicitation and Source Selection Plan and their relative importance"–determined that CMR's proposal was the "the best overall proposal and most beneficial to the Government."  Id. at 296.  Citing his "broad discretion" to make the source selection decision, Mr. Wickham indicated that he compared the strengths, weaknesses, deficiencies, and prices of the competing offerors in order to determine which proposal reflected the best value.  Id.  He then concluded that a single firm-fixed-price contract award would be made to CMR.  Id.; see also id. (stating that it was "advantageous and in the best interest of the Government to award one (1) contract" to CMR).

### G.  Post-Award Communications Between the Corps and BBSSI

### 1.  Notification of Unsuccessful Offeror to BBSSI

On January 28, 2010, Mr. Wickham notified BBSSI in writing that it was ineligible to receive the JOC award.  Id. at 305.  First, he noted that seven proposals, including BBSSI's proposal, "were included in the technical evaluations upon completion of the Contract Specialist's [initial] review for compliance with the solicitation instructions in accordance with section 00100."  Id.  Second, he indicated that, although BBSSI "provided an excellent technical submission and a total evaluated bottom-line coefficient of [. . .], [it was] ineligible to receive an award."  Id.  Specifically, BBSSI's use of BBH's SOA certificate when BBH was debarred–and the original submission of eight projects awarded to BBH–rendered BBSSI "not responsible and ineligible for award in accordance with FAR 9.103, 9.403 and 9.405(a)."  Id.  Mr. Wickham acknowledged that BBSSI was not on the EPLS; however, he indicated that BBSSI has chosen to use the SOA certificate of a debarred firm and that rendered BBSSI ineligible for the JOC award. Id.

With regard to BBSSI's use of BBH's SOA certificate, Mr. Wickham elaborated:

> The use of a debarred contractor's SOA [certificate,] together with the
> avvalimento declaration accompanying it that certifies that [BBSSI] has the legal

right to use the [BBH] SOA [certificate], under Italian law the firm must make use of [BBH]'s technical and financial resources, is either controlled by [BBH] or the two (2) firms are jointly controlled by a third party, and [is] jointly and severably liable [with BBH] for their work when using the SOA [certificate]–evidencing that the firms are "affiliated" in accordance with the definition at FAR Part 9.403 and that a debarred firm, [BBH], is attempting to indirectly propose on this solicitation through its "affiliate," [BBSSI].  Therefore, per [FAR] Part 9.405, [BBSSI] is inel[i]gible to receive an award as a debarred "contractor," as defined by FAR 9.403.

Id.  Mr. Wickham indicated that the revised technical proposal and price coefficient submitted by CMR constituted the best value for the government.  Id. at 306.

## 2.  BBSSI's Request for a Debriefing

On January 29, 2010, BBSSI formally requested a debriefing.  Id. at 307-09.  Citing FAR 15.506(d), BBSSI sought information concerning (1) the Corps' evaluation of the significant weaknesses or deficiencies in its proposal; (2) the overall evaluated cost, technical rating, and past performance information for CMR; (3) the overall ranking of all offerors; (4) a summary of the rationale for the award to CMR; (5) "the make and model of the item to be delivered by the successful offeror"; and (6) "[r]easonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed."[45]  Id. at 307-08.  BBSSI also submitted numerous questions concerning the evaluation.  First, it requested "the legal basis, including a legal citation, for [the Corps'] statement that 'under Italian law the firm must make use of [BBH]'s technical and financial resources.'"  Id. at 308.  Second, it asked what facts the Corps relied upon to determine that BBSSI "must or would rely upon the technical and financial resources of [BBH] in performing the contract work."  Id.  Third, it requested the basis for the Corps' assertion that BBH controlled BBSSI and the facts utilized by the Corps to make this determination.  Id.  Fourth, it requested the basis for the Corps' assertion that BBH and BBSSI were controlled by a

---

[45]  Subpart 15.506(d) of the FAR, which pertains to post-award debriefing of offerors, provides that, at a minimum, debriefing information shall include: (1) the government's evaluation of significant weaknesses or deficiencies in the offeror's proposal; (2) overall evaluated cost or price and technical rating of the successful offeror and the debriefed offeror, as well as past performance information on the debriefed offeror; (3) overall ranking of all offerors; (4) a summary of the rationale for award; (5) the make and model of items to be delivered by the successful offeror in acquisitions of commercial items; and (6) reasonable responses to relevant questions about whether source selection procedures contained in the solicitation, applicable regulations, and other applicable authorities were followed.  48 C.F.R. § 15.506(d)(1)-(6).

common third party.[46]  <u>Id.</u>  It also posed the following questions:

- Whether it was the Corps' position that a finding of "affiliation" between BBSSI and BBAG was the single determining factor that rendered BBSSI ineligible for the JOC award.

- What facts, including those derived from BBSSI's proposal and obtained "external to the proposal," did the Corps rely upon in determining that BBH was attempting to indirectly propose on the JOC through BBSSI?

- Whether the Corps considered BBSSI's proposal during the best value analysis and, if so, where its proposal ranked against the remaining offerors.

<u>Id.</u>  Finally, BBSSI posed a series of questions related to the Corps' conclusion that eight projects identified in its initial proposal had been awarded to BBH, particularly in light of the Corps' December 10, 2009 discussion response stating that BBSSI satisfied and exceeded the experience factor requirements.[47]  <u>Id.</u> at 308-09.

### 3.  The Corps' Written Debriefing

The Corps provided a written debriefing to BBSSI on February 2, 2010.  <u>Id.</u> at 310-14. With respect to the Corps' overall evaluation of weaknesses or deficiencies pursuant to FAR

---

[46]  In a related question, BBSSI asked whether BBAG was the third party that the Corps believed controlled both BBH and BBSSI.  Pl.'s App. 308.  If BBAG was that third party, then BBSSI asked the following: "If BBAG allegedly is the controlling third party, how does the [Corps] reconcile this position with the fact, which was made clear in BBSSI's proposal, that BBSSI is the Italian branch of BBAG, <u>not</u> a third party or separate legal entity?"  <u>Id.</u>

[47]  First, BBSSI indicated that three of the ten projects it identified as part of its initial proposal "arose under contracts held by BBAG through BBSSI."  Pl.'s App. 309.  BBSSI sought clarification that the eight projects, in fact, referred to seven projects.  <u>Id.</u>  Second, BBSSI stated that the Corps was factually incorrect to conclude that these seven projects had been awarded to BBH, particularly in light of BBSSI's December 10, 2009 discussion response.  Therefore, BBSSI asked whether the Corps considered its December 10, 2009 discussion response and whether its content was "disregarded or rejected and, if so, why . . . ."  <u>Id.</u>  Third, BBSSI questioned the Corps' determination that it was an affiliate of BBH, as defined in FAR 9.403.  <u>Id.</u> Stating that "affiliation with a debarred entity is not in-and-of-itself a reason to exclude an offeror from a competition," BBSSI requested the basis for excluding BBSSI from the competition.  <u>Id.</u>  Specifically, it asked (1) whether its proposal failed to satisfy the technical requirements, and (2) for the factual or legal basis for any determination that BBH was proposing through BBSSI.  <u>Id.</u>

15.506(d)(1), Mr. Wickham noted that the Corps found no weaknesses or deficiencies in BBSSI's submission related to the experience, past performance, management approach, and price factors.  Id. at 310.  With respect to a summary of the rationale for award pursuant to FAR 15.506(d)(4), Mr. Wickham explained:

> Although your technical proposal[, as] submitted[,] received highly-rated adjectival ratings during evaluation and your price coefficient proposal was lower than the price proposal of the successful offeror, the Government determined . . . the bas[is of] a non-responsibility determination at point (g) of FAR 9.104-1–**The Contractor must be otherwise qualified and eligible to receive an award under applicable laws and regulations.**  Your firm's use of [an SOA certificate] registered to . . . [BBH], wh[ich] is currently debarred, makes your firm ineligible to receive an award.
>
> In accordance with FAR 15.402 and [Defense Federal Acquisition Regulation Supplement Procedures, Guidance and Information] 215.402(1)[,] Contracting Officers must purchase supplies and services from responsible sources at fair and reasonable prices.  [BBSSI] has not been determined to be a responsible contractor as it has failed at point (g), the requirements of FAR Part 9.1 and Section 00100 of the solicitation . . . and is therefore considered ineligible for providing the required construction services.  The Contracting Officer has determined that your firm is not responsible within the meaning of FAR Subpart 9.1 and 9.4, Responsible Prospective Contractors.

Id. at 311.

In response to BBSSI's questions concerning the extent to which the Corps adhered to source selection procedures, regulations, and other authorities, Mr. Wickham furnished the following answers:

> 1.  The legal basis for the Corps' determination that, under Italian law, BBSSI must make use of BBH's technical and financial resources was "BBSSI's use of a debarred firm's resources and assets (SOA [certification]) to propose on this solicitation."  Id.
>
> 2.  The facts relied upon by the Corps in determining that BBSSI must or would rely upon the technical and financial resources of BBH "were that BBSSI presented [an] SOA [certificate] in the name of a debarred firm and the accompanying declaration stating that an avvalimento had been executed between BBSSI and [BBH], which legally enable[d] BBSSI to utilize a debarred firm's SOA [certificate]."  Id.

3.  The Corps made no statement that BBH controls BBSSI.  The Corps "relied on the SOA [certificate] presented by BBSSI in [BBH]'s name and the accompanying Declaration stating that a permanent avvalimento infra-gruppo had been executed" between BBSSI and BBH, "which legally enable[d] BBSSI to utilize the debarred firm's SOA [certificate] for the three year Italy JOC . . . period."  Id.

4.  In determining that BBH and BBSSI were controlled by a common third party, the Corps "relied on BBSSI's own submission of [an] SOA [certificate] in a debarred firm's name to be qualified to bid on and to perform work required under this contract."  Id. at 312.

5.  The Corps did not allege that BBAG was the controlling third party; instead, it stated that

> BBSSI's declaration attached to the SOA [certificate] in a debarred company's name states that an avvalimento infra-gruppo has been executed between BBSSI and [BBH], which has particular implications and relationships under Italian Law 163/2006 and EU Directive 2004/18.  Please also note the language on the BBSSI[-] submitted Declaration and the language from the DLA Piper letter to [the Corps] regarding the Declaration submitted by BBSSI and the solicitation requirement that [an] SOA [certificate] must be available and valid throughout the contract period.

Id.

6.  With regard to whether the Corps found an affiliation between BBSSI and BBH that rendered BBSSI ineligible, "it is not the affiliation per se, but the use of a debarred company's resources and assets (SOA [certification]) to propose on this solicitation."  Id.

7.  The Corps previously answered questions related to its determination that BBH was attempting to indirectly propose on the solicitation through BBSSI, reiterating: "All documents and information relied on were all provided in the BBSSI proposal submission and various discussions with BBSSI personnel."  Id.

8.  The Corps confirmed that BBSSI's proposal was considered during the best value determination.  Id.

9.  The Corps noted that seven projects BBSSI provided in its initial proposal named BBAG as the awardee and that "[m]uch of the past performance and other correspondence . . . attached to the Italy JOC proposal to support the Experience and Past Performance criteria[] provided by BBSSI[] was addressed to personnel

in Kaiserslautern, to [BBH]." Id. at 313.  Additionally, the Corps indicated that BBSSI's revised proposal submission "in response to discussions was carefully considered and improved the technical ratings of the firm, however[,] it was not relevant to the responsibility determination, which [was] a threshold matter and the reason for non-selection." Id.

10.  In response to BBSSI's inquiry concerning the basis for its exclusion from the competition, the Corps' position was "one of responsibility, not debarment, which [was] demonstrated by BBSSI utilizing the resources and assets (SOA [certificate]) of a debarred company to propose on the Italy JOC . . . , a United States Government contract." Id.

11.  BBSSI did not fail to satisfy the technical requirements under the experience factor, and the Corps' "non-selection [of BBSSI] for award was based on responsibility and the use of a debarred firm's resources and assets to propose on this solicitation through the use of the debarred firm's SOA [certificate]." Id.

12.  The factual or legal basis for the Corps' determination that BBH was proposing through BBSSI was BBSSI's proposal, wherein BBSSI, according to the Corps,

> presented that it was technically able to meet the Solicitation's SOA [certification] requirement.  The SOA [certificate] that BBSSI provided and the accompanying declaration stating that an avvalimento had been executed between BBSSI and [BBH], which legally enabled BBSSI to utilize [BBH]'s SOA [certificate], was in the name of a debarred firm.  BBSSI [was] relying on the technical capabilities and resources of a debarred firm through the use of a debarred firm's SOA [certificate] to qualify itself and to execute work under this contract.

Id. at 313-14.

On February 4, 2010, BBSSI filed a protest with the United States Government Accountability Office ("GAO").[48] Id. at 315-37.

---

[48]  Proceedings before the GAO are discussed in Part II.A, infra.

### H.  Post-JOC Solicitation Discussions Between the Corps and BBSSI

### 1.  Reconsideration of the JOC Award and Participation in the Italy MATOC Procurement

On February 23, 2010, during the pendency of its protest before the GAO, BBSSI, through counsel, contacted Ms. Denzel to discuss a resolution to several outstanding issues.  Id. at 387.  First, counsel advised the Corps that BBH had been removed from the EPLS.  Id. Accordingly, counsel requested that the Corps take corrective action on the JOC procurement by reevaluating BBSSI's responsibility or eligibility to compete.  Id. at 388-89.  Second, counsel indicated that Mr. Wickham, on February 16, 2010, advised BBSSI that it was unqualified to receive the Italy MATOC solicitation because BBSSI, in response to the presolicitation notice, submitted BBH's SOA certificate.[49]  Id. at 391.  Counsel sought to avoid filing a protest related to the Italy MATOC and to reach "a potential basis for agreement and a starting point to resolve these matters . . . ."  Id. at 388.

Ms. Denzel responded to counsel on February 25, 2010, stating that the JOC award was made when BBH was "clearly ineligible for award and listed on the Excluded Parties List.  It is not possible to terminate a legitimate award made to an eligible, responsible contractor providing the best value in accordance with the solicitation based on future events that had not yet occurred at the time of the award."  Id. at 396.  To terminate the contract award to CMR in light of changed circumstances, Ms. Denzel noted, "would create an impossible contracting system where no awards could be sustained . . . ."[50]  Id.  With regard to the Italy MATOC solicitation, Ms. Denzel acknowledged that "the status of BBH is in a sort of limbo," but she represented that the Corps was willing to cooperate and provide BBSSI with the Italy MATOC solicitation documents.[51]  Id. at 397.

_____

[49]  Counsel for BBSSI clarified that

we are not requesting an affirmative determination that [BBSSI] is eligible. Rather, we hope that the [Corps] will be convinced to engage in a reconsideration of the matter, in light of the BBH development . . . .  [A]ll that would be necessary is a written representation from the [Corps] (in particular, C.O. Wickham) that such review is underway and that the former determination of non-responsibility or ineligibility is no longer in effect or suspended until the review is complete.

Pl.'s App. 392.

[50]  Ms. Denzel also indicated that reconsideration of the JOC award would be unfair and that CMR "would have a valid protest that could not be defensible by this Agency if its award was terminated."  Pl.'s App. 396.

[51]  BBSSI ultimately participated in the Italy MATOC procurement.  See Compl. ¶ 58. On May 19, 2010, the Corps requested from BBSSI information listing the actual resources of

## 2.  Issues Related to the Predecessor JOC

In January 2010, several electronic-mail communications were exchanged between the Corps and BBSSI regarding various issues related to the predecessor JOC.  On January 14, 2010, Mario Eccel, BBSSI's Senior Project Manager, wrote to Howard L. Mosley, Jr., Project Engineer at the Corps, and indicated that BBSSI (1) could not work for only one week per month, and (2) would, in accordance with prior discussions and agreements, perform construction related to an access trail in August 2010.  Id. at 421.  Mr. Mosely responded on January 15, 2010, stating that, "because of the disbarment issue, we cannot extend the contract.  I am open to any options you may have for the time schedule, but as it stands, your schedule should not go beyond the contract completion date."  Id. at 420.

Additionally, Mr. Hagner, on January 15, 2010, contacted the Corps to express concern that the Corps considered BBSSI affiliated with BBH, effectively excluding it from ongoing solicitations.  Id. at 433.  Mr. Hagner noted that the Corps "already stopped all negotiations on Task Orders and Mod[ifications]."  Id.  He also reiterated that BBSSI was not associated with any debarred or suspended entity.  Id.

On March 8, 2010, counsel for BBSSI contacted Ms. Denzel concerning the existing JOC for which BBSSI was performing the first option period.  Id. at 411; supra note 22.  Counsel noted that the first option period was set to expire on March 10, 2010.  Pl.'s App. 411.  He also noted that the Corps had not exercised the second option period and opined that "this likely was due to the BBH debarment."  Id.  Counsel requested that the Corps reconsider is position, to the extent the BBH debarment factored into its decision not to exercise the second option period, and consider exercising the option, noting that "exercise of the option is critical and in the best interest of the Government."  Id.  In response, Ms. Denzel indicated that the Corps' capacity on the predecessor JOC "has been exhausted[,] so we cannot exercise the option in any case."  Id. at 410.  She explained:

> There is only enough saved for modifications that we know we need on existing
> task orders.  The new JOC was put in place to cover our needs this year once it
> was realized that capacity on the old one was being used much quicker than

BBH that BBSSI intended to use, as well as a declaration from BBH indicating that those resources were available to BBSSI for use during the course of performance under the Italy MATOC.  Id.; Pl.'s App. 399.  On May 26, 2010, BBSSI responded, stating that it "intends to–and is capable of–performing the MATOC contract with its own resources.  Resources of [BBH] . . . will not be used to perform the MATOC contract.  As such, there is no list of BBH . . . resources to be provided and, consistent with this, there are no declarations from those companies to be submitted."  Pl.'s App. 399.  BBSSI also provided documentation confirming that BBH satisfied all of the general requirements of Article 38 of the Italian Code.  Id.; supra note 39.  On June 23, 2010, Mr. Wickham, the contracting officer for the Italy MATOC procurement, notified BBSSI that it had been awarded one of four contracts.  Pl.'s App. 408.

normal.  BBSSI's unknown status contributed to the original issuance of the
solicitation as well as changes to some of our contracting regulations and the
Italian safety and environmental laws, but it was put on hold until we knew,
without a doubt, that we had a serious requirement for a new JOC after fiscal year
end with the exhausted capacity.[52]

Id. (footnote added).

## II.  PROCEDURAL HISTORY

### A.  Proceedings Before the GAO

In its initial protest before the GAO, BBSSI alleged that the Corps unreasonably and
improperly determined that BBSSI was ineligible for the JOC award based upon its need to
utilize the resources and assets of BBH, a debarred firm.  Id. at 315.  According to BBSSI, it
submitted a proposal in which it represented performance based exclusively upon its own assets
and resources.  Id. at 316.  Moreover, BBSSI argued that the Corps' ineligibility determination
effectively constituted a debarment of BBSSI.  Id.  Specifically, it asserted that the Corps (1)
erroneously determined that BBSSI failed to satisfy the SOA certificate requirement, id. at 323-
27, (2) ignored relevant information when it determined that BBSSI was not responsible, id. at
327-30, and (3) subjected BBSSI to a de facto debarment, id. at 331-34.  On March 12, 2010,
BBSSI asserted a supplemental protest ground based upon additional documents produced by the
Corps.  Id. at 338-47.  In its supplemental brief, BBSSI alleged that the Corps unreasonably
procured and relied upon an Italian legal opinion to determine that BBSSI was ineligible for the
JOC award.[53]  Id. at 344-46.

The GAO denied BBSSI's protest on May 13, 2010.  Id. at 381-86.  In response to
BBSSI's challenge to Mr. Wickham's negative responsibility determination, the GAO stated that
a contracting officer "is vested with a wide degree of discretion and, of necessity, must rely upon
his or her business judgment in exercising that discretion."  Id. at 383.  The GAO explained that
it generally does not question a negative determination of responsibility because the agency
"must bear the effects of any difficulties experienced in obtaining the required performance."  Id.
It noted, however, that negative determinations of responsibility could be challenged upon a
showing by the protester of bad faith or a lack of any reasonable basis for the determination.  Id.

---

[52]  Notwithstanding this response, BBSSI again requested that the Corps reconsider its
decision not to exercise the second option period.  Pl.'s App. 410.

[53]  During the course of proceedings before the GAO, BBSSI obtained its own legal
opinion from Italian counsel explaining the SOA certificate requirement under Italian law and the
concept of avvalimento infra-gruppo.  Pl.'s App. 378-79.

The GAO acknowledged that Mr. Wickham, "based on the information available to him, . . . concluded that BBSSI . . . provided indications that it may have been 'a mechanism for [BBH] to submit proposals and to continue to contract with the U.S. Government.'" Id. at 383. It determined that Mr. Wickham relied upon "extensive information" that "supported the view that BBSSI and BBH were closely related, and the resultant appearance that BBH, a debarred contractor, would be involved in performing the contract, as it had been under prior contracts." Id. at 384.  The GAO also determined that Mr. Wickham's concerns about BBSSI's reliance upon BBH's SOA certificate were reasonable, citing his consideration of Dr. Cosmelli's opinion. Id. at 384.  Furthermore, the GAO concluded that the Corps "was not bound to accept BBSSI's representations and disregard its SOA [certificate] arrangement with BBH, together with the other substantial information bearing on the firms' relationship."[54] Id.

With respect to BBSSI's contention that Mr. Wickham misinterpreted the Italian legal opinion, the GAO determined that BBSSI failed to establish that the interpretation was incorrect or unreasonable.  Id. at 385.  Instead, according to the GAO, BBSSI provided "no definitive information, other than its own legal opinion," see supra note 53, concerning the use of another company's SOA certificate without involving that company in the performance of the contract, Pl.'s App. 384.  Moreover, the GAO, citing Dr. Cosmelli's opinion, explained that the statements contained therein were "all reasonably supportive of the contracting officer's conclusion that BBSSI's reliance on BBH's SOA [certificate] was indicative of an intent to 'have at its disposal the resources of [BBH] to carry out the [contract].'" Id. (quoting the SSDD) (alterations in original).

The GAO also rejected BBSSI's assertion that the SOA certificate requirement "was a definitive responsibility criterion" that BBSSI satisfied via submission of BBH's SOA certificate. Id. at 386.  According to the GAO, "BBSSI was not found nonresponsible due to failure to meet the solicitation requirement for submission of an SOA" certificate.  Id.  Instead, the GAO

---

[54]  The GAO rejected BBSSI's contention that Dr. Cosmelli's opinion was flawed, stating:

> [T]he protester asserts that the Request for Quotations seeking the legal opinion did not provide sufficient background material, including information setting forth BBSSI's views regarding the legal effect of the SOA [certificate].  We do not agree with BBSSI, however, that the absence of its views from the RFQ diminished the reliability of the opinion.  The RFQ adequately described the subject matter the opinion was to address, and there was no requirement that the agency turn the opinion into a vehicle for debate by setting forth BBSSI's views on the matter.  Contracting officers generally are entitled to rely on information available to them at the time of a responsibility determination, absent any indication that the information is defective, unsupported, or suspect.

Pl.'s App. 385 (citation & footnote omitted).

explained, Mr. Wickham determined that BBSSI was not responsible based upon its submission of BBH's SOA certificate and the circumstances surrounding the two entities' affiliation.  Id.

Finally, the GAO determined that BBSSI's de facto debarment argument lacked merit.  It indicated that a de facto debarment occurs "when the government uses nonresponsibility determinations as a means of excluding a firm from government contracting or subcontracting, rather than following the debarment regulations and procedures set forth at FAR subpart 9.4."  Id. One key element of a de facto debarment, the GAO noted, was an agency's intent "not to do business with the firm in the future."  Id.  Based upon its examination of the record, the GAO concluded that there was "no[] show[ing] that the agency intends to exclude [BBSSI] from other procurements based on its specific determination here."  Id.

## B.  Proceedings Before the Court of Federal Claims

A redacted version of the GAO's decision was not available for dissemination to BBSSI until June 18, 2010.  Id. at 380.  On July 26, 2010, BBSSI filed a complaint in the Court of Federal Claims.  The complaint contains six counts: (1) wrongful determination by the Corps that BBSSI was not responsible; (2) de facto debarment of BBSSI during the period of time when BBH was listed on the EPLS; (3) lack of meaningful discussions by the Corps; (4) unsupportable determination by the Corps to not make multiple awards under the JOC procurement; (5) violations of FAR 1.102-2(c) and FAR 1.102(b)(3) based upon the Corps' exclusion of BBSSI; and (6) breach of an implied-in-fact contract by the Corps to consider proposals fairly.  Compl. ¶¶ 66-97.  BBSSI requests that the court issue (1) a preliminary injunction enjoining the Corps from issuing task orders to CMR and to suspend performance of any existing task orders, and (2) a declaratory judgment stating that the Corps' determination that BBSSI was nonresponsible and ineligible for the JOC award was arbitrary, capricious, an abuse of discretion, contrary to law, and without a rationale basis.  Id. Wherefore ¶¶ A-B.  Furthermore, BBSSI requests that the court issue a permanent injunction directing the Corps to (1) award the JOC to BBSSI, (2) make a second award under the JOC to BBSSI, or (3) reopen discussions, reevaluate its needs, or recompete the JOC.[55]  Id. Wherefore ¶ C.

During briefing of plaintiff's motion for a temporary restraining order and preliminary injunction, defendant moved to dismiss the complaint on both RCFC 12(b)(1) and 12(b)(6) grounds.  In support of its motion to dismiss, defendant contends that BBSSI waited over ten weeks after the GAO's decision to file its complaint and, as a result, lacks standing to bring the protest.  The court, on August 13, 2010, heard oral argument on both motions.  As indicated in note 1, supra, the court issued a temporary restraining order on August 20, 2010.

---

[55]  BBSSI also seeks bid preparation costs, as well as the costs of pursuing the protest. Compl. Wherefore ¶ D.

## III.  LEGAL STANDARDS

### A.  Bid Protests

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), and may "award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs," id. § 1491(b)(2).  Interested parties are those "prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (Supp. IV 1998)).  Defendant challenges the court's jurisdiction over BBSSI's complaint.  See Parts IV.A.1-3, infra.

The court reviews the procuring agency's action pursuant to the standards set forth in 5 U.S.C. § 706.  See 28 U.S.C. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Although "it is well-settled that procurement officials are entitled to broad discretion in the . . . application of procurement regulations," Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 622 (2002), the court may set aside a procuring agency's contract "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The protester must show, by a preponderance of the evidence, that either ground justifies a set aside of the contract award.  AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004); see also Gulf Group Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (articulating the preponderance of the evidence standard).

In order to succeed on the first ground, the protester "must show the decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  Med. Devel. Int'l, Inc. v. United States, 89 Fed. Cl. 691, 700 (2009) (quoting 5 U.S.C. § 706(2)(A) (2006)).  Where "the challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1333 (quoting Kentron Haw., Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973)); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (holding that, if the procuring agency's decision was made in violation of the applicable statutes, regulations, or procedures, then the court must "determine, as a factual matter, if the bid protester was prejudiced by that conduct"); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (stating that, in addition to showing "a significant error in the procurement process," a protester must show "that the error prejudiced it").  A

protester must satisfy both requirements–significant and prejudicial error–in order to prevail.[56]
Bannum, Inc., 404 F.3d at 1351.

"To establish prejudice . . . , a protester must show that there was a 'substantial chance' it
would have received the contract award absent the alleged error." Banknote Corp. of Am., 365
F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086
(Fed. Cir. 2001)); see also Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)
("[F]or [a protester] to prevail[,] it must establish not only some significant error in the
procurement process, but also that there was a substantial chance it would have received the
contract award but for that error."); Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice,
a protester must show that, had it not been for the alleged error in the procurement process, there
was a reasonable likelihood that the protester would have been awarded the contract."). The
"substantial chance" test creates a "reasonable balance between the importance of (1) averting
unwarranted interruptions of and interferences with the procurement process and (2) ensuring
that protesters who have been adversely affected by allegedly significant error in the procurement
process have a forum available to vent their grievances." Data Gen. Corp, 78 F.3d at 1563. A
protester need not show under the "substantial chance" test that, "but for the alleged error, [it]
would have been awarded the contract." Id. at 1562. Rather, it must "demonstrate more than a
'mere possibility that [it] would have received the contract but for the error [in the procurement
process].'" Asia Pac. Airlines v. United States, 68 Fed. Cl. 8, 18 (2005) (quoting Data Gen.
Corp., 78 F.3d at 1562); cf. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d,
1366, 1370-71 (Fed. Cir. 2002) (stating that, where a protester claims that the government was
obligated to rebid the contract, as opposed to where the protester claims it should have been
awarded the contract during the original bid protest, the protester "need only establish that it
'could compete for the contract' if the bid process were made competitive" (quoting Impresa
Construzioni Geom. Domenico Garufi, 238 F.3d at 1334)).

## B. Standing

Standing constitutes a "threshold requirement in every federal action." Myers
Investigative & Sec. Servs., Inc., 275 F.3d at 1369. As an "indispensable part of the plaintiff's
case," Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992), standing is "not a mere
pleading requirement," Night Vision Corp. v. United States, 68 Fed. Cl. 368, 391 (2005). "[T]he
question of standing," the United States Supreme Court ("Supreme Court") explained, "is
whether the litigant is entitled to have the court decide the merits of the dispute or of particular
issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). In Lujan, the Supreme Court summarized
three elements that comprise standing. 504 U.S. at 560. First, the plaintiff must have suffered an
"'injury in fact'–an invasion of a legally protected interest which is (a) concrete and

---

[56] "[M]inor errors or irregularities, i.e., harmless errors, committed in the course of the
procurement process are not sufficient grounds to warrant judicial intrusion to upset a
procurement decision." Metcalf Constr. Co., 53 Fed. Cl. at 622 (citing Day & Zimmermann
Servs., a Div. of Day & Zimmermann, Inc. v. United States, 38 Fed. Cl. 591, 597 (1997)).

particularized, and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.''" Id. (citation & footnote omitted).  Second, "there must be a causal connection between the injury and the conduct complained of."  Id.  In other words, the injury "has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  Id. (alterations in original) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).  Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Id. at 561 (quoting Simon, 426 U.S. at 38, 43).  The burden of establishing these elements of standing rests with the party invoking federal jurisdiction.  See id.  Standing must be determined "as of the commencement of suit."  Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1334 (Fed. Cir. 2005).

"[T]he plaintiff in a bid protest must show that it has standing to bring the suit."  L-3 Global Commc'ns Solutions, Inc. v. United States, 82 Fed. Cl. 604, 608 (2008) (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).  The Tucker Act provides that a bid protest action may be brought by an "interested party objecting to a solicitation by a Federal agency."  28 U.S.C. § 1491(b)(1).  "The pivotal element of standing in a bid protest is whether a protestor qualifies as an 'interested party' under [section] 1491(b)(1)."  RhinoCorps Ltd. v. United States, 87 Fed. Cl. 481, 485 (2009).  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has construed the term "interested party" as synonymous with the term "interested party" defined in the Competition in Contracting Act of 1984 ("CICA"),[57] Pub. L. No. 98-369, 98 Stat. 494 (codified as amended at 31 U.S.C. §§ 3551-3556).  See Am. Fed. of Gov't Emps., AFL-CIO, 258 F.3d at 1302.  In order to have standing as an "interested party," a protester must satisfy a two-part test.  First, the protester must demonstrate that it is an actual or prospective bidder.  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006); see also MCI Telecom. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989) (noting that "one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation").  Second, the protester must demonstrate that it has a direct economic interest in the procurement.  Rex Serv. Corp., 448 F.3d at 1307.

In addition to satisfying the "interested party" requirement under section 1491(b)(1), a protester must show that any alleged errors caused prejudice.  See Data Gen. Corp., 78 F.3d at 1562 ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 283 (2006) ("[A] successful protestor must also establish that the errors complained

---

[57] The CICA, which "was designed to create a level playing field, upon which all qualified vendors would have a fair chance to compete for a share of the hundreds of billions of dollars spent by the Federal Government in procurement each year," H.R. Rep. 103-545(I), at 21 (1994), defines the term "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2)(A) (2006).

of caused prejudice."). Therefore, "prejudice (or injury) is a necessary element of standing."
Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370.

Confusion over the standard of prejudice necessary for establishing standing exists
"because, in addition to being an element of standing, a showing of prejudice is required before
injunctive relief is granted." Textron, Inc., 74 Fed. Cl. at 284; see also Bannum, 404 F.3d at
1351 (requiring that a protester demonstrate a significant and prejudicial error in order to succeed
on the merits); Banknote Corp. of Am., 365 F.3d at 1351 (requiring that the protester show it had
a "substantial chance" of receiving the contract award in order to demonstrate prejudice); cf. Rex
Serv. Corp., 448 F.3d at 1308 (requiring that a putative, prospective bidder establish that it had a
"substantial chance" of receiving the contract as proof of possessing a direct economic interest).
As these cases suggest, the court "looks twice at prejudice, first weighing prejudice as it pertains
to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be
afforded relief." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 n.4 (2006). Thus,
addressing questions of standing "presupposes discussion of the merits, which would lead the
court in a round-robin through the arguments on the merits in order to resolve a jurisdictional
issue. Such is not a desirable or appropriate procedure." Textron, Inc., 74 Fed. Cl. at 284-85.

A prejudice determination for the purpose of evaluating standing is a "limited review"
that seeks "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and
therefore standing." Night Vision Corp., 68 Fed. Cl. at 392 & n.23; see also L-3 Global
Commc'ns Solutions, Inc., 82 Fed. Cl. at 608 n.4 (explaining that the "first showing of prejudice
to the protestor, in order to prove standing, must occur before reaching the merits of the bid
protest review"). A merits-based determination of actual prejudice based upon the "substantial
chance" test should be separate from the standing inquiry. Textron, Inc., 74 Fed. Cl. at 285. The
court therefore utilizes the approach set forth in Textron, Inc. for assessing standing, which
avoids a merits-based determination of actual prejudice and requires

> only that a protestor be (1) either a bidder or proposer that has been prevented
> from bidding or proposing due to some infraction other than the terms of the
> solicitation itself; or (2) either a bidder or proposer who would be in contention
> absent the unreasonable procurement decision or violation of applicable
> procurement regulations.

Id. The court addresses defendant's argument that BBSSI lacks standing in Parts IV.A.2.a-c,
infra.

## C.  Motion to Dismiss

## 1.  RCFC 12(b)(1)

The court's "general power to adjudicate in specific areas of substantive law . . . is
properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313

(Fed. Cir. 1999).  When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747.  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.  If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim.  Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

## 2. RCFC 12(b)(6)

An RCFC 12(b)(6) motion tests the sufficiency of a complaint.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); see also RhinoCorps Ltd., 87 Fed. Cl. at 492 ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.").  The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity."  Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989)).  When considering an RCFC 12(b)(6) motion, the court "must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail."[58]  Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer, 416 U.S. at 236).  A failure to allege a cause of action upon which relief can be granted warrants a judgment on the merits rather than a dismissal for want of jurisdiction.  Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1361 (Fed. Cir. 2008).

The Supreme Court clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive a Rule 12(b)(6) motion in Twombly, stating that "a plaintiff's

[58]  As in the RCFC 12(b)(1) context, the court, when adjudicating an RCFC 12(b)(6) motion, "assume[s] all well-pled factual allegations are true and indulge[s] in all reasonable inferences in favor of the nonmovant."  United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (citations & quotation marks omitted); accord Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001).

55

obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 555 (citation & quotation marks omitted).  While a complaint need not contain "detailed" factual allegations, those "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."[59]  Id.  In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 556).  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (citing Twombly, 550 U.S. at 556); see also id. (stating that a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citing Twombly, 550 U.S. at 555)).  Neither allegations "that are 'merely consistent with' a defendant's liability," id. (quoting Twombly, 550 U.S. at 557), nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," suffice, id. (citing Twombly, 550 U.S. at 555).

## D.  Preliminary Injunctive Relief

Courts "ordinarily refrain from interference with the procurement process . . . ."  United States v. John C. Grimberg Co., 702 F.2d 1362, 1372 (Fed. Cir. 1983).  In a bid protest case, the Tucker Act provides that

> the court may award any relief that the court considers proper, including declaratory and injunctive relief[,] except that any monetary relief shall be limited to bid preparation and proposal costs.

> [T]he court shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

28 U.S.C. § 1491(b)(2)-(3).  Preliminary injunctive relief is an extraordinary and drastic remedy, Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam), and the decision to grant injunctive relief falls within the sound discretion of the trial court, FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); see also PGBA, LLC v. United States, 389 F.3d 1219, 1225-26 (Fed. Cir.) (determining that the statutory scheme for reviewing procurements "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate" and holding that, in a bid protest action, a court is not automatically required to set aside an arbitrary, capricious, or otherwise unlawful contract award), aff'g 60 Fed. Cl. 196 (2004).

---

[59]  In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley v. Gibson, 355 U.S. 41, 45 (1957), "earned its retirement."  Twombly, 550 U.S. at 563.

As the Supreme Court acknowledged, a preliminary injunction is designed "merely to preserve the relative positions of the parties until a trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  In order to obtain a preliminary injunction, the moving party must demonstrate that: (1) it has a likelihood of success on the merits;[60] (2) it will suffer irreparable harm if preliminary relief is not granted; (3) the harm it will suffer outweighs the harm to the government and to third parties; and (4) the grant of relief is not contrary to the public interest.  Four Rivers Invs., Inc. v. United States, 77 Fed. Cl. 592, 594-95 (2007); accord FMC Corp., 3 F.3d at 427; Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 952 (Fed. Cir. 1990); Hosp. Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 625 (2005).  "No one factor, taken individually, is necessarily dispositive . . . .  [T]he weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp., 3 F.3d at 427.  Moreover, "equitable factors are of particular significance at the preliminary stage, where the question is whether to change the position of the parties during the litigation."  Abbott Labs., 544 F.3d at 1364.

## IV.  DISCUSSION

BBSSI asserts, among other things, that the Corps acted arbitrarily and capriciously when it determined that BBSSI was nonresponsible and ineligible for the JOC award based upon its submission of BBH's SOA certificate.  Mem. P. & A. Supp. Pl.'s Mot. TRO & Prelim. Inj. ("Pl.'s Mot.") 11.  Specifically, it argues that the Corps improperly concluded that BBH was "allegedly 'attempting to indirectly propose on [the] solicitation through its "affiliate," [BBSSI],'" despite the fact that BBSSI represented that "it would perform exclusively with its own assets and resources, with no reliance upon those of BBH."  Id. (first alteration in original).  According to defendant, injunctive relief is improper because BBSSI "waited to bring its case in this Court until more than ten weeks after the GAO's May 13, 2010 decision."  Def.'s Mot. Dismiss & Opp'n Mot. TRO ("Def.'s Mot.") 15.  Furthermore, defendant contends that BBSSI

---

[60]  Although "[t]here is some disagreement on the standard of proof required for injunctive relief," see Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 218 (2008), the Federal Circuit recently stated that "[n]o other court has held that when the [party seeking injunctive relief] has presented a 'substantial question' on its side of the dispute–that is, more than a scintilla but less than a preponderance of evidence in support of its side–no injunction pendente lite is available."  Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1364 (Fed. Cir. 2008).  The Abbott Laboratories court emphasized that "the standard is the likelihood of success of the plaintiff at trial, with recognition of the presumptions and burdens."  Id.; see also id. at 1365 ("The general criterion of likelihood of success on the merits, in the context of the equities of the particular case, are uniform throughout the regional circuits. . . .  [A]ll refer to the likelihood of the eventual outcome, not whether a substantial question has been raised."), 1368 ("All of the circuits have placed the preliminary injunction in terms of the likelihood of success on the merits and equitable factors.  No circuit has held that it suffices simply to raise a 'substantial question.'  Raising a substantial question achieves the threshold required of the well-pleaded complaint; it does not demonstrate a likelihood of prevailing.").

cannot satisfy the requirements necessary for injunctive relief.  Id. at 16-31.

In support of its jurisdictional argument, defendant asserts that dismissal is warranted because BBSSI failed to comply with the JOC solicitation requirement that it submit its own SOA certificate and, as a result, BBSSI "cannot challenge any other aspect of the agency's decision."  Id. at 1.  With regard to Count IV of the complaint, which contests the Corps' decision to make a single award under the JOC procurement, defendant argues that dismissal is required because BBSSI lacks standing to pursue that claim.  Id. at 1, 26-27.  Furthermore, defendant seeks dismissal of Count VI of the complaint, which alleges a breach of an implied-in-fact contract, based upon Federal Circuit precedent.  Id. at 1, 27-28.

Before reaching BBSSI's motion for a preliminary injunction, the court must determine whether it possesses jurisdiction over the complaint.

## A.  Defendant's Motion to Dismiss

### 1.  Whether BBSSI Engaged in Unreasonable Delay

First, the court addresses arguments advanced by both defendant and CMR that BBSSI unreasonably delayed filing its complaint in the Court of Federal Claims after the GAO denied its protest.  Although these arguments relate primarily to whether BBSSI is entitled to injunctive relief on the basis of an alleged irreparable injury, see, e.g., id. at 15 (asserting that BBSSI's request for injunctive relief "should be denied because [it] waited to bring its case in this Court until more than ten weeks after the GAO's . . . decision"), they also are jurisdictional insofar as they are construed in connection with the equitable doctrine of laches, see Pepper v. United States, 8 Cl. Ct. 666, 671 (1985) (noting that, "for the jurisdictional purposes of this court, laches takes the form of an affirmative defense"), aff'd, 794 F.2d 1571 (Fed. Cir. 1986).  Although laches must be pled pursuant to RCFC 8(c), the Court of Federal Claims may address laches sua sponte.  Hermes Consol., Inc. v. United States, 58 Fed. Cl. 3, 20 n.21 (2003).

### a.  Standards for a Laches Defense

Laches is an affirmative defense, Sucesion J. Serralles, Inc. v. United States, 46 Fed. Cl. 773, 783-84 (2000); accord RCFC 8(c)(1), that requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense, Costello v. United States, 365 U.S. 265, 282 (1961); see also JANA, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir. 1991) (stating that the defense of laches "requires a showing of two things: (1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party"); Athey v. United States, 78 Fed. Cl. 157, 160 (2007) ("To prevail on a claim of laches, the burden lies with the [party asserting the defense] to show an 'unreasonable' delay in filing suit which causes 'prejudice or injury to the defendant.'" (quoting Poett v. Merit Sys. Prot. Bd., 360 F.3d 1377, 1384 (Fed. Cir. 2004))); cf. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992) (en banc) (stating that "[m]aterial prejudice . . . resulting from

the . . . delay is essential to the laches defense").  The doctrine of laches recognizes the necessity for "speedy vindication or enforcement of rights" and "is based upon considerations of public policy, which require for the peace of society the discouragement of stale demands."  <u>Alligood v. United States</u>, 14 Cl. Ct. 11, 15 (1987).

As an equitable doctrine, laches "differs from the statute of limitations in that it offers the courts more flexibility, eschewing mechanical rules."  <u>Waddell v. Small Tube Prods., Inc.</u>, 799 F.2d 69, 79 (3d Cir. 1986); <u>see also Galliher v. Cadwell</u>, 145 U.S. 368, 373 (1892) ("[L]aches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced . . . ."); <u>Pepper</u>, 794 F.2d at 1573 (stating that the doctrine of laches "can apply 'apart and irrespective of' the court's statute of limitations" (quoting <u>Brundage v. United States</u>, 504 F.2d 1382, 1384 (Ct. Cl. 1974))).  As the court in <u>CW Government Travel, Inc. v. United States</u> recognized,

> [w]hen a limitation on the period for bringing suit has been set by statute, laches
> will generally not be invoked to shorten the statutory period.  Jurisdiction . . . is
> based on 28 U.S.C. § 1491(b), which does not limit the time in which a bid protest
> action may be brought.  Had Congress wanted to set a statute of limitations on bid
> protest actions, it would have done so[; however,] Congress did not so limit the
> jurisdiction of this Court to hear such actions . . . .

61 Fed. Cl. 559, 569 (2004).  Unlike a statute of limitations defense, laches is "personal to the particular party[,] . . . must have flexibility in its application[, and a] court must look at all of the particular facts and circumstances . . . and weigh the equities of the parties."  <u>A.C. Aukerman Co.</u>, 960 F.2d at 1032; <u>see also Cornetta v. United States</u>, 851 F.2d 1372, 1379 (Fed. Cir. 1988) ("The general rule is that laches . . . must be considered in light of the facts of each case.").  Therefore, there "are no predetermined exact boundaries to the length of time that are considered unreasonable by the courts and sufficient to support a laches defense."  <u>Mexican Intermodal Equip., S.A. de C.V. v. United States</u>, 61 Fed. Cl. 55, 71 (2004); <u>see also A.C. Aukerman Co.</u>, 960 F.2d at 1032 ("The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances.").  Indeed, the court must "consider and weigh any justification offered by the [party against whom the laches defense is asserted] for its delay."  <u>A.C. Aukerman Co.</u>, 960 F.2d at 1033.  Ultimately, application of laches "is committed to the sound discretion of the district court."  <u>Id.</u> at 1032.

### b.  The Parties' Arguments

Defendant and CMR contend that BBSSI waited too long to file its complaint in the Court of Federal Claims.  <u>See, e.g.</u>, Def.'s Reply Supp. Mot. ("Def.'s Reply") 11 (arguing that BBSSI failed to explain "why [it] sat on its rights for months"); Def.-Intervenor's Opp'n Pl.'s Mot. ("Def.-Intervenor's Opp'n") 4 (arguing that seventy-five days after the GAO issued its decision and sixty-seven days after the stop work order was lifted, BBSSI, "with no explanation for its extended delay, seeks to enjoy performance of the Contract").  According to defendant,

BBSSI could have brought its case "immediately after the GAO issued its decision," thereby effectuating a more expeditious resolution.  Def.'s Mot. 16.  Instead, defendant asserts, the government must defend against injunctive relief that could have been avoided entirely.  Id.  CMR advances a similar argument:

> BBSSI has remained inactive for 75 days since [the] GAO denied its protest.  During the pendency of BBSSI's delay, ten task orders have been issued and work has commenced.  If BBSSI accurately portrays the harm it stands to suffer, and its viability in Italy is truly dependent upon this Contract, why did it wait so long to file its protest? . . .  [N]o conceivable legitimate reason exists for BBSSI's delay.  BBSSI's failure to promptly appeal to this Court following [the] GAO's denial evidences the lack of harm BBSSI would suffer.

Def.-Intervenor's Opp'n 6.

In response, BBSSI asserts that the GAO did not publicly release its decision until June 18, 2010, more than five weeks after the initial denial date.  Pl.'s Revised Mem. P. & A. Reply Def.'s Opp'n Pl.'s Mot. & Opp'n Def.'s Mot. ("Pl.'s Reply") 17.  Although it was aware of the GAO's decision on May 13, 2010, BBSSI emphasizes that it could not evaluate the substantive issues contained therein until after a public version was issued.  Id. at 18.  A review of the redacted GAO decision prior to filing its protest in the Court of Federal Claims was, according to BBSSI, critical to its assessment.[61]  Id.  BBSSI also details its counsel's numerous attempts throughout July 2010 to communicate with counsel for the Corps in an effort to propose corrective action.  See id.  It adds:

> BBSSI did not sleep on its rights.  It patiently awaited the GAO's full disposition and release of a public decision memorializing the rationale.  Following receipt of the decision, as the preparation of pleadings progressed, counsel to BBSSI reached out to Agency counsel in a hopeful attempt to resolve the matter without further litigation.  When it became apparent such was not possible, BBSSI diligently completed the pleadings and filed the protest with the Court.

Id.  But see Def.'s Reply 11 ("[I]t was BBSSI's choice not to file its case until the end of July.  BBSSI's assertion that it was merely acting 'patiently' is precisely the point–a party cannot 'patiently' sit on its rights for months and then seek a temporary restraining order.").

---

[61]  Defendant disputes BBSSI's contention that it did not have access to the GAO's decision, noting that the GAO's protected version of its decision had been sent to the parties via facsimile on May 13, 2010.  Def.'s Reply 10.  The redacted version of the GAO's decision, dated June 17, 2010, ultimately was "identical to the protected version faxed to the parties on May 13[, 2010] . . . ."  Pl.'s App. 380.  Nevertheless, the June 17, 2010 redacted version could not be released outside the terms of the protective order until the close of business the following day.  Id.

### c.  BBSSI's Delay Was Not Unreasonable

The court is not persuaded that BBSSI, by waiting to file its complaint until July 26, 2010, engaged in unreasonable delay.  First, notwithstanding defendant's contention that "any confidential materials discussed in the GAO's opinion involved BBSSI's own proprietary information and, in fact, the redacted version ended up being identical to the protected version," Def.'s Reply 10, the protective order in place during proceedings before the GAO precluded dissemination of the May 13, 2010 decision to BBSSI until June 18, 2010, see supra note 61.  In effect, counsel was unable to convey the substance of the GAO decision to BBSSI until the latter date.  Defendant's argument therefore benefits solely from hindsight and ignores the fact that none of the parties could anticipate what information, if any, would be redacted from the public version of the GAO's decision as of May 13, 2010.[62]

Second, neither defendant nor CMR has presented any evidence that calls into question BBSSI's diligence in asserting its rights.  According to BBSSI, ten weeks, standing alone, is not an unreasonable amount of time to file a bid protest at the Court of Federal Claims, see Oral Argument at 3:37:15-25, and the court agrees.  There exists no firm line of demarcation separating a reasonable delay from an unreasonable delay,[63] see A.C. Aukerman Co., 960 F.2d at 1032, and courts are cognizant of the realities presented by litigation.  To that end, negotiations between the parties, as well as the composition of briefs and assembly of supporting documentation, have been recognized as legitimate excuses for a delay in filing suit.  See, e.g., Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 423 (2009) (recognizing that "voluminous filings cannot be drafted and assembled overnight"); LaForge & Budd Constr. Co. v. United States, 48 Fed. Cl. 566, 571 (2001) (noting that negotiations between the parties may be a reasonable excuse for delay (citing Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008, 1013-14 (7th Cir. 1970))).  In the intervening period of time spanning the release of the GAO's public decision on June 18, 2010, and July 26, 2010, BBSSI sought to negotiate a resolution of this dispute prior to filing its complaint, and the volume of its filings required time to assemble.  A period of one month cannot be construed as unreasonable delay under the circumstances presented here.

---

[62]  Indeed, BBSSI represented that the parties engaged in a "back and forth exchange" concerning redactions between May 13, 2010, and June 17, 2010.  Oral Argument at 3:38:18-24; see also Compl. ¶ 53 (indicating that, "due to the GAO's adjudication of proposed redactions and one substantive issue regarding the language of the decision, the public version was not authorized to be released until after the close of business on Friday, June 18, 2010").

[63]  There are, of course, exceptions.  For example, the CW Government Travel, Inc. court observed that, "[i]n the context of a bid protest, 14 months is a lifetime."  61 Fed. Cl. at 569.  Although the court determined that fourteen months constituted an "unreasonable delay," it concluded that laches was inapplicable because the government and the contract awardee failed to demonstrate prejudice stemming from the protester's delay.  See id.

Moreover, neither defendant nor CMR has demonstrated any prejudice resulting from BBSSI's delay.  Defendant merely asserts that BBSSI's delay placed it in the position of defending against a temporary restraining order "that might well have been avoided."  Def.'s Mot. 16.  Such an assertion does not constitute prejudice.  See, e.g., Vineberg v. Bissonnette, 529 F. Supp. 2d 300, 311 (D.R.I. 2007) (acknowledging that the court "'cannot say that the expense and inconvenience of further litigation, without more, rises to the level of prejudice contemplated by the doctrine of laches'" (quoting Lin Ron, Inc. v. Mann's World of Arts & Crafts Inc., 624 P.2d 1343, 1345 (Colo. Ct. App. 1981))), aff'd, 548 F.3d 50 (1st Cir. 2008); see also Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 808 (8th Cir. 1979) (rejecting the argument that "the cost of litigation . . . by itself could constitute prejudice within the contemplation of a laches defense"); Jeffers v. Clinton, 730 F. Supp. 196, 203 (E.D. Ark. 1989) (observing that any "expense, trouble, and disruption . . . would have occurred whenever the suit was filed"), aff'd, 498 U.S. 1019 (1991).  Accordingly, the court concludes that any jurisdictional attack based upon BBSSI's delay in filing its complaint lacks merit.

## 2.  Whether BBSSI Possesses Standing

### a.  Defendant Has Not Demonstrated That any SOA Certificate Deficiencies Could Not Be Cured

Defendant contends that BBSSI lacks standing to bring its protest because it failed to submit an SOA certificate "demonstrating that it has the technical and organizational capabilities and economic and financial standing to complete the contract at issue."  Def.'s Mot. 3.  Instead, defendant argues, BBSSI "first submitted an SOA [certificate] in its own name that was expired.  Then BBSSI submitted an SOA [certificate] in the name of a company–[BBH]–that was debarred."  Id.; see also id. at 16 (arguing that BBSSI's failure to provide its own SOA certificate rendered it "not qualified to submit an offer").  The Corps raised this argument before the GAO:

- BBSSI submitted an expired SOA certificate with an expiration date of 15 January 2009, and was not qualified under Italian Law [number] 34/2000 to offer on this solicitation and did not meet the prequalification requirements prescribed in the presolicitation notice with the presentation of an expired SOA certificate.

- The [Corps] erroneously provided a solicitation to BBSSI on 12 May 2009 by failing to notice the expiration date of the SOA [certificate].  In addition, contributing to the [Corps'] error, was BBSSI's submission of the expired SOA contrary to the presolicitation notice [and] its failure to alert the Agency of the expired SOA [certificate].  Moreover, Italian Law [number] 34/2000 also requires companies to only offer on solicitations for which they are qualified.

Pl.'s Mem. Ex. 2 at 2 (citation omitted); accord Def.'s Mot. 16-17 ("While the Corps erred in

providing a copy of the solicitation to an offeror who was not qualified to propose on the solicitation, the fact remains that BBSSI did not meet this prequalification requirement and did not meet the requirement of the solicitation.  Given this fact, it lacks standing . . . .").  The GAO did not address whether BBSSI lacked standing to bring its protest.  Reaching the merits of the protest, the GAO concluded that Mr. Wickham's determination that BBSSI was nonresponsible based upon its use of BBH's SOA certificate was reasonable.[64]  Pl.'s App. 384-86.

Defendant relies upon A & D Fire Protection, Inc. and Dismas Charities, Inc. in support of its standing argument.[65]  In A & D Fire Protection, Inc., the General Services Administration ("GSA") issued a solicitation that required the submission of a bid bond via mail or hand-delivery and explicitly prohibited submission via facsimile or electronic-mail.[66]  72 Fed. Cl. at 137.  Offerors were advised that their failure to submit a bid bond could result in the rejection of their proposals.  Id. (citing 48 C.F.R. § 52.228-1(a) (2005), which was incorporated by reference into the solicitation).  The court observed that A & D's proposal, as reproduced within the administrative record, contained no bid bond, id., though the GSA ultimately scored the proposal and considered A & D a potential awardee, id. at 140.  In addition to arguing that the FASA barred A & D's protest, the government asserted that A & D lacked standing to bring the protest because its failure to submit a bid bond in accordance with the solicitation's requirements rendered its proposal nonresponsive.  Id. at 137.

---

[64]  The fact that the GAO reached the merits of BBSSI's protest without addressing standing is of no consequence since GAO opinions are not binding on the court.  See Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir. 2003); Tel-Instrument Elecs. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003).  Indeed, the court in Dismas Charities, Inc. v. United States rejected the protester's contention that it possessed standing to bring its case before the Court of Federal Claims simply because the GAO decided its protest on the merits.  75 Fed. Cl. 59, 60 n.2 (2007).

[65]  Prior decisions of the Court of Federal Claims, "while persuasive, do not set binding precedent for separate and distinct cases" in the Court of Federal Claims.  W. Coast Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994).

[66]  As an initial matter, the court notes that the A & D Fire Protection, Inc. court, before reaching the government's standing argument, determined that the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-355, § 1054, 108 Stat. 3243 (1994) (codified at 41 U.S.C. § 253j(d) (2006)), divested the court of jurisdiction over protests of task orders for multiple award IDIQ contracts.  See 72 Fed. Cl. at 133-36.  It also concluded that jurisdiction could not be established under the Tucker Act and the Contract Disputes Act of 1978, 41 U.S.C. § 609(a)(1), because A & D Fire Protection, Inc. ("A & D") did not allege that a contract claim had been submitted to the contracting officer, A & D Fire Prot., Inc., 72 Fed. Cl. at 135.

The court determined that A & D lacked standing to bring the protest. Id. First, it explained that the record was devoid of any evidence showing that the GSA received a bid bond from A & D.[67] Id. at 139. It explained that a failure to submit a bid bond, regardless of whether by facsimile, mail, or hand-delivery, would render A & D's proposal nonresponsive. Id. at 137. Submission of a bid bond via facsimile would render A & D's proposal nonresponsive because "[p]roposals submitted by means forbidden by a solicitation's terms must be rejected . . . ." Id. at 139. Moreover, mailing or hand-delivering a facsimile of the bid bond would "not normally have been an adequate substitute for an original bond" and would also render A & D's bid nonresponsive.[68] Id. at 138; accord id. at 140 ("Thus, even if A & D did fax a bid bond to [the] GSA, A & D's bid was nonresponsive for lack of a bid bond."). Nevertheless, the court noted that defective bid bonds could be corrected under certain circumstances, explaining:

> [I]f A & D had timely mailed or hand-delivered a facsimile bid bond to [the] GSA, utilizing a submission method approved by the solicitation, and if the bid bond thus submitted was arguably merely defective and subject to correction . . . , the court would have been required to review the circumstances of the solicitation to see if the defect could have been cured.

> . . . If A & D's mailed or hand-delivered facsimile bid bond would necessarily have been rejected as nonresponsive, A & D would have lacked standing to bring a bid protest. If A & D's mailed or hand-delivered facsimile bid bond might have been subject to correction, on the other hand, A & D's standing to bring a bid protest would have been unaffected by the bid bond issue.

Id. at 138 n.13 (citing 48 C.F.R. § 28.101-4(b)). Since A & D did not submit any bid bond, it lacked standing to bring the protest. Id. at 140.

Furthermore, the court explained that it was "of no consequence" that the GSA scored and rescored A & D's bid during the procurement process. Id. It observed: "Even where an agency has awarded a contract, the successful bidder may lose the contract if its bid bond is found to be defective during subsequent protest proceedings." Id. (citing Hugo Key & Son, Inc.;

---

[67] Circumstantial evidence suggested that A & D submitted a bid bond via facsimile. A & D Fire Prot., Inc., 74 Fed. Cl. at 137. Nevertheless, A & D presented "no evidence" to substantiate that a bid bond had, in fact, been sent to the GSA via facsimile before the deadline set forth in the solicitation. Id.; see also id. at 139 (noting that "the record does not support A & D's assertion that a faxed bid bond was timely sent to [the] GSA, [and] there is a similar lack of evidence from [the] GSA showing that no faxed bid bond was received").

[68] Bid bonds, the court explained, "are normally required to be submitted as original documents" because doing so "assure[s] that the surety will not be able to defend against enforcement of the bond in the possession of the contracting officer by claiming that alterations of the original bond have occurred." A & D Fire Prot., Inc., 72 Fed. Cl. at 140 n.14.

Alco Envtl. Servs., Inc., B-251,053 et al., 93-2 CPD ¶ 21 (Comp. Gen. July 15, 1993)).  A & D lacked standing to bring its protest, the court concluded, because it did not have a substantial chance of being awarded the task order due to (1) its failure to submit a bid bond with its proposal, or (2) its submission of a bid bond to the GSA via facsimile, which was a method not authorized under the terms of the solicitation.[69]  Id.

In Dismas Charities, Inc., the Federal Bureau of Prisons ("BOP") issued a solicitation for a residential center and related services to which Dismas Charities, Inc. ("Dismas") and two other offerors submitted proposals. 75 Fed. Cl. at 60.  Although "none of the offerors had met all of the solicitation requirements," the contracting officer commenced written discussions with each offeror and later conducted a second round of discussions.  Id.  The contracting officer then requested final proposal revisions that included the submission of a 120-day start-up schedule between contract award and performance.  Id. at 60-61.  In its final proposal revision, Dismas expressed concern about the effect of recent hurricane activity upon construction in the southeastern United States and provided a "revised development schedule and critical path schedule reflecting a 240-day start-up period from contract award to performance.  Id. at 61.  The BOP determined that another proposal was the best value to the government, Dismas filed a protest with the GAO, and the GAO upheld the contract award in a decision on the merits.  Id. at 60-61.  Dismas then filed a protest with the Court of Federal Claims.  Id. at 60.

The government moved to dismiss Dismas's protest, contending that Dismas was not an interested party.  Id. at 59.  Specifically, both it and the contract awardee asserted that Dismas submitted a noncompliant proposal by including a 240-day development schedule.  Id. at 61.  Although the court acknowledged that the BOP evaluated Dismas's proposal "on the merits" and "never explicitly stated that it did not comply with the solicitation,"[70] id., it determined that Dismas did not submit its 240-day schedule as an alternative proposal, id. at 61-62.  Relying upon the reasoning set forth in A & D Fire Protection, Inc., the court concluded that Dismas, by submitting a 240-day start-up schedule instead of a 120-day start-up schedule, "did not meet a fundamental requirement of the solicitation . . . ."  Id. at 62.  Since Dismas "submitted a Final Proposal Revision that did not conform to the solicitation requirements," the court dismissed the protest, holding that Dismas "did not have a substantial chance of contract award and cannot be an 'interested party' for purposes of this Court's bid protest jurisdiction."  Id.

---

[69]  Although A & D lacked a substantial chance of being awarded the task order based upon its failure to submit a bid bond, the court noted that the GSA ranked its proposal fourth out of the five proposals that the GSA received.  A & D Fire Prot., Inc., 72 Fed. Cl. at 129.

[70]  The source selection decision indicated that all offerors' responses were "'reviewed and determined to be acceptable'" and that Dismas "'met the minimum requirements.'"  Dismas Charities, Inc., 75 Fed. Cl. at 61.  Furthermore, the BOP's post-award debriefing letter noted that Dismas' proposal "also met the requirements of the solicitation in every factor of the solicitation . . . ."  Id.

Defendant's reliance upon both cases is misplaced.  With respect to <u>Dismas Charities, Inc.</u>, the BOP's request for proposals expressly required that offerors include a 120-day start-up schedule.  Dismas did not submit such a schedule.  Instead, it submitted a 240-day start-up schedule that "'would extend beyond the required performance date.'"  <u>Id.</u> at 62.  No such situation is present in this case.  Although defendant argues that the JOC solicitation required that offerors submit an SOA certificate in their own name, its interpretation of the SOA certificate requirement, as discussed in Part IV.A.2.b, <u>infra</u>, is not supported by the plain language of the JOC solicitation.  Moreover, whereas Dismas submitted a schedule that was longer in duration than the schedule required by the BOP, BBSSI ultimately submitted an SOA certificate as required under the JOC solicitation.  Accordingly, <u>Dismas Charities, Inc.</u> is inapposite.

Likewise, <u>A & D Fire Protection, Inc.</u>, which the <u>Dismas Charities, Inc.</u> court found persuasive, is factually distinguishable from the case at bar.  First, <u>A & D Fire Protection, Inc.</u> involved an offeror's complete failure to include a bid bond with its proposal.  Evidence suggested that A & D never submitted the required bid bond to the GSA.  To the extent that A & D did, in fact, submit a bid bond, it did so via facsimile, a method expressly not authorized under the terms of the solicitation.  Here, defendant never argues that BBSSI failed to submit an SOA certificate.  It is undisputed that BBSSI submitted BBAG's SOA certificate with its original proposal.  <u>See</u> Pl.'s App. 259.  That SOA certificate, however, was expired, an apparent oversight that the Corps itself did not immediately notice.  <u>See</u> Pl.'s Mem. Ex. 2 at 2 (noting that the Corps erred in failing to discover the expired SOA certificate).  Thereafter, BBSSI submitted BBH's SOA certificate.  <u>See</u> Pl.'s App. 260.  Although defendant challenges BBSSI's ability to submit BBH's SOA certificate as part of its proposal, <u>see</u> Def.'s Reply 7 ("BBSSI relied upon the certification of a <u>debarred</u> contractor[,] mean[ing] that it failed to comply with the plain language of the solicitation"), the fact remains that BBSSI provided an SOA certificate with its proposal, as required under the JOC solicitation, <u>see</u> <u>infra</u> Part IV.A.2.b.  As such, <u>A & D Fire Protection, Inc.</u> is not applicable.

Second, defendant does not explain how the bid bond requirement in the <u>A & D Fire Protection, Inc.</u> procurement is analogous to the SOA certificate requirement in the JOC solicitation.  Bid bonds are a "material part of the bid and must be furnished with it" when required by a solicitation, and it has been recognized that "[n]oncompliance with a solicitation requirement <u>for a bid guarantee</u> generally renders the bid nonresponsive and requires the rejection of the bid."  <u>Harris Excavating</u>, B-284,820, 2000 CPD ¶ 103 (Comp. Gen. June 12, 2000) (emphasis added).  Bid bonds are expressly addressed in FAR Subpart 28.1.  <u>See</u> 48 C.F.R. §§ 28.101-1 to -4.  Notwithstanding the importance of a bid bond, an offeror may be afforded an opportunity to correct a deficient bid bond without an agency rendering its proposal nonresponsive.  <u>See</u> <u>id.</u> § 15.306(a)(2).  Defendant's reading of <u>A & D Fire Protection, Inc.</u> all but ignores the court's recognition that a defective bid bond, if submitted with a proposal in accordance with the solicitation's requirements, may ultimately be cured.

Furthermore, while the JOC solicitation specified that an offeror's failure to furnish any required documents, including an SOA certificate, "may be cause for elimination" of the proposal,[71] Pl.'s App. 42 (emphasis added); cf. A & D Fire Prot., Inc., 72 Fed. Cl. at 137 (noting that the solicitation incorporated by reference FAR 52.228-1, which provided that "[f]ailure to furnish a bid guarantee in the proper form and amount, by the time set for opening of bids, may be cause for rejection of the bid" (emphasis added)), it also indicated that offerors might have an opportunity to clarify their submissions. Specifically, the JOC solicitation provided: "Firms must furnish any additional back-up documentation requested by the contracting officer within the time period specified by the Contracting Officer." Pl.'s App. 42 (emphasis added). In the event that submission of an SOA certificate–or any other portion of an offeror's proposal–presented an issue, the contracting officer was authorized under the terms of the JOC solicitation to request additional information. Indeed, it is apparent that BBSSI corrected the expired SOA certificate by submitting BBH's SOA certificate with its proposal. The Corps ultimately considered BBSSI's proposal based upon its submission of BBH's SOA certificate.[72] See Pl.'s App. 290 (noting that, in "early September 2009, it was noticed that [BBSSI] was submitting their required SOA for this contract in the name of [BBH]"). Therefore, defendant's suggestion that BBSSI was nonresponsive because it could never cure a deficient SOA certificate finds no support within the JOC solicitation.[73] Moreover, defendant acknowledges that the Corps offered BBSSI an opportunity to cure an apparently deficient SOA certificate, though it contends that the defect was BBSSI's use of BBH's SOA certificate, not its submission of the original, expired SOA certificate issued in BBAG's name during the prequalification stage. See Def.'s Reply 6 (acknowledging that the Corps "did not initially reject BBSSI's proposal but instead gave it an opportunity to cure the proposal").

BBSSI also contends that the Corps "waived any post hoc claim that BBSSI was ineligible for award" when it accepted the expired BBAG SOA certificate for prequalification

---

[71] Use of the permissive term "may" connotes discretion, whereas "shall" connotes mandatory language. Andersen Consulting v. United States, 949 F.2d 929, 932 (Fed. Cir. 1992). Therefore, the JOC solicitation did not require that the Corps reject an offeror's proposal based upon a failure to submit an SOA certificate.

[72] On December 4, 2009, Mr. Wickham determined that BBSSI, together with CMR, Pavan, and SKE, "[had] a reasonable chance of being selected for award and [was] therefore recommended for inclusion in the Competitive Range." Pl.'s App. 154. Defendant acknowledges that the Corps initially found BBSSI's proposal responsive. Def.'s Mot. 17. It was not until after the Corps obtained and interpreted Dr. Cosmelli's legal opinion that it found BBSSI nonresponsible and ineligible for the JOC award. See Pl.'s App. 290-91; infra Part IV.B.1.

[73] By contrast, A & D could not correct any bid bond deficiency because it either submitted no bid bond at all or submitted a bid bond via a method expressly disallowed under the terms of the solicitation. A & D Fire Prot., Inc., 72 Fed. Cl. at 140.

purposes and provided the JOC solicitation to BBSSI.  Pl.'s Reply 28.  Defendant argues that the Corps never waived the SOA certificate requirement.  Def.'s Reply 6.  The court rejects the contention that the Corps waived the SOA certificate requirement contained in the JOC solicitation.  A distinction, however, must be made between materials submitted during a prequalification stage and while bidding remains open.  During the prequalification stage, the Corps accepted BBSSI's submission of the expired BBAG SOA certificate prior to the release of the JOC solicitation and furnished BBSSI with a copy of the solicitation.  Its acceptance of BBSSI's submission at that time was unrelated to BBSSI's proposal, which had not yet been submitted.  Therefore, BBSSI's submission of an expired BBAG SOA certificate during the prequalification stage cannot serve as the basis for the Corps' later determination that BBSSI's proposal, which was submitted in response to the JOC solicitation, was nonresponsible.  See Veterans Constr. of S.C., LLC, B-401723.2, 2010 CPD ¶ 36 (Comp. Gen. Jan. 21, 2010) (explaining that "the failure of a bidder to include completed standard representations and certifications with its bid does not render the bid nonresponsive because it does not affect the bidder's material obligation" and indicating that "the failure of a bidder under a small business set-aside to provide a properly executed certification of small business status with its bid is normally waivable and the appropriate representation may be made after bid opening because it pertains only to the bidder's status and eligibility for award, not to the firm's commitment to provide the required service"); Star Elec. Co., B-181042, 74-2 CPD ¶ 75 (Comp. Gen. Aug. 2, 1974) (rejecting a protester's argument that a bidder's proposal was nonresponsive based upon the bidder's failure to submit prequalification information, indicating that "the failure of the bidder to submit data in accordance with the solicitation's data submission requirements is not fatal to the consideration of its bid, inasmuch as a bidder's capacity or responsibility may be determined on the basis of information submitted after the bid opening" and explaining that a "failure to submit data concerning bidder responsibility may be waived even where the solicitation warns that the failure to conform may result in bid rejection").

**b.  The Solicitation Did Not Require an Offeror to Submit an SOA Certificate in Its Own Name**

Defendant's reliance upon A & D Fire Protection, Inc. is based upon the presumption that BBSSI, like A & D, "fail[ed] to submit a requirement of the solicitation . . . ."  Def.'s Reply 5.  According to defendant, BBSSI failed to comply with the JOC solicitation because the solicitation "makes clear, in a number of places, that BBSSI was required to submit its own valid SOA" certificate.  Id. at 3 (emphasis added).  Defendant elaborates:

> BBSSI did not submit its SOA [certificate]–it submitted the SOA [certificate] of another company, indeed a debarred company.  BBSSI fails to cite any provision of the solicitation that allows it to submit an SOA [certificate] from another company, let alone a debarred company.  For the Corps to have permitted BBSSI to rely on BBH's SOA [certificate] would have made a mockery of the SOA [certificate] requirement.

68

Id. at 4; see also Def.'s Mot. 17 (arguing that BBSSI's reliance upon an SOA certificate from a debarred contractor evidences its failure to comply with the solicitation).

None of the provisions defendant cites supports its interpretation of the SOA certificate requirement under the JOC solicitation.  First, each offeror was required to submit, as part of its proposal package, "S.O.A.s–Qualifications of Firms Pursuant to Italian Decree DPR 00/34 (Decreto Del Presidente Della Republica, January 25, 2000, No. 34)."  Pl.'s App. 15, 21. Although this provision required that an offeror furnish an SOA certificate, it was wholly silent as to whether the SOA certificate must be in that offeror's name.  Second, as noted in Part I.A.3, supra, offerors were required to submit the following:

> b.      A copy of **ALL** of the following Societa Organismi D'Attestazione (S.O.A.) Certifications, which have been established for this solicitation:
>
> Prevailing Category of Work: CONTRACTOR QUALIFICATIONS
>
> Offerors shall be qualified in accordance with [D.P.R.] 34 of 25 Jan 2000, REGULATIONS FOR THE QUALIFICATIONS CONSTRUCTION [OF] FIRMS IN ITALY, IAW Legislative Decree 12 April 06 u. 163, the "De Lise Code" and subsequent amendments as follows:
>
> **Class IV € 2.582.284.**
>
> OG 1 Edifici Civili e Industriali
> Civil and Industrial Buildings
>
> c.      Contractors must comply with the following:
>         Art. 38 of the De Lise Code as follows:
>
> •      Self certify they meet the requirements of Art. 38;
> •      Submit the "Documento Unico di Regolaritá Contributiva" pursuant to Art. 2 of Legislative Decree [number] 210/2002 concerted into law n. 266/2002, which embodies the relevant statements from INPS and INAIL;
> •      Submit a copy of the "Casellario Guidiziario" Certificate for each member of the company.
>
> d.      If the potential Offeror is a joint venture, the joint venture members shall demonstrate how the joint venture team meets the S.O.A. certification requirements as stated in Paragraph 2, JOINT VENTURES.

Pl.'s App. 104-05.  Again, this provision required that an offeror submit an SOA certificate for the type of work encompassed within the JOC solicitation, and it did not address whether the SOA certificate must be in the offeror's name.  Third, the JOC solicitation provided that, with

respect to the SOA certificate, offerors "must comply with the requirements of D.P.R. [number] 34 of 25 January 2000 and subsequent amendments."  <u>Id.</u> at 42.  Once again, this provision did not indicate whether an SOA certificate must be in the offeror's name.  It merely required that each offeror comply with applicable Italian Code provisions.

        Fourth, the JOC solicitation provided:

> If this project is valued at over Euro 150,000[,] offerors <u>must provide their S.O.A. reflecting eligibility to bid on the work solicited, by work qualification and classification</u>.  The prevailing work categories and classification are described in the pre-solicitation notice and in this solicitation.  These work categories and classifications will also be described in individual task order requests for proposal[,] and the S.O.A. demonstrating eligibility will be required to be submitted with the task order proposal.

<u>Id.</u> at 43 (emphasis added).  Defendant focuses upon the word "their," which it contends makes clear that BBSSI must submit an SOA certificate in its own name.  The court disagrees.  The word "their" has been defined as "used of a thing with which a number of persons have to do," 17 <u>Oxford Dictionary</u> 888 (2d ed. 1989), or "that they have to do with or are supposed to possess or to have knowledge or a share of or some special interest in," <u>Webster's Third New International Dictionary</u> 2370 (2002).  The clause "must provide their S.O.A." did not compel an offeror to submit an SOA certificate in its name.  Indeed, a plausible reading of this provision indicates that "their" generally referred to the SOA certificate–reflecting the offeror's eligibility to compete for the JOC solicitation–that is submitted with each proposal.  It did not preclude an offeror from furnishing an SOA certificate that was issued in another company's name as part of its proposal.

        Indeed, the JOC solicitation's joint venture provisions support a broader reading of the word "their" than defendant advances.  Pl.'s App. 16-17.  The JOC solicitation expressly permitted an offeror that was part of a joint venture to submit a proposal.  If an offeror submitted a proposal as part of a joint venture, then it was required, among other things, to (1) identify the companies that comprised the joint venture, (2) describe the division of work that would be performed by each member of the joint venture, and (3) indicate "how the joint venture meets the S.O.A. certification requirements of this solicitation[.]"  <u>Id.</u> at 17-18; <u>see also id.</u> at 18 (stating that the "joint venture team" must satisfy the SOA certificate requirements).  These requirements included providing SOA certifications that demonstrated qualification under the Italian Code to perform projects in general category OG1 (civil and industrial buildings) and that fell within classification IV for work valued at up to € 2,582,284.  Pl.'s App. 17; <u>supra</u> note 17.  Although the JOC solicitation may have contemplated the submission of multiple SOA certificates where an offeror was part of a joint venture team in order to demonstrate how the team satisfied the SOA certificate requirements, it did not explicitly require that any SOA certificate submitted by an offeror proposing as part of a joint venture team be issued in the offeror's name or the name of

any particular joint venture team member.[74]

Finally, defendant's interpretation of the JOC solicitation's SOA certificate provisions ignores the availability of avvalimento infra-gruppo, which is codified under the Italian Code. As Dr. Cosmelli explained, Article 49 of the Italian Code authorizes an offeror to utilize an SOA certificate from a third party, and, according to Dr. Cosmelli, an offeror need not furnish an SOA certificate in its own name.  See Pl.'s App. 267 (noting that an offeror must produce "its own SOA certificate, if any, and the SOA certificate from the company providing the necessary resources" (emphasis added)).  Thus, it would appear that avvalimento infra-gruppo enables an offeror to submit an SOA certificate in the name of another company if certain requirements are satisfied under the Italian Code.  Significantly, nothing in the JOC solicitation prohibited an offeror from utilizing avvalimento infra-gruppo to submit an SOA certificate in the name of the other company with which it engaged in avvalimento infra-gruppo.

Dr. Cosmelli indicated that an offeror could submit an SOA certificate from another company via avvalimento infra-gruppo.  BBSSI alleges that the Corps accepted its submission of BBH's SOA certificate as part of its proposals for other United States government contracts.  See Compl. ¶¶ 57-61 (alleging that BBSSI received one of four Italy MATOC awards from the Corps after BBSSI submitted BBH's SOA certificate with its proposal).  The issue here is whether the Corps acted reasonably when it determined that BBSSI was nonresponsible and ineligible for the JOC award based upon its use of BBH's SOA certificate, through avvalimento infra-gruppo, while BBH was on the EPLS.

In short, the JOC solicitation did not require that an offeror submit an SOA certificate in its own name.  Furthermore, it did not prohibit an offeror from utilizing avvalimento infra-gruppo, a practice permitted under the Italian Code, to submit an SOA certificate in the name of another company.  Therefore, defendant's contention that BBSSI lacks standing because it submitted BBH's SOA certificate in lieu of an SOA certificate in its own name is not supported by the plain language of the JOC solicitation.

---

[74] Two companies might comprise a joint venture team, and the JOC solicitation offered the following example of division of work responsibilities under such a scenario: "Firm A performing 70% of OG-1, Firm B performing 30% of OG-1."  Pl.'s App. 17.  It required that the team satisfy the SOA certificate requirements.  Therefore, the offeror could conceivably submit two SOA certificates: one utilized by the offeror and one utilized by the second team member. The JOC solicitation did not require that these SOA certificates be issued in the name of each joint venture team member.  Indeed, as discussed below, nothing in the JOC solicitation precluded an offeror–or a joint venture team member–from utilizing avvalimento infra-gruppo under the Italian Code to satisfy the SOA certificate requirement.

**c. Absent the Alleged Procurement Error, BBSSI Would Have Had a Substantial Chance of Receiving the JOC Award**

Defendant's standing argument is ultimately dependent upon its interpretation of Italian law. According to defendant, "the mere fact that BBSSI relied upon the certification of a debarred contractor means that it failed to comply with the plain language of the solicitation and its case should be dismissed." Def.'s Mot. 17-18. As explained above, the plain language of the JOC solicitation does not support defendant's position. Moreover, defendant asserts that BBSSI's reliance upon BBH's SOA certificate "provides ample evidence that BBSSI, in fact, did not have the resources necessary to obtain the required SOA and would be relying on the resources of BBH." Id. at 18-19. Yet, this position is contrary to Mr. Wickham's December 4, 2009 determination that BBSSI's proposal was responsive and that BBSSI had a reasonable chance of being selected for the JOC award. Pl.'s App. 154.

Furthermore, BBSSI alleges that the Corps improperly interpreted Dr. Cosmelli's opinion and adopted a "fundamentally-flawed position," Compl. ¶ 7, viz., that BBSSI, by submitting BBH's SOA certificate with its proposal, was obligated to utilize BBH's personnel and resources during contract performance, id. ¶ 6. Specifically, BBSSI claims that the Corps

> capriciously determined that BBSSI [was] ineligible for award as a matter of U.S. law because, under the [Corps'] unsupportable reading of the Italian legal opinion, BBSSI must use BBH to perform the JOC. Because BBH was debarred under U.S. law at the time, the [Corps] determined that BBSSI was not responsible for proposing to perform with resources and personnel of a debarred firm.

Id. ¶ 7. Mr. Wickham initially determined that BBSSI's proposal presented the best value to the government. Pl.'s App. 289. However, Mr. Wickham, after interpreting Dr. Cosmelli's opinion, ultimately concluded that BBSSI was not a responsible offeror. Id. at 291 (noting that Dr. Cosmelli "advis[ed] [the Corps] that use of the [BBH] SOA [certificate] would indicate a relationship between the firms" in which BBSSI "must make use of [BBH's] technical and financial resources"). The interpretation and application of Dr. Cosmelli's opinion by the Corps is the allegedly arbitrary and capricious agency action that BBSSI protests in this case.

BBSSI must establish that it has standing to bring its protest by showing that it was an actual offeror whose direct economic interest was affected by the award of the JOC or by failure to award the JOC. In other words, BBSSI must demonstrate that it was an interested party that was prejudiced by the Corps' award of the JOC to CMR. Info. Tech. & Applications Corp., 316 F.3d at 1319. There is no dispute that BBSSI submitted a proposal in response to the JOC solicitation, and BBSSI has demonstrated that it, as the incumbent contractor on the predecessor JOC, has a direct economic interest that was affected by the Corps' JOC award to CMR. See, e.g., Info. Scis. Corp. v. United States, 80 Fed. Cl. 759, 771 (2008) (determining that an incumbent contractor's economic interests are directly affected by an agency's decision to award a contract to another offeror, thereby rendering the incumbent contractor an interested party

under 28 U.S.C. § 1491(b)(1)).

In order to demonstrate prejudice, BBSSI must show that there was a "substantial chance" that it would have received the JOC "absent the alleged error . . . ." Banknote Corp. of Am., 365 F.3d at 1350.  BBSSI emphasizes that, prior to the Corps' interpretation of Dr. Cosmelli's opinion, Mr. Wickham determined that BBSSI was within the competitive range and that its proposal represented the best value to the government: "BBSSI's proposal was determined to be technically equal to or superior than all other offerors, and BBSSI was the lowest-price offeror by a significant margin."  Compl. ¶ 12.  As noted above, the alleged error in the procurement process, according to BBSSI, was the Corps' determination that BBSSI was ineligible and nonresponsible because BBSSI, under avvalimento infra gruppo, was required to utilize BBH's technical and financial resources while BBH was listed on the EPLS.  See id. ¶¶ 38-44 (alleging that Mr. Wickham's responsibility determination, which was based upon his interpretation of Dr. Cosmelli's opinion, was arbitrary, capricious, an abuse of discretion, not in accordance with law, and devoid of a rational basis).  Since Mr. Wickham concluded that BBSSI represented the best value to the government before applying his interpretation of Dr. Cosmelli's opinion to BBSSI's proposal, there is little room for doubt that BBSSI would have received the JOC award absent the allegedly unreasonable agency action that rendered it nonresponsible and eliminated its proposal from consideration.[75]  See Textron, Inc., 74 Fed. Cl. at 285.  Therefore, BBSSI had greater than a "mere possibility" of receiving the JOC award.  Asia Pac. Airlines, 68 Fed. Cl. at 18.

### d. The Corps' Decision to Make a Single Award

Defendant also contends that BBSSI lacks standing to bring its claim alleging that the Corps' decision to make a single award was arbitrary and capricious.  Def.'s Mot. 26-27; Def.'s Reply 7-8.  According to defendant, BBSSI could not receive any award under the JOC solicitation because it was found nonresponsible.  Def.'s Mot. 26; accord Def.'s Reply 27 (asserting that BBSSI's proposal was also noncompliant).  BBSSI argues that the Corps failed to justify its decision and did not make the necessary findings pursuant to FAR Part 16.  See Compl. ¶¶ 17, 83-87.  Specifically, it argues that the record "is devoid of contemporaneous documentation that the [Corps] ever engaged in [any] analysis" concerning the propriety of issuing multiple awards.  Pl.'s Reply 32.

Additionally, defendant asserts that BBSSI's claim challenges the terms of the solicitation, which it argues "explicitly provides . . . that a single award would be made."  Def.'s Mot. 26.  Although BBSSI acknowledges that "[t]he Solicitation arguably implied there would be only one JOC awardee," Pl.'s Mot. 22; see also Pl.'s App. 23 ("[A]ward will be made to one Offeror who is deemed responsible . . . ."), the JOC solicitation also reserved to the Corps the

---

[75] For this reason, A & D Fire Protection, Inc. is also inapposite.  See supra note 69.

ability to issue multiple awards,[76] see Pl.'s App. 36 (noting that "[t]he Government <u>intends to award a contract or contracts</u> resulting from this solicitation to the responsible offeror(s) whose proposal(s) represents the best value" and indicating that "[t]he Government <u>reserves the right to make multiple awards</u> if, after considering the additional administrative costs, it is in the Government's best interest to do so" (emphasis added)).  Thus, BBSSI asserts, the contracting officer was required–but ultimately failed–to consider specific factors enumerated in the FAR when determining the number of contracts to be awarded under the JOC solicitation.[77]  Pl.'s Mot. 23-24.

---

[76]  Similarly, the JOC solicitation indicated that the government "<u>intends</u> to evaluate proposals and award a contract without discussions with offerors . . . ."  Pl.'s App. 36 (emphasis added).  Nevertheless, the Corps conducted discussions with the offerors whose proposals were within the competitive range, as permitted under the JOC solicitation: "The government "reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary."  <u>Id.</u>

[77]  Specifically, FAR 16.504(c)(1)(ii)(A) provides:

The contracting officer must determine whether multiple awards are appropriate as part of acquisition planning.  The contracting officer must avoid situations in which awardees specialize exclusively in one or a few areas within the statement of work, thus creating the likelihood that orders in those areas will be awarded on a sole-source basis; however, each awardee need not be capable of performing every requirement as well as any other awardee under the contracts.  The contracting officer should consider the following when determining the number of contracts to be awarded:

(1) The scope and complexity of the contract requirement.

(2) The expected duration and frequency of task or delivery orders.

(3) The mix of resources a contractor must have to perform expected task or delivery order requirements.

(4) The ability to maintain competition among the awardees throughout the contracts' period of performance.

48 C.F.R. § 16.504(c)(1)(ii)(A).  The contracting officer may not make multiple awards under specifically enumerated circumstances.  See <u>id.</u> § 16.504(c)(1)(ii)(B).  Ultimately, the contracting officer "must document the decision whether or not to use multiple awards in the acquisition plan or contract file."  <u>Id.</u> § 16.504(c)(1)(ii)(C).

The parties generally agree that BBSSI's standing to pursue its claim concerning the Corps' decision to make a single award is contingent upon a merits-based determination in its favor. In other words, "if BBSSI prevails on any of the protest grounds challenging the [Corps'] responsibility determination, then the impediment to BBSSI's standing to challenge the decision to make only one award . . . would no longer exist." Pl.'s Reply 34; see also Def.'s Reply 8 ("[I]f BBSSI is correct (which it is not) that its proposal was compliant and that the contracting officer's non-responsibility finding should be overturned[,] then, and only then, would it possess standing to contest the decision to make a single award."). At the preliminary injunction stage, the court is tasked with ascertaining whether BBSSI has a likelihood of success on the merits. Therefore, the court must defer ruling upon whether BBSSI possesses standing to challenge the Corps' single award under the JOC solicitation until it addresses the merits of BBSSI's protest.

Thus, with the exception of Count IV of the complaint, upon which the court defers ruling, BBSSI has standing to bring its protest before the Court of Federal Claims.

### 3.   Whether BBSSI's Implied-in-Fact Contract Claim Is Barred by Federal Circuit Precedent

In Count VI of the complaint, BBSSI alleges that the Corps, by relying upon Dr. Cosmelli's opinion and interpreting it to conclude that BBSSI was nonresponsible and ineligible for the JOC award, breached an implied contractual obligation to consider offerors' proposals fairly. Compl. ¶¶ 94-95. Specifically, BBSSI claims that the Corps' failure to "adequately investigate and evaluate the representations made by BBSSI regarding its ability and intent to independently perform the contract work, without reliance on BBH's resources" constituted a broader failure to consider BBSSI's proposal. Id. ¶ 96. Defendant, however, citing Resource Conservation Group, LLC v. United States, 597 F.3d 1238 (Fed. Cir. 2010), argues that a separate implied-in-fact contract claim cannot be brought in the Court of Federal Claims when a remedy exists under 28 U.S.C. § 1491(b)(1). Def.'s Mot. 28. According to defendant, bid protest jurisdiction is exclusive, thereby precluding a protester from bringing an implied contract claim. Def.'s Reply 9.

In Resource Conservation Group, LLC, the United States Naval Academy ("Navy") issued a Request of Interest for proposals to lease property that was utilized as a dairy farm. 597 F.3d at 1240. After receiving an expression of interest from the protester, Resource Conservation Group ("RCG"), and other parties, the Navy issued a Notice of Availability for Lease. Id. RCG and other interested bidders toured the property, and RCG toured the property a second time for the express purpose of surveying and testing the area for the presence of sand and gravel. Id. Thereafter, RCG submitted a proposal stating that it sought to lease the property in order to mine it for sand and gravel. Id. at 1241.

The Navy apprised RCG that its proposal did not fall within the scope of the solicitation because the disposal of sand and gravel, which were construed as real property pursuant to 41 C.F.R. § 102-71.20, was prohibited. Id. According to the Navy, it had no obligation during the

prebid process to apprise RCG that its bid would not be reviewed.  Id.  RCG then filed a bid
protest with the GAO, which dismissed its protest on the basis that a solicitation for offers to
lease government-owned land did not constitute a procurement of property or services and was
therefore outside the GAO's bid protest jurisdiction.  Id.  Following the GAO dismissal, RCG
filed suit in the Court of Federal Claims.  Id.  The court held that it lacked jurisdiction under 28
U.S.C. § 1491(b)(1) to adjudicate bid protests involving leases of land where the government
was the lessor because the action was not in connection with a procurement or proposed
procurement.  Id. at 1242.  It also held that the right to sue under an implied-in-fact contract
pursuant to 28 U.S.C. § 1491(a)(1) was impliedly repealed when section 1491(b)(1) was enacted
by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, 110
Stat. 3870 (codified at 28 U.S.C. § 1491(b)(1)).  Res. Conservation Group, LLC, 597 F.3d at
1241.

     The Federal Circuit affirmed the trial court's determination that RCG's claim was not
encompassed within section 1491(b)(1).[78]  Id. at 1243-45.  However, it reversed the trial court's
ruling that the Court of Federal Claims lacked jurisdiction under section 1491(a)(1).  Id. at 1245-
47.  The Federal Circuit first noted that the Court of Federal Claims, prior to the enactment of
section 1491(b)(1), exercised jurisdiction over solicitations for the sale of government property
and that nothing in the ADRA repealed that jurisdiction.  Id. at 1245-46.  Analyzing the ADRA's
legislative history, the Federal Circuit explained that the statute "was meant to unify bid protest
law in one court under one standard.  However, it seems quite unlikely that Congress would
intend that statute to deny a preexisting remedy without providing a remedy under the new
statute."  Id. at 1246.  Therefore, it concluded that "Congress did not intend to alter or restrict the
Court of Federal Claims' existing jurisdiction in cases not covered by the new statute."  Id.

     Defendant's reading of Resource Conservation Group, LLC to preclude an implied-in-
fact contract claim in a procurement protest brought pursuant to 28 U.S.C. § 1491(b)(1) cannot
be sustained.  The Federal Circuit limited its analysis in Resource Conservation Group, LLC to a
claim that did not fall within the court's bid protest jurisdiction under section 1491(b)(1).  Since
RCG could not bring its claim pursuant to section 1491(b)(1), it invoked the court's implied-in-
fact jurisdiction over nonprocurement solicitations pursuant to section 1491(a)(1).  The Federal
Circuit's holding, therefore, focused upon whether enactment of the ADRA eliminated the
court's implied-in-fact jurisdiction over nonprocurement solicitations under section 1491(a).  It
answered that question in the negative, thereby permitting RCG to move forward with its

_____

     [78]  The Federal Circuit reasoned that the definitions of "procurement" and "procure," as
contained in the ADRA, "signify the act of obtaining or acquiring something, in the context of
acquiring goods or services.  It strains the ordinary meaning of 'procurement' to extend that
definition to encompass a situation in which it is the government that is seeking to lease its own
property."  Res. Conservation Group, LLC, 597 F.3d at 1244.  Moreover, it determined that the
"process involved in soliciting lessees for government-owned property cannot be characterized as
a 'process of acquiring property or services.'"  Id.  As such, the Federal Circuit concluded that
section 1491(b)(1) is "exclusively concerned with procurement solicitations and contracts."  Id.

76

implied-in-fact contract claim pursuant to section 1491(a)(1).  See also FAS Support Servs., LLC v. United States, No. 10-289C, 2010 WL 3038713, at *7-8 (Fed. Cl. July 28, 2010) (determining that the court possessed jurisdiction over an implied-in-fact contract to have bids fairly and honestly considered pursuant to 28 U.S.C. § 1491(a)(1) and noting the difference in relief available under section 1491(b)(1) (equitable) and section 1491(a)(1) (monetary, limited to the costs incurred in preparing the proposal and bid) (citing Keco Indus. Inc. v. United States, 428 F.2d 1233, 1240 (Ct. Cl. 1970))); Creation Upgrades, Inc. v. United States, No. 09-788C, 2010 WL 1255684, at *1-2 (Fed. Cl. Mar. 24, 2010) (unpublished decision) (dismissing for lack of jurisdiction, in light of Resource Conservation Group, LLC, portions of the complaint that sought declaratory and injunctive relief related to a solicitation concerning the disposition of government property but construing the remaining allegations within the framework of the government's implied obligation to consider bids honestly and fairly under section 1491(a)(1)).  In a recent decision, L-3 Communications Integrated Systems, L.P. v. United States, the Honorable Mary Ellen Coster Williams explained:

> The [ADRA] statute does not delete implied-in-fact or express procurement contracts from its reach.  Section 1491(a)(1) continues to allow any plaintiff, including a disappointed bidder, to invoke this Court's general contract jurisdiction to recover money damages, including bid preparation and proposal costs.  The revision of [section] 1491(b) did not terminate the implied contract of fair dealing.  Nor did a cause of action for breach of the implied cont[r]act of fair dealing under § 1491(a) cease to exist simply because a breach occurred in the context of a procurement decision and could also be denominated a "bid protest."

No. 06-396C, 2010 WL 3296862, at *3 (Fed. Cl. Aug. 23, 2010).  Here, BBSSI's bid protest is before the court pursuant to section 1491(b)(1).  In this regard, Resource Conservation Group, LLC is inapposite because BBSSI does not invoke section 1491(a)(1) as the basis for bringing its implied-in-fact contract claim.  Moreover, the jurisdictional basis upon which the court can entertain BBSSI's protest, which involves a procurement, is contained in section 1491(b), not section 1491(a).

     The court does not interpret Resource Conservation Group, LLC as altering the jurisdiction of the Court of Federal Claims.  As noted above, the Federal Circuit concluded that the court's implied-in-fact contract jurisdiction, which existed prior to the 1996 enactment of the ADRA, remains viable.  In L-3 Communications Integrated Systems, L.P., Judge Williams explained that the Federal Circuit did "not hold that [the] ADRA eliminated [section] 1491(a) jurisdiction in a breach of implied contract action involving a procurement."  Id. at *5.  Furthermore, the Federal Circuit did not determine that the ADRA precludes a protester from alleging a breach of an implied contract of fair dealing in a procurement case brought pursuant to section 1491(b).  Rather, the Resource Conservation Group, LLC court clarified that "Congress intended the [section] 1491(b)(1) jurisdiction to be exclusive where [section] 1491(b)(1) provided a remedy (in procurement cases)."  597 F.3d at 1246 (emphasis added).  The Federal Circuit recognized that Congress intended the ADRA

to give the Court of Federal Claims exclusive jurisdiction over the full range of <u>procurement protest cases</u> previously subject to review in the federal district courts and the Court of Federal Claims.  <u>This section is not intended to affect the jurisdiction or standards applied by the Court of Federal Claims in any other area of law</u>.

<u>Id.</u> (quoting H.R. Rep. No. 104-841, at 10 (1996)).

The Federal Circuit, while acknowledging that section 1491(b) provides exclusive jurisdiction for procurement cases, did not address the ability of a protester to assert an implied-in-contract claim in a procurement case that was properly brought pursuant to section 1491(b). Therefore, the court adopts the reasoning set forth in <u>L-3 Commications Integrated Systems, L.P.</u> and concludes that a protester may challenge arbitrary and capricious conduct based upon an implied-in-fact contract to consider bids fairly theory as part of a procurement protest in which Tucker Act jurisdiction is based upon 28 U.S.C. § 1491(b)(1).[79]  Accordingly, defendant's motion to dismiss BBSSI's claim based upon an implied-in-fact contract theory is denied.

### B.  BBSSI's Motion for a Preliminary Injunction

As explained in Part III.D, <u>supra</u>, BBSSI, in order to obtain injunctive relief, must demonstrate that: (1) it has a likelihood of success on the merits; (2) it will suffer immediate and irreparable harm if preliminary relief is not granted; (3) the harm it will suffer outweighs the harm to defendant and to CMR; and (4) such relief is in the public interest.  <u>See</u> <u>FMC Corp.</u>, 3 F.3d at 427; <u>Four Rivers Invs., Inc.</u>, 77 Fed. Cl. at 594-95.  None of the four factors, standing alone, is dispositive.  <u>See</u> <u>FMC Corp.</u>, 3 F.3d at 427; <u>Univ. Res. Co., LLC v. United States</u>, 65 Fed. Cl. 500, 504 (2005).  Nevertheless, "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial" of an injunction.  <u>Chrysler Motors Corp.</u>, 908 F.2d at 952.

---

[79]  The court acknowledges that a different conclusion was reached in <u>Metropolitan Van and Storage, Inc. v. United States</u>, 92 Fed. Cl. 232 (2010).  Interpreting <u>Resource Conservation Group, LLC</u>, the court reasoned that, because section 1491(b)(1) provides exclusive bid protest jurisdiction and exclusive remedies, which include injunctive relief and bid and proposal costs, <u>see</u> 28 U.S.C. § 1491(b)(2), the implied-in-fact contract theory was "not operative," <u>Metro. Van & Storage, Inc.</u>, 92 Fed. Cl. at 249 n.7.  While the <u>Metropolitan Van and Storage, Inc.</u> court noted that section 1491(b)(2) provides exclusive remedies (including injunctive relief and bid and proposal costs), it did not explain why a protester properly challenging a procurement based upon an implied-in-fact contract theory is foreclosed from obtaining the relief set forth in section 1491(b)(2), particularly since section 1491(b)(2) authorizes the court to award bid and proposal costs–the sole remedy available for an implied-in-fact contract claim in a nonprocurement case under section 1491(a).  Instead, the <u>Metropolitan Van and Storage, Inc.</u> court declined to address the implied-in-fact contract theory any further, rendering its unavailability a fait accompli.  <u>See id.</u>  Therefore, the court does not follow <u>Metropolitan Van and Storage, Inc.</u>

**1. Whether BBSSI Is Likely to Succeed on the Merits**

In order to demonstrate a likelihood of success on the merits, BBSSI must show that the
Corps' determination that BBSSI was nonresponsible and ineligible for the JOC award based
upon its submission of BBH's SOA certificate was arbitrary and capricious, an abuse of
discretion, or otherwise not in accordance with law.  See 5 U.S.C. § 706(2)(A).  BBSSI bears a
heavy burden of proving that the Corps acted unlawfully because contracting officers are
entrusted with a relatively high degree of discretion in negotiated procurements.  LaBarge Prods.,
Inc. v. West, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing Burroughs Corp. v. United States, 617
F.2d 590, 597-98 (Ct. Cl. 1980)); see also Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl.
303, 320 (2000) (explaining that the deference afforded to agencies "is particularly great when a
negotiated procurement is involved and is greater still when the procurement is a 'best value'
procurement" (citing Cubic Def. Sys. Inc. v. United States, 45 Fed. Cl. 450, 458 (1999))).  As
discussed below, BBSSI has satisfied its burden.

BBSSI asserts that the Corps "unreasonably concluded that BBSSI's use of BBH's SOA
certificate necessarily requires BBSSI to both (i) have access to BBH's resources (technical,
financial, etc.) and (ii) actually use BBH's resources to successfully complete the contract work.
This conclusion is legally and factually unsupportable."  Pl.'s Mot. 3-4.  According to defendant,
the Corps' determination that BBSSI's proposal was nonresponsive because it submitted an SOA
certificate in the name of a debarred contractor was reasonable.  Def.'s Mot. 18-19.  The Corps'
determination hinged upon its reliance upon and interpretation of Dr. Cosmelli's opinion.  BBSSI
contends that the Corps relied upon Dr. Cosmelli's opinion "as the foundation supporting [its]
conclusion that BBSSI's use of BBH's SOA certificate requires BBSSI to use BBH's resources
in performing the contract and, therefore, BBSSI is an affiliate of BBH and ineligible" to receive
the JOC award.  Pl.'s Mot. 12.

According to BBSSI, the Corps "elected to solicit a legal opinion from an Italian attorney
to confirm the Agency's belief that the submission of another firm's SOA certificate renders the
two firms 'affiliated' for U.S. debarment purposes."  Id. at 13 (emphasis added).  It also claims
that Dr. Cosmelli's opinion was incomplete because the Corps "fail[ed] to provide the Italian
attorney all relevant factual background needed for a complete and accurate analysis (e.g.,
BBSSI's discussion response on the topic and all exchanges between BBSSI and the [Corps] on
this issue) . . . ."  Id. at 14.  It is apparent that the issue of BBH's debarment was raised as early
as April 2009, when BBAG requested that the Corps consider it eligible to submit a proposal, via
BBSSI, under the JOC solicitation.[80]  See Def.'s Ex. 2 at 16-19.  BBAG emphasized to the Corps

---

[80]  The Corps apparently intended to declare BBAG "as a whole, ineligible to participate
in any procurement actions under the auspices of the [Corps]" as a result of the BBH debarment.
Def.'s Ex. 2 at 16.  BBAG "request[ed] the reinstatement of eligibility for [BBSSI]," id., and
noted that neither the United States Air Force nor the United States Navy determined that BBSSI
was affected by BBH's proposed debarment, id. at 17.  It requested that the Corps "kindly weight
the facts we have presented . . . and find your way clear to reinstating [BBSSI] as eligible to

that (1) BBSSI was both financially and managerially independent of BBH, id. at 17, (2) the 2008 de-merger agreement expressly indicated that BBSSI was not part of the de-merger and remained part of BBAG, id. at 17-18, and (3) BBSSI and BBH "have completely different lines of accountability and authority within the Bilfinger Berger Organization,"[81] id. at 18.

Then, in August 2009, the Corps requested that BBSSI clarify all of its proposals in light of its submission of BBH's SOA certificate. Id. at 15. Ms. Denzel explained: "As you have always insisted that your company in Italy is completely separate . . . , we would appreciate clarification on these SOA submissions from [BBH]." Id. As noted above, Mr. Tomaiuolo, on August 26, 2009, responded and reiterated that BBSSI and BBH were separate entities and that BBSSI "not only can but has legally full independent authority[] to use and be qualified with a group member SOA certification, using a standard procedure (a self-declaration) introduced by the latest version of the 'Codice de Lise'" via avvalimento infra-gruppo. Id. at 13. Thereafter, Mr. Tomaiuolo emphasized that BBSSI was the sole entity competing for the JOC award "and will be the only one obligated to the Government . . . ." Pl.'s App. 250.

In its September 16, 2009 RFQ for an Italian expert opinion, the Corps noted BBSSI's representations that it was completely separate from BBH. Id. at 237, 239. However, it appears that the Corps did not amend the solicitation to reflect BBSSI's representations to the Corps that BBH "will have no links whatsoever with the awarding agency," id. at 252, and that BBSSI was "absolutely capable of fulfilling–and intends to fulfill–its own contractual duties by means of its own requirements and resources, without any involvement of BBH,"[82] id. at 160.  Dr. Cosmelli's

---

compete for future [Corps] contracts . . . ."  Id. at 18.

[81]  BBAG also noted that BBSSI had a separate SOA certificate issued in its name.  Def.'s Ex. 2 at 18.  According to defendant, "[i]t seems odd that, given this representation, BBSSI now takes the position that the SOA [certificate] is meaningless."  Def.'s Mot. 21.  BBSSI has not represented that the SOA certificate is meaningless.  Furthermore, it is undisputed that BBSSI, through BBAG, had an SOA certificate that expired in January 2009.  Pl.'s App. 259.  By contrast, BBH's SOA certificate is set to expire in July 2012.  Id. at 260.

[82]  The GAO noted that the Corps "was not bound to accept BBSSI's representations," Pl.'s App. 384, and was not required to include BBSSI's "views" about the SOA certificate requirement in the RFQ, id. at 385.  The court agrees that the Corps was not bound to accept BBSSI's interpretation of the SOA certificate requirement.  Indeed, one of the primary reasons the Corps issued the RFQ was to "verify[] the . . . explanation as valid from [BBSSI]," id. at 240, a clear indication that the Corps did not, in fact, accept BBSSI's interpretation absent confirmation from an Italian legal expert.  Nevertheless, BBSSI's "views" cannot be examined selectively.  It is beyond peradventure that, in order to opine about the vitality of a legal position, all relevant circumstances contributing to the formulation of that position must be considered.  The focus, therefore, is not upon BBSSI's "views" about the SOA certificate requirement but rather the factual circumstances upon which BBSSI based its "views."

opinion reflected the extent to which the information he was furnished by the Corps was incomplete.[83]  He explained that, because avvalimento infra-gruppo "implies that the work will be carried by the company awarded using the resources . . . of the ancillary company," id. at 268 (emphasis added), a bidder must

> (i) specifically declare[] which such resources are; (ii) submit[] to the contracting authority an undertaking from the ancillary company whereby the latter agrees to put at the disposal of the bidder the required resources; (iii) submit[] to the contracting authority a declaration of the ancillary company whereby the latter declares to have itself the general requirements set forth by Art[icle] 38 of the [Italian] Code . . . [;] and (iv) submit[] to the contracting authority a self-declaration whereby the bidder confirms the infra-group links with the ancillary company.

Id. (fourth emphasis in original).  Dr. Cosmelli then acknowledged that, "[f]rom the documents submitted to us it does not appear that all the above documentation/representations required . . . have been submitted nor that [BBSSI] has explained the reason why it assumes that they are not necessary."  Id. (emphasis added).  This passage indicates that Dr. Cosmelli was not provided with all the relevant factual information concerning BBSSI's proposal and upon which BBSSI relied in justifying its ability to use BBH's SOA certificate.  It is apparent that, had the Corps furnished information about BBSSI's intention not to rely upon BBH's resources, Dr. Cosmelli may have been able to explain the absence of the documentation to which he referred.

The questions presented in the Corps' RFQ did not reach the core legal issue arising from BBSSI's proposal.[84]  Indeed, the Corps did not seek an opinion as to whether BBSSI could, under Italian law and through avvalimento infra-gruppo, submit BBH's SOA certificate while simultaneously disclaiming reliance upon BBH's resources in order to perform the work

---

[83]  Indeed, BBSSI alleges that the Corps "never provided its Italian counsel BBSSI's December 10[, 2009] discussion response . . . ."  Compl. ¶ 81.

[84]  As BBSSI notes,

> the simple fact that the Agency procured a legal opinion to determine the Italian legal impact of BBSSI's submission of BBH's SOA [certificate] demonstrates that the Agency did not understand its Solicitation to bar an offeror from submitting the SOA [certificate] of another firm if permitted by Italian law.  If such was the Agency's position, why was a legal opinion necessary or even helpful?  If this was the Agency's view, it simply would have excluded BBSSI from the competition.

Pl.'s Mem. P. & A. Supp. Pl.'s Mot. Leave Br. Gov't's Late Submission Docs. & Args., Adjournment Hr'g Parties' Appls. TRO/Prelim. Inj. & Mot. Dismiss, & Issuance TRO Stop Performance Until New Hr'g Date 11-12.

81

encompassed by the JOC award.  Not surprisingly, Dr. Cosmelli's opinion did not address whether a company relying upon another entity's SOA certificate must, as a matter of Italian law, utilize that entity's resources.  Dr. Cosmelli concluded that "the use by [BBSSI] of [BBH]'s SOA [certificate] implies that, in order to carry out the works, the former will need to use [BBH]'s resources . . . ."  Id. at 269 (emphasis added).  Yet, Dr. Cosmelli did not indicate that the Italian Code mandates such reliance.  See id. at 268-69.  Assuming, arguendo, that Dr. Cosmelli's opinion can be interpreted to suggest that avvalimento infra-gruppo presumes reliance upon another company's resources, it is ultimately silent as to whether that presumption is rebuttable.

It is likely that the Corps, by procuring an opinion from Dr. Cosmelli that was not based upon all relevant and critical facts related to BBSSI's specific use of BBH's SOA certificate in connection with the JOC procurement, acted arbitrarily, capriciously, and without a rational basis.  It is also likely that BBSSI would succeed on the merits of its claim that the Corps arbitrarily and capriciously excluded BBSSI from consideration based upon its use of Dr. Cosmelli's incomplete opinion to assess BBSSI's eligibility to complete for the JOC award.  In essence, it appears that the Corps obtained an opinion from Dr. Cosmelli that ultimately did not address the full circumstances presented by BBSSI's proposal and, consequently, was deficient through no fault of Dr. Cosmelli.

It is also likely that BBSSI would succeed on the merits of its claim that the Corps arbitrarily and capriciously excluded BBSSI from consideration based upon its interpretation of Dr. Cosmelli's incomplete legal opinion.  Notwithstanding the deficiencies inherent in Dr. Cosmelli's opinion, the Corps nevertheless utilized the opinion to conclude that BBH

> must provide to [BBSSI] full disposal of its assets and resource[s]–technical, financial, employees, machinery, know-how, organization, economic and financial standing, etc. and [BBSSI] shall avail itself of these assets. . . .
>
> . . . The use of a debarred contractor's SOA [certificate], together with the avvalimento declaration accompanying it certifies that [BBSSI] has the legal right to use . . . [BBH]'s SOA [certificate], [and] under Italian [law,] the firm must make use of [BBH]'s technical and financial resources . . . . [A] debarred firm, [BBH], is attempting to indirectly propose on this solicitation through its "affiliate," [BBSSI].  Therefore, per [FAR] Part 9.405, [BBSSI] is inel[i]gible to receive an award as a debarred "contractor," as defined by FAR 9.403.

Id. at 291.  Because Dr. Cosmelli's opinion did not address the specific situation presented by BBSSI's proposal, it appears that it was arbitrary for the Corps to utilize any portion of that opinion as a basis for determining BBSSI's eligibility to submit a proposal under the JOC solicitation.

Moreover, it appears that the Corps' interpretation of Dr. Cosmelli's opinion to conclude that BBSSI was nonresponsible and ineligible to compete was arbitrary.  Dr. Cosmelli indicated

that <u>avvalimento infra-gruppo</u> may "imply" reliance upon another entity's resources.[85]  <u>See</u> <u>id.</u> at 269 ("This <u>implies</u> that, in carrying out the awarded works, the subsidiary and affiliated companies will use the resources . . . of the parent company." (emphasis added)).  As previously noted, Dr. Cosmelli did not opine as to whether <u>avvalimento infra-gruppo</u> required use of another entity's resources or merely authorized an offeror to elect use of those resources.  It is apparent from his opinion that Dr. Cosmelli was unaware of BBSSI's representations to the Corps that it possessed and intended to rely upon its own resources.  Therefore, Dr. Cosmelli could not discuss the legal significance, if any, of BBSSI's use of BBH's SOA certificate without reliance upon BBH's resources.[86]

Nevertheless, the Corps added a new gloss to Dr. Cosmelli's opinion, applied it to the facts of BBSSI's proposal, and determined that BBSSI's submission of BBH's SOA certificate mandated that BBSSI use BBH's resources.  Consequently, the Corps concluded that BBH, a debarred contractor, was utilizing BBSSI as a conduit through which to indirectly propose on the JOC solicitation.  <u>See</u> <u>id.</u> at 291; <u>see also</u> <u>id.</u> at 305 (explaining that BBSSI, by utilizing BBH's SOA certificate, "under Italian law . . . must make use of [BBH]'s technical and financial resources"), 312 (stating that BBSSI was ineligible to compete for the JOC award because of "the use of a debarred company's resources and assets (SOA [certificate])"), 313 (concluding that

---

[85]  Defendant argues that BBSSI's submission of BBH's SOA certificate evidences an intent to use BBH's resources, regardless of whether BBSSI actually used them.  Oral Argument at 3:06:20-26; <u>cf.</u> Def.-Intervenor's Supp'l Mem. 7 (asserting that intent to use the resources of the SOA certificate holder is immaterial).  Dr. Cosmelli, however, did not render an opinion regarding BBSSI's intent.  Rather, he explained that a competitor may demonstrate "technical capabilities and the economic and financial standing necessary to participate [in] a bid for the award of a public works contract, by . . . prov[ing] . . . that it <u>will have in its disposal</u> the resources of such other entities to carry out the works . . . ."  Pl.'s App. 266 (emphasis added).  Nowhere did Dr. Cosmelli equate having resources at a competitor's disposal with an intent to utilize those resources.  Instead, Dr. Cosmelli indicated that, based upon the information he received from the Corps, BBSSI's use of BBH's SOA certificate "implies" that BBSSI "will need" to utilize BBH's resources.  <u>Id.</u> at 269.  Nevertheless, BBSSI apprised the Corps of its intent to not utilize BBH's resources, information that the Corps did not furnish to Dr. Cosmelli for consideration.  Therefore, defendant's argument finds no support in Dr. Cosmelli's opinion, which formed the basis upon which Mr. Wickham determined that BBSSI was nonresponsible and ineligible for the JOC award.

[86]  Defendant also contends that it is "irrelevant" whether BBSSI actually planned to–or was required to–utilize BBH's resources because it "was attempting to satisfy a contract requirement with a certificate of a debarred contractor."  Def.'s Reply 17.  The court disagrees.  BBSSI contends that it could lawfully utilize BBH's SOA certificate, without reliance upon BBH's resources, in order to participate in the JOC solicitation.  The Corps never presented this issue to Dr. Cosmelli, and Dr. Cosmelli never considered it in his opinion.  In the absence of an Italian legal opinion exploring this issue, defendant's claim of irrelevance is pure speculation.

BBSSI was nonresponsible because BBSSI was "utilizing the resources and assets (SOA [certificate]) of a debarred company to propose on the Italy JOC contract"), 314 (explaining that avvalimento infra-gruppo indicated that "BBSSI is relying on the technical capabilities and resources of a debarred firm through the use of a debarred firm's SOA [certificate] to qualify itself and to execute work under this contract"). Dr. Cosmelli's opinion, however, does not support this interpretation. Because Dr. Cosmelli never indicated that BBSSI was required, as a matter of Italian law, to utilize BBH's resources, it is likely that the Corps acted arbitrarily, capriciously, and abused its discretion by determining that BBSSI had to utilize–and, in fact, would utilize–the resources of a debarred contractor in order to perform the work encompassed by the JOC solicitation.

The Corps' interpretation of Dr. Cosmelli's opinion resulted in a finding that BBSSI, despite submitting a proposal that "appear[ed] to be the best value" to the government, id. at 289, was nonresponsible and ineligible to compete for the JOC award, id. at 290-91. Indeed, Mr. Wickham acknowledged that BBSSI possessed the requisite ability to perform the work encompassed by the JOC solicitation:

> The contractors have demonstrated the required abilities, skills, experience, and operational control to be able to perform this contract . . . . There is no doubt as to the ability of the contractors with regard to their performance. As cited by the TEB, [BBSSI] management plans articulate complete understanding of all requirements and present sound approaches for effectively controlling, supervising, administering, managing, and performing the required work effort . . . . The management staff and key personnel have outstanding technical and operational education and experience to successfully manage the wide variety of tasks listed . . . . [Its] proposal reflects outstanding detail and a very thorough understanding of the technical requirements. [BBSSI's] Technical/Management approaches meets all of the Government's minimum objectives/requirements and can successfully perform the required services. . . . [T]he decision has been reached that award to [BBSSI] offer[s] the best value to the Government. The proposal provides strengths and demonstrates an understanding of the proposed requirements.

Id. at 290. Indeed, according to Mr. Wickham, BBSSI was the "highest technically rated offeror." Id. at 287. However, the Corps also determined that, because of BBSSI's submission of BBH's SOA certificate, BBSSI was "required to utilize the capabilities" of BBH, a debarred contractor. Id. It explained: BBSSI was "fully qualified to provide and maintain the needed services, but again, this may mean, due to [BBSSI's] use of [BBH's] SOA [certificate], that [BBSSI is] also required to utilize the assets and equipment of a debarred firm in order to perform the technical requirements of the contract . . . ." Id. (emphasis added). Based upon the language of Mr. Wickham's analysis, it is apparent that the Corps first determined that BBSSI was fully qualified to perform the work encompassed by the JOC. Then, Mr. Wickham, interpreting Dr. Cosmelli's opinion, determined that BBSSI, while fully qualified to perform,

may also be compelled under Italian law to utilize BBH's resources during performance.  Since the Corps believed that BBSSI was required to utilize BBH's resources, BBSSI's proposal, while constituting the best value to the government, was deemed nonresponsive.  See id. at 290-91.

Because the Corps' reliance upon and interpretation of a legal opinion that was devoid of all relevant facts and failed to address core legal issues was likely arbitrary, capricious, and an abuse of discretion, its concomitant decision to reject BBSSI's proposal based upon BBSSI's submission of BBH's SOA certificate was likely arbitrary, capricious, and an abuse of discretion. Therefore, BBSSI has shown a likelihood of success on the merits that, but for the Corps' use and interpretation of Dr. Cosmelli's opinion, BBSSI, which presented a proposal that constituted the best value to the government, would have received the JOC award.[87]

## 2.  Whether BBSSI Will Suffer Immediate and Irreparable Harm

When assessing irreparable injury, the "relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993).  According to BBSSI, it will suffer immediate and irreparable harm if the Corps is not enjoined from issuing new task orders to CMR and if performance of task orders already issued are not suspended because it "will have no recourse against the Agency for sustained work flow in Italy and lost profits if CMR is permitted to perform current and future task orders."  Pl.'s Mot. 30.  Mr. Hagner estimated that approximately [. . .] percent of BBSSI's revenue in Italy for the past three years was derived from its performance under the predecessor JOC.  Hagner Decl. ¶ 13.  He also opined that the JOC at issue in this protest "will generate a similar revenue stream . . . ."  Id.  An anticipated loss of revenue constitutes an irreparable injury.  See SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004).

Additionally, BBSSI asserts that it is "significantly dependent on work from the Agency under the JOC procurement in order to maintain its viability in Italy."  Pl.'s Mot. 30.  Mr. Hagner explained that BBSSI's exclusion from the JOC competition has impacted its financial viability in Italy, as well as its "ability to operate elsewhere," thereby requiring BBSSI to undertake administrative changes to ensure that it can remain competitive and can maintain oversight and

---

[87]  Since BBSSI has demonstrated a likelihood of success on the merits that the Corps acted arbitrarily and capriciously with regard to its procurement of Dr. Cosmelli's opinion and reliance thereon in determining that BBSSI was nonresponsible and ineligible for the JOC award, the court need not address at this time the likelihood of BBSSI's success on the merits of its remaining claims, all of which stem from or are the direct consequence of the Corps' reliance upon Dr. Cosmelli's opinion.  Accordingly, the court shall address these claims in its merits-based ruling.

control over its existing contracts.[88]  Hagner Decl. ¶ 15; see also id. (noting that "there is no real prospect for alternatives for this kind of work on the market in Italy").  BBSSI's loss of work flow and dependency upon the work encompassed by the JOC solicitation in order to maintain its viability in Italy constitute irreparable injuries.  See Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004) (recognizing that "a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders. . . .  [W]hen a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the government's improper conduct, the plaintiff has satisfied requirement for irreparable injury"); accord PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003).

It is apparent that the potential injuries to BBSSI constitute immediate and irreparable harm for purposes of a preliminary injunction.

### 3.  Whether the Harm BBSSI Will Suffer Outweighs the Harm to Defendant and to CMR

BBSSI contends that an injunction will not harm the Corps.  It asserts that the Corps "took no, or very little, action to ramp up to issue task orders following the GAO's disposition of the protest or at any time following the January 2010 award date, when, despite the stay, the Agency could have been performing the necessary work to have [task] orders ready to be issued upon the lifting of the stay."[89]  Pl.'s Reply 20; see also id. at 3 (noting the absence of an explanation from Colonel Erik O. Daiga, Garrison Commander for the United States Army Garrison Vicenza, a power-projection platform for the 173rd Airborne Brigade Combat Team, as to why task order execution could not commence until early June 2010).  Documentation furnished by defendant indicates that task orders were issued in early July 2010.[90]  Def.'s Reply

---

[88]  BBSSI also claims irreparable harm based upon an inability to operate its business due to an anticipated reduction in personnel.  Specifically, Mr. Hagner indicates that [. . .] of [. . .] "key administrative personnel in Italy" were dedicated–[. . .] exclusively and [. . .] primarily–to oversight and work on the predecessor JOC.  Hagner Decl. ¶ 15.  Absent receiving the JOC award, Mr. Hagner explains that these "critical administrative personnel" can no longer be retained.  Id. ¶ 16.  The court, however, notes that a potential loss of employees, absent a more specific showing, has not been deemed an irreparable harm.  See Computer Scis. Corp. v. United States, 51 Fed. Cl. 297, 324 (2002); accord PGBA, LLC, 60 Fed. Cl. at 221; cf. Global Computer Enters., Inc., 88 Fed. Cl. at 454 (recognizing that the loss of skilled employees critical to a company's performance in a specialized field may constitute an irreparable harm).

[89]  According to BBSSI, the automatic stay prevented the Corps from accepting performance from CMR but did not preclude it "from ramping up to issue task orders in the event that the stay was lifted."  Pl.'s Reply 3.  The GAO automatic stay was lifted on or about May 13, 2010.  Id.

[90]  Defendant, focusing primarily upon BBSSI's perceived delay in filing its protest, notes that "task orders cannot be issued immediately," Def.'s Reply 11, and emphasizes that the Corps

11; see generally Def.'s Reply Ex. (containing example task orders).

Defendant, relying upon Colonel Daiga's declaration, claims that the JOC "is a mission essential contract tool used for safety, training, and morale" at United States Army facilities in Italy.[91]  Def.'s Ex. 4 at 2 (Daiga Decl. ¶ 2); see also id. (Daiga Decl. ¶ 6 (noting that the JOC "improves the quality of life of the Soldiers and their families, with significant annual repair work to our dental clinics, chapels, recreation facilities, physical fitness centers, libraries, and community centers")).  It also cites an April 2008 incident at Fort Bragg, North Carolina that was videotaped and posted on the internet website YouTube in which barracks "appeared to be in an uninhabitable condition," invoking national security concerns and characterizing the work encompassed by the JOC as a "national priority."  Id. at 5 (Daiga Decl. ¶ 11).  Furthermore, defendant cites the urgency of the work, explaining that staying performance of the JOC will provide insufficient time to repair the barracks before soldiers and military personnel return from Afghanistan, thereby "equating to mission failure . . . ."  Id. (Daiga Decl. ¶ 12).  Lastly, defendant notes that appropriations for use in connection with work under the JOC expire on September 30, 2010, after which time the funds will be lost.  Id. at 6 (Daiga Decl. ¶ 13); accord Def.'s Mot. 30 & n.2.

Despite the perceived urgency of the work encompassed by the JOC, the record indicates that the Corps did not begin issuing task orders until at least early June 2010.  See Def.'s Ex. 4 at 2 (Daiga Decl. ¶ 5); cf. Def.'s Reply Ex. (indicating that task orders were issued to CMR in early July 2010).  The reasons for this perceived delay have not been fully explained.  Although both defendant and CMR emphasize that the JOC "is the Government's only JOC contract from which it can order emergency repairs and routine maintenance necessary to operate the bases," Def.-Intervenor's Opp'n 8; see also Oral Argument at 3:23:25-49 (stating that performing work under the Italy MATOC is problematic for a variety of reasons), defendant acknowledges that the Italy MATOC could be utilized as an alternative vehicle through which work can be performed.[92]  Oral Argument 3:23:49-24:33.  If the Italy MATOC could be utilized for certain types of work,

_____

[91] The JOC, according to Colonel Daiga, is utilized for minor construction, quick repair, and maintenance activities that are "crucial for safety and to sustainment and restoration of the facilities used by Soldiers and their families."  Def.'s Ex. 4 at 2 (Decl. Col. Erik O. Daiga ("Daiga Decl.") ¶ 6).  Defendant cites the following work encompassed by task orders issued to CMR under the JOC: replacing ceilings, light fixtures, screens, damaged electrical outlets, damaged ceiling fans, damaged flush boxes in bathrooms, and shower heads, as well as sealing sinks and showers and fixing and replacing doors and shutters in barracks used by soldiers returning from war.  Def.'s Reply 12.

has no obligation to issue task orders "immediately . . . whenever a contract is signed on the supposition that a losing party may, at some time, file a protest."  Id. at 12.

[92] Nevertheless, defendant asserts that time constraints prevent the Corps from issuing solicitations under the Italy MATOC for certain types of work.  Oral Argument at 3:23:49-24:33.

then defendant has not explained why the Corps did not mitigate any harm by availing itself of this option.

Additionally, absent further explanation, the court is not persuaded by defendant's contention that the work encompassed by the JOC is "mission critical" or that the urgency of the work implicates national security concerns. See supra note 91. Defendant has also not indicated how an April 2008 incident at Fort Bragg that appeared in an internet video is relevant to conditions at different military installations in 2010. Although "the Court certainly must give serious consideration to national defense concerns and arguably should err on the side of caution when such vital interests are at stake, allegations involving national security must be evaluated with the same analytical rigor as other allegations of potential harm to parties or to the public." Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003); see also Harris Corp. v. United States, 628 F. Supp. 813, 822 n.13 (D.D.C. 1986) (noting that, while "[c]laims of national security, of course, are often advanced by the government in challenges to procurement decisions[, t]he Court will not blindly accede to such claims"). Here, defendant has not shown a severity of harm that outweighs the imminent harm to BBSSI.

CMR's asserted harm involves costs it would incur if an injunction is issued. Relying upon a declaration from Daniel Pelletier, CMR's United States NATO Program Manager, CMR indicates that it hired "several full-time employees" pursuant to long-term employment contracts in order to perform work under the JOC and that a stop-work order would obligate CMR to incur employment costs while these employees are idle.[93]  Decl. Daniel Pelletier ("Pelletier Decl.") ¶ 10. Additionally, CMR notes that it purchased equipment and information technology resources, secured financing, leased facilities, and obtained safety provisions in order to perform the work encompassed by the JOC. Def.-Intervenor's Opp'n 7. CMR emphasizes that it would continue to incur these costs, as well as administrative costs, during a work stoppage. Pelletier Decl. ¶ 13-14; see also id. ¶ 14 (approximating costs incurred at [. . .] if an injunction is issued); cf. id. ¶ 15 (noting that its estimate does not include costs related to subcontractors). Nevertheless, CMR acknowledges that it would be entitled to an equitable adjustment under the JOC and would be reimbursed by the Corps for these costs. Id. ¶ 14.

Any harm that might befall CMR would ultimately stem from losing (1) work that was the result of an unlawful contracting process, which should be discounted, see Cardinal Maint. Serv., Inc., 63 Fed. Cl. at 111 (stating that the beneficiary of a CICA violation suffers no harm when the violation is corrected), or (2) employees and subcontractors hired specifically to perform the work encompassed by the JOC.  CMR also acknowledges that it would be entitled to an equitable adjustment and reimbursement for its expenses.  Furthermore, as the court in University Research Co., LLC recognized,

---

[93]  Since CMR also signed subcontracts for the performance of various work, including fencing, electrical and mechanical work, demolition, construction, and painting, it opines that, if work is stopped, these subcontractors may no longer be available once work recommences, thereby requiring CMR to secure alternatives.  Def.-Intervenor's Opp'n 7-8.

> an incumbent is likely to suffer potentially greater injury than a new bidder for a
> contract, based on the difference between the actual and the prospective: an
> incumbent's bid is based on keeping together a team whose existence is
> eliminated in the absence of injunctive relief, while a new bidder is usually
> projecting the sort of team it could assemble if awarded the contract.

65 Fed. Cl. at 514; see also Pl.'s App. 287 (indicating that, "[t]hough [BBSSI's] coefficient appears [. . .][, it is] the incumbent contractor and therefore may have known efficiencies in [its] current process that would reflect a lower cost than others" (emphasis added)). The harm BBSSI will suffer outweighs the harm to defendant and to CMR.

### 4. Whether Injunctive Relief Is in the Public Interest

BBSSI asserts that "[s]afeguarding the integrity of the procurement process is a matter of high public interest that is best served by enjoining arbitrary and capricious agency action, or action generally inconsistent with procurement law and regulations. Pl.'s Mot. 31. Defendant describes the "detrimental impact" upon the military as "severe" if injunctive relief is awarded, noting that there exists a strong public interest in not interfering with an agency's procurement process. Def.'s Mot. 31. CMR argues that the public interest is not served "by issuing contracts to companies that act as conduits to debarred contractors." Def.-Intervenor's Opp'n 9.

In this case, the Corps initially determined that BBSSI's proposal constituted the best value to the government. It also determined that BBSSI was "fully qualified" to perform the work encompassed by the JOC. Pl.'s App. 290. Based upon its interpretation of Dr. Cosmelli's opinion, the Corps concluded that, while BBSSI was qualified to perform the work, BBSSI was nevertheless "also required" to utilize BBH's resources. Id. The "public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 744 (2000); Info. Scis. Corp., 80 Fed. Cl. at 799 (recognizing the public's interest in "ensuring that the ultimate awardee offers the 'best' value to the Government, pursuant to the terms of the Solicitation and applicable procurement regulations"); Beta Analytics Int'l, Inc. v. United States, 69 Fed. Cl. 431, 434 (2005) (recognizing the "public's interest in receiving the best value in public services"). The public interest was compromised by the Corps' likely arbitrary and capricious procurement of and reliance upon Dr. Cosmelli's opinion, which constituted the basis for its elimination of BBSSI's proposal.

### V. CONCLUSION

For the reasons discussed above, defendant's motion to dismiss is **DENIED IN PART** and plaintiff's motion is **GRANTED**. Defendant, its officers, agents, employees, representatives, and all other persons acting in connection therewith are hereby **ENJOINED** from issuing any new task orders to CMR under JOC number W912GB-10-D-0007 and are directed to suspend performance by CMR on any previously issued task order under JOC number

W912GB-10-D-0007.

The court has filed this opinion under seal.  The parties shall confer to determine proposed redactions that are agreeable to all parties.  Then, **by no later than Friday, October 1, 2010**, the parties shall file a joint status report indicating their agreement with the proposed redactions and **attaching a complete copy of the court's opinion with all redactions clearly indicated**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge